# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| AB STABLE VIII LLC, | ) | |
| | ) | |
| Plaintiff/Counterclaim-Defendant, | ) | |
| | ) | |
| v. | ) | C.A. No. 2020-0310-JTL |
| | ) | |
| MAPS HOTELS AND RESORTS ONE LLC, MIRAE ASSET CAPITAL CO., LTD., MIRAE ASSET DAEWOO CO., LTD., MIRAE ASSET GLOBAL INVESTMENTS, CO., LTD., and MIRAE ASSET LIFE INSURANCE CO., LTD., | ) ) ) ) ) ) | |
| | ) | |
| Defendants/Counterclaim-Plaintiffs. | ) | |

## MEMORANDUM OPINION

Date Submitted: October 28, 2020
Date Decided: November 30, 2020

Raymond J. DiCamillo, Kevin M. Gallagher, Sara A. Clark, John M. O'Toole, RICHARDS LAYTON & FINGER, P.A., Wilmington, Delaware; Adam H. Offenhartz, Marshall R. King, Shireen A. Barday, Nathan C. Strauss, GIBSON, DUNN & CRUTCHER LLP, New York, New York; Tyler A. Amass, GIBSON, DUNN & CRUTCHER LLP, Denver, Colorado; *Attorneys for Plaintiff and Counterclaim Defendant AB Stable VIII LLC.*

A. Thompson Bayliss, Michael A. Barlow, Stephen C. Childs, ABRAMS & BAYLISS LLP, Wilmington, Delaware; Michael B. Carlinsky, Andrew J. Rossman, Christopher D. Kercher, Rollo C. Baker IV, QUINN EMANUEL URQUHART & SULLIVAN, LLP, New York, New York; Kap-You Kim, PETER & KIM ATTORNEYS AT LAW, Seoul, South Korea; *Attorneys for Defendants and Counterclaim Plaintiffs Maps Hotels and Resorts One LLC, Mirae Asset Capital Co., Ltd., Mirae Asset Daewoo Co., Ltd., Mirae Asset Global Investments, Co., Ltd., and Mirae Asset Life Insurance Co., Ltd.*

**LASTER, V.C.**

AB Stable VIII LLC ("Seller") is an indirect subsidiary of Dajia Insurance Group, Ltd. ("Dajia"), a corporation organized under the law of the People's Republic of China. Dajia is the successor to Anbang Insurance Group., Ltd. ("Anbang"), which was also a corporation organized under the law of the People's Republic of China. For simplicity, and because Anbang was the pertinent entity for much of the relevant period, this decision refers to both companies as "Anbang."

Through Seller, Anbang owns all of the member interests in Strategic Hotels & Resorts LLC ("Strategic," "SHR," or the "Company"), a Delaware limited liability company. Strategic in turn owns all of the member interests in fifteen limited liability companies, each of which owns a luxury hotel.

Under a Sale and Purchase Agreement dated September 10, 2019 (the "Sale Agreement" or "SA"), Seller agreed to sell all of the member interests in Strategic to MAPS Hotel and Resorts One LLC ("Buyer") for a total purchase price of $5.8 billion (the "Transaction"). Buyer is a special purpose vehicle formed to acquire Strategic. Buyer's ultimate parent company is Mirae Asset Financial Group ("Mirae"), a financial services conglomerate based in Korea with assets under management of over $400 billion. Three of Mirae's affiliates executed equity commitment letters that bound them to contribute a total of $2.2 billion to Buyer at closing. The balance of the purchase price would be funded with debt. Due to a combination of factors, Buyer was not able to obtain debt financing.

On April 17, 2020, the scheduled closing date, Buyer asserted that a number of Seller's representations and warranties were inaccurate and that Seller had failed to comply with its covenants under the Sale Agreement. Buyer contended that as a result, Seller had

failed to satisfy all of the conditions to closing, and Buyer was not obligated to close. Buyer informed Seller that if the breaches were not cured on or before May 2, 2020, then Buyer would be entitled to terminate the Sale Agreement.

On April 27, 2020, Seller filed this action seeking a decree of specific performance (i) compelling Buyer to perform its obligations under the Sale Agreement and (ii) directing Buyer's three affiliates to contribute $2.2 billion under the equity commitment letters. After Seller filed suit, Buyer purported to terminate the Sale Agreement. Buyer then filed counterclaims seeking determinations that Seller failed to satisfy conditions to closing, breached its express contractual obligations, breached implicit obligations supplied by the implied covenant of good faith and fair dealing, and committed fraud.

The initial set of issues involves Buyer's obligation to close. The factual underpinnings of those issues fall into two largely distinct categories: the "COVID Issues" and the "DRAA Issues."

The COVID Issues are factually straightforward and result from the COVID-19 pandemic. First, Buyer was not obligated to close if Seller's representations were inaccurate and the degree of the inaccuracy was sufficient to result in a contractually defined Material Adverse Effect (the "Bring Down Condition"). Seller represented that since July 31, 2019, there had not been any changes, events, states of facts, or developments, whether or not in the ordinary course of business that, individually or in the aggregate, have had or would reasonably be expected to have a Material Adverse Effect. (the "No-MAE Representation").

According to Buyer, the business of Strategic and its subsidiaries suffered a Material Adverse Effect due to the onset of the COVID-19 pandemic, rendering the No-MAE Representation inaccurate, causing the Bring-Down Condition to fail, and relieving Buyer of its obligation to close. Assuming for purposes of analysis that Strategic suffered an effect that was both material and adverse, Seller nevertheless proved that the consequences of the COVID-19 pandemic fell within an exception to the definition for effects resulting from "natural disasters and calamities." Consequently, the business of Strategic and its subsidiaries did not suffer a Material Adverse Effect as defined in the Sale Agreement.

Second, Buyer was not obligated to close if Seller failed to comply with its covenants between signing and closing (the "Covenant Compliance Condition"). Seller's covenants included a commitment that the business of Strategic and its subsidiaries would be conducted only in the ordinary course of business, consistent with past practice in all material respects (the "Ordinary Course Covenant").

Buyer proved that due to the COVID-19 pandemic, Strategic made extensive changes to its business. Because of those changes, its business was not conducted only in the ordinary course of business, consistent with past practice in all material respects. The Covenant Compliance Condition therefore failed, relieving Buyer of its obligation to close.

Unlike the COVID Issues, the DRAA Issues are factually complex. They relate to a fraudulent scheme whose origins date back to 2008, when Anbang began a series of

3

disputes with a shadowy and elusive figure named Hai Bin Zhou.[1] At least one of Hai Bin Zhou's business strategies involves using otherwise passive entities to register trademarks associated with established businesses, with the expectation that companies will settle to secure their marks.

Hai Bin Zhou pursued this strategy against Anbang. Anbang fought back until 2018, when the insurance regulator in the People's Republic of China took over Anbang's operations and placed the company in receivership. The regulatory team decided to stop asserting Anbang's rights to its trademarks in the United States. As a result, Anbang defaulted in litigation with Hai Bin Zhou before the United States Patent and Trademark Office (the "USPTO"). For Hai Bin Zhou, the default judgment was a near-term tactical victory but a long-term strategic defeat, because it undermined his ability to extract consideration from Anbang through trademark litigation in the United States

---

[1] Hai Bin Zhou appears to work with a number of other individuals in the United States and in the People's Republic of China. It is therefore more precise to refer to Hai Bin Zhou and his associates. For simplicity, this decision refers to Hai Bin Zhou.

Hai Bin Zhou and his associates are not parties to this action. Although both sides served subpoenas on Hai Bin Zhou and many of his entities, no one produced discovery or appeared for deposition. Anbang likely could have filled some of the gaps in the record, because Anbang has repeatedly investigated Hai Bin Zhou in connection with their long-running disputes. During this litigation, however, Anbang maintained that counsel conducted the investigations and invoked the attorney-client privilege to shield them from discovery. The record for purposes of this litigation is therefore thinner than it might have been. The record is nevertheless sufficient for the court to make findings with a high degree of confidence regarding Hai Bin Zhou and the fraudulent nature of his activities.

To create a new source of leverage, Hai Bin Zhou turned to fraud. He interwove the history of trademark disputes with the events that led to Anbang's regulatory takeover in what might be regarded begrudgingly as an inspired work of fiction. But instead of producing a captivating novella or screenplay, he generated a spurious agreement, purportedly between Anbang and five of his affiliates. The ersatz contract ostensibly bound Anbang to pay billions of dollars, with the obligation secured by Anbang's ownership interests in its subsidiaries and other assets. The apocryphal agreement also contained a durable power of attorney that supposedly gave Hai Bin Zhou's affiliates the authority to transfer Anbang's assets to satisfy its liabilities. Ingeniously, Hai Bin Zhou recognized that the Delaware Rapid Arbitration Act (the "DRAA") contained few procedural protections against the confirmation and enforcement of fake arbitral awards. Perceiving that the DRAA could be used to facilitate fraud, Hai Bin Zhou styled the counterfeit agreement as providing for arbitration under the DRAA and labeled it the "DRAA Blanket Agreement." This decision shortens that term to the "DRAA Agreement."

Beginning in summer 2018, Hai Bin Zhou filed a series of grant deeds in the county record offices in California where Strategic owned hotels (the "Fraudulent Deeds"). The Fraudulent Deeds purportedly transferred ownership of the hotels from Strategic's subsidiaries to Hai Bin Zhou's affiliates.

In August 2019, Hai Bin Zhou caused four of his affiliates to sue Anbang and the fifth affiliate in this court, ostensibly to appoint arbitrators to resolve a dispute under the DRAA Agreement. *World Award Found. v. Anbang Ins. Gp. Co., Ltd*, C.A. No. 2019-0606-JTL (the "DRAA Chancery Action"). In September 2019, a California lawyer sent

5

the court a package of documents. To establish a public record of the *ex parte* submission, the court docketed the documents under a notice stating that "[t]he filing of these materials by the court does not have any implications under Delaware Rapid Arbitration Act."

The submission contained a series of spurious arbitral awards. Despite facially apparent problems with the awards, Hai Bin Zhou convinced a Delaware lawyer to file actions in the Delaware Superior Court to enforce the awards as judgments. The same Delaware lawyer obtained an exemplified copy of one of the judgments, which Hai Bin Zhou used to bring an enforcement action against Anbang in California.

Anbang discovered the Fraudulent Deeds in December 2018, but chose not to disclose them to any potential buyers. Anbang did not disclose the Fraudulent Deeds to Mirae until August 2019, just before signing the Sale Agreement. When disclosing the Fraudulent Deeds, Anbang did not reveal what it knew about Hai Bin Zhou or their history of trademark disputes. Anbang misled Mirae into thinking that the Fraudulent Deeds were the work of a twenty-something Uber-driver with a felony conviction. By the time it disclosed the existence of the Fraudulent Deeds, Anbang had learned about the DRAA Chancery Action and understood the connection to Hai Bin Zhou, but Anbang did not disclose the existence of the litigation.

After Hai Bin Zhou brought the enforcement action in California, Anbang engaged in extensive litigation efforts in this court, the Delaware Superior Court, and the California court to address the threat that these actions posed to the Transaction. During those litigation efforts, Anbang provided the courts with partial and misleading accounts of what it knew about Hai Bin Zhou and his activities.

6

Despite seeking emergency relief from three courts because of the threat that Hai Bin Zhou's activities posed to the Transaction, Anbang did not disclose anything to Mirae. Instead, the lawyers for Mirae's financing syndicate discovered the proceedings just as Mirae was attempting to secure financing. After the lawsuits were revealed, Anbang again failed to provide the full story about its history of disputes with Hai Bin Zhou.

For a time, Anbang managed to reassure Mirae, but the threat posed by Hai Bin Zhou and his activities resurfaced when a major law firm disclosed that it was evaluating whether to represent Hai Bin Zhou. The law firm provided information about the history of trademark disputes between Anbang and Hai Bin Zhou that conflicted with Anbang's longstanding claims. That was the third strike against Anbang's credibility.

The Sale Agreement conditioned Buyer's obligation to close on Seller obtaining documentation (i) expunging the Fraudulent Deeds from the public record (the "Expungement Condition") and (ii) enabling Buyer to obtain title insurance that either did not contain an exception from coverage for the Fraudulent Deeds or which included an exception and then affirmatively provided coverage through an endorsement (the "Title Insurance Condition"). Seller obtained documentation that satisfied the Expungement Condition, but the title insurers refused to issue title commitments that satisfied the Title Insurance Condition. Although the commitments did not contain a specific exception for the Fraudulent Deeds, the commitments included a broad exception for any matter arising out of or disclosed in the DRAA Agreement, the DRAA Chancery Action, the Delaware Superior Court enforcement actions, or the California enforcement action (the "DRAA Exception").

7

As framed, the DRAA Exception encompassed the Fraudulent Deeds, causing the Title Insurance Condition to fail. Seller sought to prove that Buyer caused the title insurers to include the DRAA Exception, thereby breaching its obligation to use reasonable efforts to complete the Transaction and excusing the failure of the Title Insurance Condition. There is evidence to support Seller's theory. On balance, however, a combination of the factual evidence and expert testimony demonstrates that Buyer did not breach its contractual obligation and did not cause the title insurers to include the DRAA Exception.

Buyer thus proved that it was not obligated to perform at closing because the Covenant Compliance Condition and the Title Insurance Condition failed. Seller did not cure its breach of the Ordinary Course Covenant, resulting in Buyer gaining the right to terminate the Sale Agreement. Buyer validly exercised that right. Since then, the outside date for completing the Transaction has passed, giving Buyer a second basis to terminate the Sale Agreement.

Under the terms of the Sale Agreement, Buyer is entitled to the return of its deposit plus associated interest. In addition, Buyer is entitled to transaction-related expenses (effectively reliance damages) in the amount of $3.685 million, plus its attorneys' fees and expenses as the prevailing party. Seller is not entitled to any relief.

## I.     FACTUAL BACKGROUND

The factual record is immense. During a five-day trial conducted using the Zoom videoconferencing system, the court heard testimony from six fact witnesses and eight expert witnesses. The parties introduced 5,277 exhibits into evidence and lodged forty-six deposition transcripts, with twenty-nine from fact witnesses and seventeen from experts.

8

Reflecting the zeal with which the lawyers represented their clients, the parties reached agreement on only sixty-three stipulations of fact in the pre-trial order.[2]

The parties assembled this record during a four-month period from April until August 2020. The principal litigants were based in China and Korea, and many of the documents had to be translated, as did the testimony of certain witnesses. Under any circumstances, that feat would be impressive. In this case, the parties engaged in expedited litigation during the COVID-19 pandemic, making their achievement extraordinary.

Sifting through the immense record to make factual findings was a challenging task. Because fact finding inherently involves uncertainty, courts evaluate evidence using a standard of proof. For the court to find that an alleged fact is true, the evidence must be sufficient to surpass a standard of proof. The burden of clearing that hurdle (and the consequence of losing if the burden is not met) is typically assigned to the party that seeks to establish the fact in question.

---

[2] Citations in the form "PTO ¶" refer to stipulated facts in the pre-trial order. JX 5171. Citations in the form "[Name] Tr." refer to witness testimony from the trial transcript. Citations in the form "[Name] Dep." refer to witness testimony from a deposition transcript. Citations in the form "JX — at —" refer to trial exhibits using the internal page number of the exhibit, or if not internally paginated, the last three digits of the control number. If a trial exhibit used paragraph numbers or sections, then references are by paragraph or section.

To constrain the proliferation of footnotes, citations to single authorities generally appear in the text. In some instances, typically involving short paragraphs or background information, the supporting citations for a paragraph are collected in a single footnote.

The standard of proof was a preponderance of the evidence. *See Estate of Osborn ex rel. Osborn v. Kemp,* 2009 WL 2586783, at *4 (Del. Ch. Aug. 20, 2009), *aff'd*, 991 A.2d 1153 (Del. 2010). The allocation of the burden of proof varied by issue. Ultimately, the burden of proof did not play a role in the case. The Delaware Supreme Court has explained that the real-world effect of the burden of proof is "modest" and only outcome-determinative in "very few cases" where the "evidence is in equipoise." *Ams. Mining Corp. v. Theriault*, 51 A.3d 1213, 1242 (Del. 2012) (internal quotation marks omitted). In this case, the evidence was not in equipoise. The factual findings would be the same regardless of the assignment of the burden of proof.

## A. Wu Xiaohui, Anbang, And Strategic

In 2004, Wu Xiaohui founded Anbang, which started life as a regional car insurance company. Anbang quickly received licenses from the Chinese government to conduct nearly every type of financial service, and it expanded rapidly. At its height, Anbang claimed to be an insurance and financial services conglomerate with over $300 billion in assets.

In 2014, Anbang made headlines in the United States by acquiring the Waldorf Astoria Hotel for $1.95 billion.[3] News accounts described Anbang's purchase as part of a larger international buying spree that saw Anbang invest billions of dollars overseas.[4] In

---

[3] *See* JX 52; JX 54; *see also* JX 77.

[4] *See* JX 58; JX 80; JX 84; JX 86; JX 112; JX 113.

10

addition to making acquisitions worldwide, Anbang reportedly acquired stakes in major Chinese banks.[5]

During its meteoric rise, Anbang reportedly benefitted from connections to China's political elite. Wu Xiaohui married a granddaughter of Deng Xiaoping, the Premier of the People's Republic of China from 1978 until 1989. Another early backer was the son of Chen Yi, a marshal in the People's Liberation Army and ally of Zhou Enlai, the first Premier of the People's Republic of China. Another notable figures associated with Anbang was the son of Zhu Rongji, Premier of the People's Republic of China from 1998 to 2003. Particularly after Anbang's international buying spree, media accounts frequently described Anbang's connections to these and other luminaries.[6]

Adding to its mystique, Anbang was a privately held company. Many of its approximately forty stockholders were shell companies or nominees. The opaque ownership structure concealed who really owned Anbang. Press accounts focused on the mystery, implying that China's political elite were its real owners.

In 2016, Anbang acquired Strategic.[7] Until 2015, Strategic had been a publicly traded real estate investment trust. *See* JX 26. In December 2015, a private equity fund

---

[5] *See, e.g.*, JX 111; JX 113.

[6] *See* JX 54; JX 59; JX 80; JX 83; JX 84; JX 111; JX 166; JX 186.

[7] *See* JX 77; JX 78; JX 79.

11

managed by Blackstone acquired Strategic for approximately $6 billion. Three months later, Anbang agreed to buy Strategic from Blackstone for approximately $6.5 billion.

After the acquisition, Anbang owned Strategic indirectly through two subsidiaries. The first-tier subsidiary was Anbang Life Insurance Co., Ltd., a wholly owned subsidiary of Anbang. The second-tier subsidiary was Seller.

During 2016, Wu Xiaohui reportedly courted Jared Kushner regarding an investment in the redevelopment of 666 Fifth Avenue, the centerpiece of the Kushner family's real estate empire. Press accounts covered these developments as well.[8]

## B.    Hai Bin Zhou And His Affiliates

Since 2008, Anbang has engaged in trademark disputes with a shadowy and elusive group of individuals and entities. The principal antagonist has been Hai Bin Zhou, an individual who operates under multiple aliases and through an assortment of shell companies. Anbang's lead representative for purposes of the Transaction, Zhongyuan Li, described Hai Bin Zhou as a "trademark troll." Li Tr. 493. That characterization aptly describes at least one of Hai Bin Zhou's business strategies, which involves using passive entities to register trademarks associated with established businesses. The USPTO's records show that between 2012 and 2019, entities affiliated with Hai Bin Zhou have been

---

[8] *See* JX 93; JX 109.

12

involved in twenty-five trademark disputes with companies like WhatsApp Inc., Apple Inc., GoPro, Inc., and Alibaba Group Holding Limited.[9]

In 2008, Anbang petitioned China's Trademark Review and Adjudication Board (the "Trademark Board") to recognize Anbang's exclusive rights to use its trademarks in China and to deny trademark rights to Beijing Great Hua Bang Investment Group Company Limited ("Great Hua Bang"), a company formed under Chinese law in 2002.[10] Anbang's petition asserted that, in 2004, after the China Insurance Regulatory Commission announced a plan to grant insurance license to eighteen new insurance companies, Great Hua Bang registered the names of Anbang and two other companies as its trademarks. Great Hua Bang never obtained an insurance license and never conducted any operations under the "Anbang" name.[11] Filings in other trademark disputes establish that Great Hua Bang is affiliated with Hai Bin Zhou.

In January 2013, the Trademark Board denied Anbang's petition and awarded trademark rights to Great Hua Bang. *See* JX 4482 at 7. Anbang responded by challenging the Trademark Board's ruling in the Beijing No. 1 Intermediate People's Court.[12] In February 2014, the Intermediate People's Court vacated the Trademark Board's ruling and

---

[9] *See* JX 4402 at 25–26; JX 4877 at 79–84.

[10] *See* JX 4482 at 7; JX 38 at 7–9, JX 45 at 12–21.

[11] JX 45 at 12, 17–20.

[12] *See* JX 45 at 12; JX 65 at 5.

remanded with instructions to the Trademark Board to issue a new decision. [13]In April 2015, the Trademark Board ruled in favor of Anbang. JX 65 at 6.

Meanwhile, with Anbang expanding overseas, Hai Bin Zhou repeated his trademark-registration strategy in other countries. Between 2008 and 2019, Anbang litigated against Hai Bin Zhou and his affiliates in a total of sixteen cases brought in five different countries. *See* JX 4482 at 5–9.

One of the many entities that Hai Bin Zhou controls is Amer Group Inc. ("Amer").[14] In 2015, Hai Bin Zhou caused Amer to register "An Bang Group" and related marks with the USPTO. When Anbang applied to use its marks in the United States, Amer asserted its rights, and the USPTO rejected Anbang's application. The USPTO ruling was a major success for Hai Bin Zhou and became the centerpiece of his campaign against Anbang.[15]

In 2016, Anbang applied to use its marks in Hong Kong. Amer and Great Hua Bang opposed the application. To bolster their claims, Hai Bin Zhou changed the name of another of his entities to An Bang Group LLC ("An Bang Delaware").[16] Relying heavily on the

---

[13] *See* JX 4482 at 8; JX 65 at 56; JX 4971.

[14] Amer Group Inc. was formed on January 26, 2011. On May 18, 2018, it was converted into a limited liability company and changed its name to Amer Group LLC. JX 5221.

[15] *See* JX 88; JX 90; JX 94; JX 95; JX 100; JX 105; *see also* JX 119.

[16] JX 106 at '428; *See* JX 819 at 9; JX 1385. An Bang Delaware started its corporate existence in December 2005 as LMK Management, Inc. In 2007, Hai Bin Zhou changed its name to Showsum, Inc. See JX 1385 at 3. On January 9, 2017, Hai Bin Zhou converted Showsum into An Bang Delaware. JX 106 at '428.

USPTO ruling, An Bang Delaware, Amer, and Great Hua Bang argued that Anbang should not be permitted to register its marks in Hong Kong. *See* JX 99.

These events caused a stir at Anbang, and one of Anbang's representatives in the United States secured the corporate filings for Amer and An Bang Delaware.[17] Anbang also hired investigators to gather information about these entities.[18]

## C. The Arrest Of Wu Xiaohui And The Arrival Of The Regulatory Team

During the first half of 2017, significant events involving Anbang unfolded in China. Chinese authorizes conducted an investigation of Wu Xiaohui, culminating in his arrest on June 8, 2017, at Anbang's offices on charges of embezzlement and manipulating Anbang's financial statements.[19] On June 14, 2017, Anbang issued a press release stating, "Chairman Wu Xiaohui is temporarily unable to fulfil [sic] his role for personal reasons. He has authorized relevant senior executives to continue running the business, which is operating as normal." JX 124.

Within days of Wu Xiaohui's arrest, the China Banking and Insurance Regulatory Commission (the "CBIRC")[20] dispatched a regulatory team to supervise Anbang's

---

[17] *See* JX 98; JX 101.

[18] *See* JX 116; JX 117.

[19] *See* JX 125; JX 127; JX 183; He Dep. 38.

[20] The CBIRC was formed in April 2018 through a merger of the China Banking Regulatory Commission and the China Insurance Regulatory Commission, which were previously separate regulatory agencies. Before April 2018, Anbang's was overseen by the China Insurance Regulatory Commission. *See* Luo Dep. 31–34.

operations.[21] Except for Wu Xiaohui, Anbang's existing managers remained in place and continued to run the company, subject to the oversight of the regulatory team.[22]

Before the regulatory team arrived, Anbang's management team had decided to file an action with the USPTO challenging Amer's rights to use the "Anbang" marks. The petition was based in part on earlier trademark registrations that Anbang had filed in 2008, which Anbang sought to renew.[23] Anbang formally filed its petition on June 8, 2017, coincidentally one day before Wu Xiaohui's arrest.[24] The petition reflected the fruits of Anbang's investigation into Hai Bin Zhou and his affiliates. It noted that although Amer claimed to have offices at "One Blackfield, Suite 416, Tiburon, California," that address was the site of a UPS Store, and "Suite 416" did not exist. Amer simply rented mailbox number 416. Anbang also reported that Amer's status with the Delaware Secretary of State was "delinquent." JX 119 ¶ 4.

Hai Bin Zhou retained Venable LLP to represent Amer. Venable countered Anbang's petition by filing a petition to cancel Anbang's earlier registrations.[25] After some

---

[21] Luo Dep. 45–48; He Dep. 23–25, 32–33.

[22] Luo Dep. 48; He Dep. 25, 28–30.

[23] *See* JX 15; JX 16; JX 17; JX 146; JX 152; JX 155.

[24] *See* JX 119; *see also* JX 120; JX 121.

[25] *See* JX 139 at 4–6; JX 144; JX 145; JX 156; JX 157; JX 160.

procedural jockeying, the USPTO consolidated the cases and entered a schedule.[26]

## D. The Sentencing Of Wu Xiaohui And The Arrival Of The Takeover Team

In March 2018, Wu Xiaohui pled guilty to "fraudulent fundraising" and "work-related embezzlement."[27] In June 2018, he was sentenced to eighteen years in prison.[28]

After the sentencing, the CBIRC replaced the regulatory team at Anbang with a "Takeover Team." Unlike the regulatory team, the Takeover Team had full authority to manage Anbang, displacing its board of directors and managers.[29] Xiafeng He ("Chairman He") led the Takeover Team. Sheng Luo ("Vice Chairman Luo") was the second in command.[30]

The Takeover Team reviewed the various proceedings involving Anbang's trademarks and made the following decisions:

1. In the United States and Canada, we shall discontinue the trademark application because there will be no business demand in these markets in the foreseeable future. When there is business demand in the future, the trademark application should be restarted as appropriate;

2. In Europe, since our trademark applications have met the business needs in the future, and from the comprehensive consideration of costs

---

[26] *See* JX 153; JX 158; JX 162; JX 165; JX 170. Litigation between Anbang, Amer, Great Hua Bang, and Anbang Delaware also continued in Hong Kong. *See* JX 154.

[27] *See* JX 173; JX 175; JX 188.

[28] JX 183; JX 184; *see* JX 164.

[29] Luo Dep. 47; JX 169.

[30] *See* Luo Dep. 47; He Dep. 33, 66–67.

17

and business needs, we shall suspend the opposition proceeding regarding the similar trademarks with AMER GROUP;

3. In Hong Kong, the trademark application shall be prosecuted according to the actual business needs. See the attachment for the detailed budget involved in the relevant legal process.[31]

In the near-term, the Takeover Team's decision to abandon Anbang's marks in the United States, Canada, and Europe proved to be a gift to Hai Bin Zhou.

After the Takeover Team's decision, Anbang stopped participating in the trademark dispute before the USPTO. In August 2018, Venable moved for a default judgment. The USPTO ordered Anbang to show cause why judgment should not be entered. Anbang did not respond and defaulted.[32]

The resulting default judgment canceled Anbang's rights to its marks and established Amer's rights.[33] As with the USPTO's earlier ruling, the default judgment became a cornerstone of Hai Bin Zhou's campaign against Anbang.

Meanwhile, Hai Bin Zhou had reactivated his challenge to Anbang's trademarks in China. In July 2018, Great Hua Bang filed a petition against Anbang in the Beijing Intellectual Property Court (the "Beijing IP Court"). The petition sought to vacate the Trademark Board's ruling, issued after the remand from the Intermediate People's Court,

---

[31] JX 178; *see* JX 180. Hai Bin Zhou continued to find new ways to assert rights to Anbang trademarks. For example, in December 2017, he caused another one of his entities, World Award LLC, to register "AnbangGroup.com" as a service mark in the United States. JX 181.

[32] *See* JX 209; JX 211; JX 299.

[33] JX 305; JX 306; *see* JX 415; JX 602.

that had awarded trademark rights to Anbang. Great Hua Bang claimed that it had not received notice of the proceedings and that its affiliates—An Bang Delaware and World Award Foundation—had used the Anbang marks in the United States since 2001. To support its claims, Great Hua Bang relied heavily on the USPTO's ruling. *See* JX 205.

## E.    The Fraudulent Deeds

Anbang's default in the USPTO proceedings gave Hai Bin Zhou a tactical victory. But it was a strategic defeat for his efforts to extract consideration from Anbang, because Anbang was no longer seeking to control its marks in the United States. Anbang was still litigating in Hong Kong, and Hai Bin Zhou had renewed his challenge in China, but in those jurisdictions Anbang was on its home turf, and Hai Bin Zhou was unlikely to prevail.

Hai Bin Zhou needed a new source of leverage. Drawing on the news stories that described Anbang's origins, its acquisition spree, and Wu Xiaohui's downfall, Hai Bin Zhou imagined an account in which Wu Xiaohui, shortly before his arrest, caused Anbang to enter into the DRAA Agreement with Amer, Great Hua Bang, An Bang Delaware, an entity named AME Group, Inc.,[34] and an entity named World Award Foundation, Inc.[35]

---

[34] AME Group was formed it in 2002. On May 15, 2018, Hai Bin Zhou would convert it into an LLC named AB Stable Group LLC, adopting a name that closely resembled Seller's. *See* JX 819 at 10–14; JX 1421 at 3; JX 1422.

[35] World Award Foundation, Inc. was formed in 2000 under the name SHR Acquisition, Inc. In 2007, its name was amended to Iamel Foundation Inc. In February 2014, its name was changed to World Award Foundation Inc. under a filing signed by Hai Bin Zhou. JX 4372; *see* JX 1393 at 3–4.

Supposedly dated May 15, 2017, the fictitious agreement purportedly bound Anbang to pay billions of dollars to Hai Bin Zhou's entities, secured by Anbang's ownership interests in its subsidiaries and other assets.[36] Shrewdly fitting his account to events that had already occurred, Hai Bin Zhou made Anbang's default in the trademark proceedings before the USPTO the triggering event for Anbang's liability, and he drafted the DRAA Agreement to grant his entities a durable power of attorney that supposedly gave them authority to transfer the assets of Anbang and its subsidiaries to satisfy Anbang's liabilities.[37] To make the DRAA Agreement look authentic, Hai Bin Zhou copied the seals that Anbang's representatives had placed on documents in the various trademark proceedings and used their images to create purported seals on the agreement.[38] He also fabricated the seal of Chen Xiaolu, one of the famous individuals who reportedly was an early backer of Anbang.[39] Ingeniously perceiving that the widely publicized Delaware Rapid Arbitration

---

[36] JX 115; *see* JX 3847. As discussed below, the parties did not obtain a copy of the DRAA Agreement until April 2020. Because the DRAA Agreement is fraudulent, it is not clear precisely when it was created.

[37] Even though the DRAA Agreement supposedly addressed the trademark disputes between Anbang and the other parties to the agreement, Anbang's trademark counsel from the proceedings before the USPTO had never heard of it. *See* Harrison Dep. 155–164, 166, 170–71.

[38] At trial, Seller introduced persuasive testimony from an expert who demonstrated that the signatures and stamps on the DRAA Agreement were copied electronically from elsewhere, manipulated, and then pasted into the document. *See* Mohammed Tr. 944–61.

[39] Chen Xiaolu's signature is also one of the many indications that the DRAA Agreement is fraudulent, as he resigned more than a year before the purported signing of the DRAA Agreement. *See* JX 4808 at 28; Li Tr. 202–03. There are no references to the

Act contained few procedural protections against the confirmation of fabricated arbitral awards, he styled the DRAA Agreement as providing for arbitration under the DRAA.

Notwithstanding the elaborate scheme and far-fetched account, the basic strategy was the same. Hai Bin Zhou would assert rights to Anbang's property, anticipating that Anbang would settle to end the harassment.

Between September and December 2018, Hai Bin Zhou caused the Fraudulent Deeds to be filed on the six hotels that Strategic owned in California (the "California Hotels"). The first was recorded on September 17, 2018, for the Westin St. Francis in San Francisco, California. JX 213. Dated September 5, 2018, it contained the following recitation:

> FOR GROUP IP, WITH NO PAYMENT CONSIDERATION, receipts of which are hereby acknowledged, SHC GROUP LLC (SHC St Francis 2017051POA), a Delaware Limited Liability company [sic]
> hereby GRANT(S) to
>
> SHC Group LLC, a Delaware Limited Liability company.
>
> The following described real property . . . .

*Id.* at 2. The deed thus cleverly linked the transfer to "GROUP IP," ostensibly grounding the deed in the trademark rights that Amer held. The deed also cited a "2017051POA," referencing the power of attorney in the manufactured DRAA Agreement.

___

DRAA Agreement in the minutes of any board or shareholder meetings of Anbang, no references to it in Anbang's electronic database of material contracts, and no copies in Anbang's archives. *See* Li Tr. 204–18, 225–30.

The deed was signed by Daniil Belitskiy, who listed his title as "vice president [sic]." *Id.* The representation that zero transfer tax was owed was signed by "Andy Bang Zhou," a pseudonym of Hai Bin Zhou. *Id.* The transferee was an affiliate of Hai Bin Zhou that he had caused to be formed on May 25, 2018.[40]

The second deed was recorded on September 19, 2018, for the Ritz-Carlton Half Moon Bay in San Mateo County, California. JX 212. Also dated September 5, 2018, it contained a similar recitation:

> FOR GROUP IP, WITH NO PAYMENT CONSIDERATION, receipts and sufficiency are hereby acknowledged, SHC GROUP LLC (SHC Half Moon bay [sic] 2017051POA), a Delaware Limited Liability company [sic], described in Exhibit "A" hereto (the "Land"), that certain real property located in the County of San Mateo, State of California, hereby grants to
>
> 1.      SHC GROUP LLC, a Delaware Limited Liability company.
>
> 2.      AB Stable Group LLC, a Delaware Limited Liability company.

JX 212. The deed was signed by Belitskiy, who listed his title as "Vice President" *Id.* The new entity, AB Stable Group LLC, was the new incarnation of AME Group, Inc., an entity Hai Bin Zhou formed in 2002, then converted into an LLC on May 15, 2018, using a new name that closely resembled the formal name of Seller.[41]

In October 2018, Hai Bin Zhou caused three more grant deeds to be filed. On October 12, 2018, a deed was filed for the Four Seasons Palo Alto in San Mateo County.

---

[40] *See* JX 641 at 25; JX 945 at 26–27; JX 1389 at 3.

[41] *See* JX 819 at 10–14; JX 1421 at 3; JX 1422.

Dated October 10, 2018, it contained similar recitations, referenced a "2017015 DPOA," and purported to transfer ownership to AB Stable Group LLC and SHRC Group LLC. JX 233. SHRC Group LLC was an affiliate of Hai Bin Zhou, who caused it to be formed on May 25, 2018.[42] The deed was again signed by Belitskiy as "Vice President" JX 233 at 1.

On October 30, 2018, a deed was filed for the Montage Laguna Beach in Orange County. JX 245. Dated October 26, 2018, it contained similar recitations, referenced a "2017 DPOA," and purported to transfer ownership to SHRC Holding Group LLC. JX 245. The deed was signed by Belitskiy, who listed his title as "Vice President" *Id.*

On October 31, 2018, a deed was filed for the Ritz-Carlton Laguna Niguel in Orange County. JX 246. Dated October 26, 2018, it contained similar recitations, referenced a "2017 DPOA," and purported to transfer ownership to SHC Holdings Group LLC. *Id.* That was another affiliate of Hai Bin Zhou, who caused it to be formed on August 24, 2018. *See* JX 1390. Belitskiy signed the deed, listing his title as "Vice President." JX 246.

From October 29 until November 4, 2018, Hai Bin Zhou stayed at the Montage Laguna Beach under the alias "Andy Zhou." *See* JX 1260. He informed the general manager that he was affiliated with Wu Xiaohui and might be involved in a change of ownership with the hotel.[43] I suspect he was trying to get Anbang's attention to open settlement talks. His presence was sufficiently concerning that the information was relayed

---

[42] *See* JX 945 at 28–29; JX 1391 at 3.

[43] JX 1449 at 1, 13; JX 1466 at 1; Hart Dep. 81–84; Hogin Dep. 124.

up the chain of command to Xu (Leo) Liu, a representative of Anbang who served on Strategic's board of directors and was a principal point of contact with Anbang.[44]

The last three grant deeds were filed in December 2018. Two were for properties where Hai Bin Zhou had already recorded deeds. On December 20, 2018, a second deed was recorded for the Montage. Dated December 12, 2018, it purported to transfer the hotel to Andy Bang LLC. JX 291 at 1. That entity was another affiliate of Hai Bin Zhou that he caused to be formed on November 20, 2018.[45] The same day, a second deed was filed for the Ritz Carlton Laguna Niguel. Also dated December 12, 2018, it purported to transfer the hotel to World Award Group LLC. JX 292 at 1. That entity was another affiliate of Hai Bin Zhou that he caused to be formed on November 27, 2018. *See* JX 945 at 30–31.

The eighth and final grant deed was filed on December 28, 2018. It purported to transfer the Lowes Hotel in Santa Monica to SHC Holdings Group LLC. JX 290 at 2. It too was signed by Belitskiy. *Id.* at 3.

During the same period that Hai Bin Zhou and Belitskiy were filing the Fraudulent Deeds, Hai Bin Zhou continued to challenge Anbang's trademarks in Hong Kong. In October and November 2018, Amer, An Bang Delaware, and Great Hua Bang (the "Amer Parties") submitted declarations in which Belitskiy averred that he was "a Vice President" of each entity, had served in that position since 2010, and had "free access to the records

---

[44] Hart Dep. 82, 104–05; JX 1449 at 5–6; Liu Dep. 170–72.

[45] *See* JX 945 at 24–25; JX 1387.

24

of [Amer] relating to their trademarks and their use." JX 436 at 27. The declarations claimed that

- Amer's marks had been used in the United States since 2001. *Id.* at 28, 30.

- Great Hua Bang had obtained a decision in China in 2011 in favor of its marks. *Id.* at 31.

- The USPTO had rejected Anbang's applications for its marks. *Id.* at 32.

- The USPTO had canceled Anbang's earlier registration of its marks. *Id.* at 32–33.

The declarations also introduced a story line about Wu Xiaohui and his conviction, asserting that "[Anbang's] founder Wu Xiaohui was sentenced to 18 years in prison . . . . It is apparent that fraud was involved in the operation of [Anbang's] business when the subject application was filed in 2016. . . . [Anbang] must have copied the [Amer Parties'] Marks in order to ride on the reputation build up by the [Amer Parties]." *Id.* at 33.

## F. The Takeover Team Decides To Sell Strategic.

Meanwhile, the Takeover Team was deciding what to do with Anbang's far-flung real estate empire. In August 2018, the Chinese government imposed limitations on the ability of Chinese companies to own overseas investments. Deciding to sell Anbang's overseas assets was an easy call.[46]

Through Strategic and its subsidiaries, Anbang owned fifteen luxury hotels in the United States. In addition to the six California Hotels, Strategic owned the Fairmont Chicago, the Fairmont Scottsdale Princess, the Four Seasons Hotel Austin, the Four

---

[46] *See* JX 208; JX 533 at 16, 19.

Seasons Jackson Hole, the Four Seasons Resort Scottsdale at Troon North, the Four Seasons Washington, D.C., the InterContinental Chicago, the InterContinental Miami, and the JW Marriott Essex House Hotel (collectively, the "Hotels").

After some initial one-off discussions with potential buyers, the Takeover Team decided to sell Strategic through a fully marketed process. In November 2018, Anbang hired Bank of America Merrill Lynch ("BAML") as its financial advisor and Gibson Dunn & Crutcher LLP as its legal counsel. Stephen Glover was the lead M&A attorney. Andrew Lance was the lead real estate attorney. Working together, the Anbang team began planning a sale process, although third-party outreach would not begin until April 2019.

## G.    Early Indications Of A Fraudulent Scheme

While preparing for the sale process, Gibson Dunn and Anbang received early indications that someone was engaged in a fraudulent scheme. On December 21, 2018, Lance received title reports on the Hotels from Fidelity National Title Insurance Company. JX 302 (the "December 2018 Title Reports"). The reports identified the grant deeds that had been filed on the St. Francis Hotel, the Ritz-Carlton Half Moon Bay, the Four Seasons Palo Alto, and the Ritz-Carlton Laguna Niguel.

Lance printed out a copy of the December 2018 Title Reports and reviewed them. *See* JX 304 at 1. He also forwarded the December 2018 Title Reports to Stephen Chan, Anbang's senior in-house counsel, with an email that was redacted for privilege. JX 302 at 1. The description of the document on Anbang's privilege log stated, "Email reflecting legal advice and request for information to facilitate legal advice from A. Lance* regarding updates to title commitments in connection with sale process." JX 5036 No. 1,514AA.

26

In this litigation, Anbang has tried to downplay the December 2018 Title Reports, but when making a formal report to Chinese law enforcement in March 2020, Anbang represented that it discovered four of the Fraudulent Deeds "in December 2018." JX 3160 at 6. Lance and a team of real estate lawyers from Gibson Dunn were conducting due diligence in advance of a sale process for a major hotel owner and operator. It is therefore more likely than not that Gibson Dunn and Anbang learned about four of the Fraudulent Deeds in December 2018 and investigated them, just as they told Chinese law enforcement.[47] It is equally likely that, in light of Anbang's extensive experience with Hai Bin Zhou and his entities in various trademark proceedings, as well as the relatively recent declarations that Belitskiy had filed in the Hong Kong trademark proceeding, Anbang identified the connection between the Fraudulent Deeds and Hai Bin Zhou.

In January 2019, one month after Lance received the December 2018 Title Reports and forwarded them to Anbang's in-house counsel, Anbang received another indication that a fraudulent scheme was afoot. In January 2019, the CBIRC sent the Takeover Team a document dated December 28, 2018, and titled "Proof of [An Bang Delaware], World Award Foundation, etc. Entrusting Beijing Great Hua Bang Investment Group Co., Ltd. to Apply for the Registration of the Anbang Trademark and DRAA Agreement." JX 340 (the "DRAA Summary").[48]

---

[47] *See, e.g.*, JX 355; JX 356; JX 357; JX 358; JX 359.

[48] *Id.* at 9. The original DRAA Summary is written in Chinese. Competing translations appear in the record at JX 4411 and JX 4748. The translations read differently,

Four entities signed DRAA Summary: Amer, An Bang Delaware, AB Stable Group LLC, and World Award Foundation. Amer and An Bang Delaware were players in the long-running trademark disputes with Anbang, and Anbang Delaware and AB Stable Group LLC appeared on two of the Fraudulent Deeds. World Award Foundation, Inc. had not previously made its appearance, but Great Hua Bang had referred to a "World Award Foundation" in the trademark litigation before the Beijing IP Court, and another "World Award" entity (World Award Group LLC) appeared on one of the Fraudulent Deeds.[49] The DRAA Summary was signed by Hai Bin Zhou using the alias "Andy Bang."[50]

The DRAA Summary set out the basic account that Hai Bin Zhou invented to justify the filing of the Fraudulent Deeds. According to DRAA Summary, the signatories "invested and participated in the . . . establishment of three insurance companies, including [Anbang] led by Mr. CHEN Xiaolu." JX 340 at 9. They claimed that in return, Anbang had entrusted Great Hua Bang with the rights to the Anbang trademarks, and they noted that the Trademark Board had ruled in favor of Great Hua Bang's marks. That was a reference to the Trademark Board's original decision in 2013 that the Intermediate People's Court later vacated, after which the Trademark Board ruled in favor of Anbang. The signatories

---

with certain translations offering more fluid phrasings for different parts of the document. It is worth reading each of them to get a sense of the possible interpretations.

[49] *See* JX 205 at 5; JX 292 at 1.

[50] *See* JX 4411 at 4; JX 4748 at 7.

claimed not to have received notice of the subsequent decision by the Trademark Board, and they pinned the blame on Wu Xiaohui:

> We believe none of the people reading this certificate is as powerful as [Wu Xiaohui], who kidnapped [a] hostage, caused a default judgment at [a] hearing by [withholding] notice from the [Beijing People's Court], and played tricks in collusion with the Trademark Office. He defrauded [us] of hundreds of billions of yuan by taking advantage of [our capital] and our trademark without investing a single penny, but he could escape the punishment [of law] ultimately. Why don't we join hands to uphold the rule of law?

*Id.*

The signatories to the DRAA Summary next claimed that they had been using Anbang's marks in the United States since January 2001. The DRAA Summary described the proceedings before the USPTO and claimed that the USPTO had "officially certified that we had been using the 'Anbang Group' and 'AB' figurative trademarks in classes of investment insurance and investment since January 2001." JX 4748 at 4. According to the DRAA Summary,

> Such revocation put to an end the 15 years of malicious embezzlement and robbery of trademarks [by Anbang] in the United States, but the malicious plagiarism and infringement of intellectual property rights also constituted one of the causes to trigger the trade war between China and the United States. If [Anbang] continues to violate the laws and regulations . . . or even deliberately undermines the consensus between the heads of state of China and the United States on ceasing the trade war, it will definitely be recorded in the history as a notorious disgusting figure.

JX 340 at 9.

The signatories to the DRAA Summary then signaled their interest in reaching a settlement, which seems to have been the goal all along. To that end, they asked the Beijing IP Court and Chairman He whether Anbang would engage in mediation. *Id.*

29

At the time, Great Hua Bang had filed a petition against Anbang in the Beijing IP Court, in which Great Hua Bang sought to vacate the Trademark Board ruling that had granted trademark rights to Anbang. *See* JX 205. The signatories to the DRAA Summary contended that under a purported DRAA Agreement, all litigation "should be ceased for one year." JX 4411 ¶ 8. They further asserted that "no party can change or sell its shares, equity, assets, and any rights and interests without paying the full penalty for breach of contract, which is common sense; otherwise, shall bear the penalty of one hundred eighty billion US dollars ($180 billion)." *Id.* ¶ 9. The signatories maintained that if Anbang's assets were not sufficient to pay the contractual damages, then the CBIRC or the Chinese government should pay the difference. *Id.* ¶ 10.

> The DRAA Summary concluded with additional aggrandized claims:
>
> The heads of the two countries of China and the United States reached the consensus to purchase 1,200 billion worth of products from the United States within two years. We propose that [Chairman He] follow the DRAA agreement, let us achieve the consensus between the heads of the two countries of China and the United States. First of all, make the payment of $90 billion of the penalty for breach of contract. Second, at the same time we can make the arrangement as part of compensation for the trade deficit. At the same time, third, we will provide the compensation of sixty-one billion Yuan (61 billion) and the interest[] to the Insurance Fund so that the State will not lose a single penny. At the same time, fourth, terminate all the lawsuits immediately. Also, fifth, make our own contribution to the early termination of the trade war between China and the United States. Sixth, assist the China Communist Party Central Authority and the country to restore the peaceful order of normal trade and intellectual properties. As such, not just one stone for two birds, but one stone for six birds. Why not do it?

JX 4411 ¶ 12.

The DRAA Summary was sent to (i) Shuqing Guo, the Chairman of the CBIRC, (ii) the judges of the Beijing IP Court, and (iii) Chairman He, as head of the Takeover Team. *See* JX 340 at 7. In its letter conveying the DRAA Summary to Anbang, the CBIRC noted that the Takeover Team was charged with accepting or rejecting the request within ten days. *Id.* at 8.

In this litigation, Anbang has claimed that it "had no communications with" the CBIRC about the request. JX 4482 at 23. That is not credible. It would mean that Anbang failed to notice or respond to a communication from its primary regulator. During his deposition, Chairman He recalled receiving and reviewing the DRAA Summary as part of his role on the Takeover Team, explaining that he thought the document was ridiculous. He Dep. 106–109, 135–38.

Two months later, Anbang received another copy of the DRAA Summary. On March 5, 2019, during the trial in the Beijing IP Court between Great Hua Bang and Anbang, Great Hua Bang introduced the DRAA Summary into evidence. *See* JX 4414 at 4–6. YuLin Song and TianZhen Fan, both in-house attorneys for Anbang, appeared in the litigation, received a copy of the DRAA Summary, and, while still in the courtroom, signed and verified the accuracy of the trial transcript that identified the DRAA Summary. *Id.* at 7–8. A record of the proceeding documents the introduction of the DRAA Summary and includes handwritten notes stating:

> Plaintiff: Nine. All of [the exhibits] are new ones, and the ninth one is a photo copy of the "Proof of An Bang Group LLC, World Award Foundation, et al.'s Entrustment of Great Hua Bang Investment Group Co Ltd.'s Registration of the 'An Bang' Trademark and the DRAA Agreement." [HAND WRITTEN NOTES: *Such evidence proves that the US entities*

31

*registered and used the "Anbang" trademark in 2001 in the United States for insurance services and investment services; prior to the incorporation of [Anbang], and authorized [Great Hua Bang] to register the trademark involved in this case in 2004; the US entities together with World Award Foundation, funded and participated in the preparation for the establishment of [Anbang], led by Mr. Chen Xiaolu; [Anbang] breached the DRAA Agreement, for which it shall bear the liability of $180 billion USD. [Anbang] obtained the two trademarks of "Anbang" through fraud and perjury, both of which were revoked by the US Patent and Trademark Office on December 26, 2018; the four US entities [the DRAA Counterparties] are willing to settle under the supervision of the [Beijing IP Court] so as not to damage the trade negotiation between the two heads of states [sic] of the United States and China on the protection of intellectual property, agreed to raise 61 billion Yuan to reimburse the Insurance Fund's contribution. If [Anbang's] assets were not sufficient to compensate for the damage, the [CBIRC] shall contribute, or the State will do so. Otherwise, the legal representative of [Anbang] and other related personnel shall face criminal responsibility of 25-35 years.]*

JX 382 at 3–4.

After the trial, TianZhen Fan gathered all the materials Anbang had relating to the case. She then reported on the trial to the director of Anbang's legal department, Hunan Hou ("Director Hou"), whose position is analogous to the role of general counsel. Between Chairman He and Director Hou, Anbang knew at the highest levels about the DRAA Summary.[51] Shortly after making her report, TianZhen Fan received an email from a colleague that attached Belitskiy's declaration from the Hong Kong trademark litigation. *See* JX 436 at 13, 35–43.

---

[51] *See* JX 374; JX 375; Fan Dep. 33–34.

## H. The Sale Process Begins

In April 2019, Anbang launched its formal sale process for Strategic. BAML emailed a "teaser" to a large number of potentially interested parties. One of the recipients was Mirae.[52]

Mirae retained Jones Lang Lasalle Americas, Inc. ("Jones Lang") as its financial advisor and Greenberg Traurig, LLP as its legal advisor for purposes of the potential transaction. PTO ¶ 17. Robert Ivanhoe was the lead attorney from Greenberg Traurig.

In early May 2019, BAML received first round bids from seventeen potential bidders, including Mirae. After receiving the bids, Anbang appointed Li to oversee the sale of Strategic, and he acted as the lead decision maker for Anbang on business matters. *See* JX 5058. BAML invited Mirae and six other bidders to participate in the second round of the sale process. *See* JX 527 at 2.

## I. Strategic Learns Independently About The Fraudulent Deeds.

Anbang and Gibson Dunn had not shared their knowledge of the Fraudulent Deeds with Strategic. During May 2019, Strategic's general counsel, Patricia Needham, learned independently about two of the Fraudulent Deeds. County officials working on real estate tax issues in the office of the recorder of deeds for San Mateo County were confused about whether the deeds reflected a change of ownership. They contacted one of Strategic's advisors, who contacted Needham. She spoke with the officials, who provided her with

---

[52] *See* PTO ¶ 14; JX 402; JX 404.

33

information about the deeds for the Ritz-Carlton Half Moon Bay and the Four Seasons Palo Alto.[53] Needham told the officials that ownership had not changed, that the deeds were likely fraudulent, and that representatives of Strategic could provide affidavits confirming those facts. *See* JX 462.

In an internal email with her colleagues, Needham stressed language from one of the county official's emails, in which the official expressed frustration about being unable to "get any supporting documentation from either Mr. Danil Belitskiy, who signed all the paperwork, or anyone else at the email address provided on the document anbanggroupllc@gmail.com." JX 466 at 1 (emphasis omitted). According to the official, "The last I heard from them, they said they are having DRAA lawsuits and ownership may change again soon and that 'the guy in charge' is in the EU and they forwarded him my emails." *Id.* (emphasis omitted).

On May 14, 2019, Needham informed David Hogin about the two Fraudulent Deeds that she knew about.[54] Hogin holds the title of Chief Operating Officer at Strategic, but he is the senior-most officer and functions as its CEO. *See* Hogin Tr. 774–75. Needham also informed Xu (Leo) Liu, one of Anbang's representatives on Strategic's board.[55] Needham also contacted Gibson Dunn. JX 461 at 2. Although the contents of her email were withheld

---

[53] *See* JX 466 at 1–4; *see also* JX 457 at 1; JX 651 at 1–2; JX 794 at 5.

[54] Hogin Tr. 863; JX 480 at 1.

[55] JX 480; JX 481; Liu Dep. 122–23.

as privileged, Lance immediately responded by sending Needham the December 2018 Title Reports.[56] Needham also obtained copies of the two Fraudulent Deeds from San Mateo County, and she obtained documents from the Delaware Secretary of State for the entities on the deeds.[57]

Seller withheld as privileged a number of emails from this period that were exchanged among Needham, Glover, and Lance addressing topics related to the Fraudulent Deeds.[58] These emails indicate that information about the Fraudulent Deeds flowed upward to Chan, Anbang's senior in-house counsel for the Transaction, who knew about Hai Bin Zhou and the years of trademark litigation.[59] Seller claimed privilege for fifty-eight different email conversations involving Needham, Gibson Dunn, or Anbang during May 2019 that mentioned deed or title issued. *See* JX 5036.

Anbang, Strategic, and Gibson Dunn did not provide potential bidders with any information about the Fraudulent Deeds. Anbang and Gibson Dunn recognized that the deeds were a material issue that would need to be disclosed. Glover Tr. 63–64. They nevertheless made a "deliberate choice" not to disclose the Fraudulent Deeds. Glover Tr. 64. Based on this decision, they did not include any information about the Fraudulent

---

[56] Lance Dep. 87–89; JX 460; JX 462; *see* JX 484.

[57] *See, e.g.*, JX 463; JX 472; JX 651 at 25–26.

[58] *See* JX 474; JX 475; JX 516; JX 517; JX 525; JX 4969.

[59] *See* JX 475; JX 4969 at 1; JX 4893 at 5–6.

Deeds in the data room. They did not even put the December 2018 Title Reports in the data room, even though Anbang and Gibson Dunn were using those reports for their own analyses. *See* Glover Tr. 60–62. Instead, Anbang and Gibson Dunn populated the data room with outdated title commitments from 2015, 2016, and earlier.[60] Mirae was told that updated title commitments would be provided only to "the final buyer in confirmatory diligence."[61]

Anbang, Strategic, and Gibson Dunn also did not take any action to quiet title to the California Hotels. Needham filed fraud complaints with the Office of the District Attorney for San Mateo County,[62] and she also reached out to a law firm about quieting title.[63] But Gibson Dunn specifically told Needham not to engage counsel to quiet title at that time.[64]

Seller has claimed in this proceeding that it had no reason to hide the Fraudulent Deeds because a buyer would find out about them eventually, either through its own due diligence or because Anbang and Gibson Dunn eventually disclosed the issue. That is a

---

[60] PTO ¶ 25; *see* JX 60; JX 494; JX 496; JX 497; JX 500; JX 501; JX 509; JX 732; JX 4740; JX 4741; JX 4742; JX 4743; JX 4744; *see also* JX 732 (Glover asking on August 9, 2019, to confirm "what we've provided in the data room regarding title"; receiving confirmation). Gibson Dunn also did not list the deeds on the draft disclosure schedules. *See* JX 499; JX 688 at 151–52.

[61] Hogin Dep. 100–101; *accord* JX 791 at 3.

[62] *See* JX 477; JX 478; JX 486; JX 498; JX 507; JX 603; JX 642; Needham Dep. 159; *see also* JX 641 at 1.

[63] *See, e.g.*, JX 641; JX 644; JX 653.

[64] Glover Tr. 84–88; *see* Needham Dep. 215.

36

misleading assertion. Anbang and Gibson Dunn withheld information about the Fraudulent Deeds so that they could choose the manner and timing of the disclosure. It is apparent based on how events transpired that they planned to reveal the information to the final bidders at the eleventh hour, when deal momentum would be at its peak and the finalists would not be inclined to ask too many questions lest they lose the deal. With the benefit of hindsight, the ultimate failure of the Transaction can be traced to Anbang and Gibson Dunn's decisions to withhold information about the Fraudulent Deeds and to delay taking action to remedy the problem.[65]

## J.      Mirae's Final Bid

In July 2019, at the end of the second phase of the process, Mirae and two other bidders submitted second round bids. Mirae offered to purchase Strategic at an enterprise value of $5.8 billion. BAML invited Mirae and one other bidder to participate in a final round of bidding. Anbang and BAML pressed the bidders to forego any confirmatory due diligence, contrary to their earlier representations that confirmatory due diligence would be provided. *See* JX 677 at 3–4.

On August 5, 2019, Mirae offered to pay $5.8 billion to acquire a 100% interest in Strategic. JX 698 at 2–3. The term sheet noted that Mirae had formed Buyer "exclusively for the purpose of acquiring the Company." *Id.* at 4. It also noted that Mirae had selected

---

[65] It was during this timeframe that the CBIRC formed Dajia to serve as the successor to Anbang. As part of the reorganization, Dajia acquired all of Anbang's assets below the holding-company level, including Seller. *See* JX 570; JX 613.

"a total of four (4) leading U.S. lenders, each and all of whom have completed their initial due diligence on this transaction" and had agreed to finance 70% of the purchase price. *Id.* The term sheet stated that affiliates of Mirae would contribute "100% of the equity required for completion of the transaction." *Id.* It was thus clear that Mirae's bid would be made through a special purpose vehicle, supported by equity commitments for 30% of the purchase price and with the balance financed by debt.

Consistent with the term sheet, Mirae had engaged in discussions during summer 2019 with potential lenders about financial arrangements. After receiving bids, Mirae selected Goldman Sachs as its lead lender, with additional banks in the syndicate (together, the "Lenders").[66] When Mirae submitted its offer on August 5, Mirae had lined up over $4 billion in financing that would take the form of commercial mortgage-backed securities ("CMBS").[67]

Mirae attached as Exhibit A to its bid letter a copy of the proposed financing commitment, along with emails evidencing internal credit committee approval from each of the Lenders. JX 688 at 3, 54–57. The proposed commitment stated that the financing would be subject to "[s]atisfactory review of title matters and acceptable lender's title insurance." *Id.* at 14; *see* Glover Tr. 101–02. Mirae expected that the transaction would

---

[66] *See* JX 632; JX 633; JX 652.

[67] Ivanhoe Tr. 514–16, 519–20; Wheeler Dep. 118, 134.

close within sixty to ninety days after signing and intended to enter into a rate lock for that period.[68]

During August 2019, Anbang and Gibson Dunn made several attempts to convince Mirae to provide equity commitments for the full amount of the purchase price or a parent-level guarantee. Ivanhoe Tr. 556–57. Mirae rejected those requests.[69] On August 19, Glover reported to Anbang that the "equity backstop has been reduced from full purchase price to approx 1.6 B."[70]

**K.    Anbang Discloses The Fraudulent Deeds**

Beginning on August 6, 2019, the day after receiving Mirae's final bid, Needham, Lance, Glover, and Hogin exchanged a series of emails about the Fraudulent Deeds.[71] A flurry of additional communications took place over the following days that included Needham, lawyers at Gibson Dunn, and Anbang representatives.[72] Anbang asserted privilege over the substance of these communications.

Separately, Needham learned about additional Fraudulent Deeds from the same representative who brought the first two to her attention. This time, she learned about deeds

---

[68] Ivanhoe Tr. 520–21; *see* JX 675; JX 680.

[69] Glover Tr. 102, 105–06; Ivanhoe Tr. 557.

[70] JX 798 at 1; *see* Glover Tr. 106 (agreeing that Mirae rejected a full equity commitment).

[71] *See* JX 701; JX 702; JX 703; JX 709; JX 710; JX 718.

[72] *See* JX 712; JX 731; JX 735; JX 739.

filed in December 2018 on the Montage Laguna Beach and Ritz Carlton Laguna Niguel, as well as a deed filed in September 2018 on the Westin St. Francis. A flurry of emails followed.[73] Anbang asserted privilege over the substance of the communications.

While these events were occurring, the Anbang deal team invited their Mirae counterparts to Beijing to finalize the business issues. *See* JX 764 at 1–2, 4. The evidence indicates that Anbang and Gibson Dunn decided to disclose the existence of the deeds in conjunction with this meeting, when the deal momentum would crest.

### 1. Blame It On The Uber Driver.

On August 16, 2019, Lance called Ivanhoe. Both were prominent real estate lawyers, and they had known each other professionally for years. Lance said that he had recently learned that a twenty-something-year-old Uber driver with a criminal record had recorded deeds against the California Hotels.[74] When Ivanhoe asked for more information, Lance claimed that he had told Ivanhoe everything that they knew. Ivanhoe Tr. 521–22. Lance described the issue as "a nuisance, but one that his title company should be able to get comfortable with once they know the facts."[75] Based on what he knew at the time, Ivanhoe agreed. JX 786 at 2 ("[Ivanhoe] said that sounds right.").

---

[73] *See* JX 747; JX 748; JX 749; JX 750; JX 751; JX 752; JX 753; JX 755; JX 757; JX 758; JX 759; JX 760; JX 768; JX 769.

[74] Ivanhoe Tr. 521–22, 536; *see* JX 786; JX 1672 at 4–5.

[75] JX 786 at 2; *see* Lance Dep. 156–57.

Lance's claim that he had only recently learned about the deeds was not true. Lance had received the December 2018 Title Reports nine months earlier, and the evidence indicates that Anbang and Gibson Dunn identified the issue then. Regardless, in May 2019, Needham learned about the deeds. Since then, Anbang, Gibson Dunn, and Needham had discussed the deeds extensively.

Lance's representation about a one-time fraud by an unsophisticated Uber driver was not true. Anbang was familiar with entities and names on the deeds—including Hai Bin Zhou and Belitskiy—from years of trademark disputes in multiple jurisdictions. Anbang had received multiple indications that the deeds were part of a larger fraudulent scheme.

Lance's statements about the nature of the fraudulent scheme and the extent of Anbang and Gibson Dunn's knowledge established the pattern that Anbang and Gibson Dunn would follow throughout their dealings with Mirae and Greenberg Traurig. Put bluntly, they committed fraud about fraud.

Technically, Greenberg Traurig already knew about the deeds. Greenberg Traurig had identified them in July 2019, when reviewing title commitments obtained from Chicago Title Insurance Company ("Chicago Title"), which was expected to provide title insurance for the deal.[76] But Greenberg Traurig did not know that the deeds were *fraudulent*. As Ivanhoe explained at trial, the information on the title insurance

---

[76] *See e.g.*, JX 614 at 1; JX 674; JX 1672 at 4.

41

commitments led Greenberg Traurig to believe that the deeds were transfers between affiliates. Ivanhoe Tr. 523–24. Their fraudulent nature was "not readily discoverable" from the title commitments alone. JX 786 at 2.

On August 18, 2019, Seller posted to the data room the deeds for the Ritz Carlton Half Moon Bay, the Four Seasons Palo Alto, the Montage Laguna Beach, and the Westin St. Francis. Seller also uploaded a document relating to the deed for the Ritz Carlton Laguna Niguel and the two real estate fraud complaints Strategic had filed. *See* JX 788.

### 2. Anbang And Gibson Dunn Learn About The DRAA Chancery Action.

On August 20, 2019, Mirae and Seller executed an exclusivity agreement.[77] That same day, Gibson Dunn learned about the DRAA Chancery Action, which the four signatories to the DRAA Summary—World Award Foundation, Amer, An Bang Delaware, and AB Stable Group LLC (together, the "DRAA Petitioners")—had filed in this court.[78] JX 806. The complaint was titled "Petition for Proceeding under Delaware Rapid Arbitration Act." JX 687. It named as respondents Anbang, Great Hua Bang, and the CBIRC. Hai Bin Zhou thus deceptively caused four of his entities (the DRAA Petitioners) to sue one of his entities (Great Hua Bang), creating the impression that the entities were unrelated.

---

[77] JX 805; *see* JX 810.

[78] JX 806. Coincidentally, the action was filed on August 5, 2019, the same day that Mirae and the competing bidder submitted their final bids. *See* JX 687; JX 698.

The petition claimed that the parties had entered into "a written agreement to arbitrate under the Delaware Rapid Arbitration Act." *Id.* ¶ 1. The petition alleged that the parties had "a dispute that they have agreed must be arbitrated under the DRAA." *Id.* ¶ 5. The petition asked the court to "[a]llow and order the agreed-upon arbitration to proceed under its auspices." *Id.* The verification was signed by an individual claiming to be "Andy Bang." JX 686.

Gibson Dunn immediately understood the connection between the DRAA Chancery Action and the Fraudulent Deeds.[79] The two principals on the Anbang deal team, Li and Chan, discussed the petition and recognized the connection to the longstanding trademark disputes with Hai Bin Zhou and his affiliates. *See* Li Tr. 303–04. Gibson Dunn hired a former FBI agent to conduct an investigation,[80] and the investigation quickly began generating results.[81]

Between August 16 and September 10, 2019, when Buyer and Seller signed the Sale Agreement, Gibson Dunn and Greenberg Traurig had at least eight conversations about the Fraudulent Deeds. Greenberg Traurig consistently asked for any information about who was behind the deeds and their motives. Ivanhoe Tr. 524–26. Gibson Dunn stuck to the story about a "twenty-something Uber driver," never mentioning Hai Bin Zhou, the years

[79] *See* Glover Tr. 68, 71, 77, 92; Lance Dep. 187–88; JX 819.

[80] *See* JX 831; JX 940; JX 945; Douglas Tr. 9–10.

[81] *See, e.g.*, JX 969; JX 1095; JX 1096; JX 1289.

43

of trademark litigation, or the DRAA Chancery Action.[82] Glover, the lead deal lawyer at Gibson Dunn, admitted that Anbang and Gibson Dunn made a conscious "decision not to disclose" the DRAA Chancery Action. Glover Tr. 75, 78, 82, 94. Anbang's and Gibson Dunn's communications during this period were misleadingly incomplete.

Demonstrating its true assessment of the situation, Gibson Dunn described the fraud in far more serious terms to law enforcement. In a letter dated August 23, 2019, a Gibson Dunn partner asked the Deputy District Attorney for San Francisco to investigate "an apparently sophisticated fraud scheme" that involved "multiple high-value hotel properties that my client owns, including one in San Francisco." JX 873 at 2.

### 3. The Lenders And Title Insurer Balk.

Based on Anbang and Gibson Dunn's misleading description of the scope of the problem, Greenberg Traurig began working with Gibson Dunn on a potential solution. Lance had contacted Chicago Title on August 16, 2019, and gave them the same story about the deeds being "a nuisance." *See* JX 786 at 2. Over the next several days, Gibson Dunn and Greenberg Traurig tried to convince Chicago Title to provide insurance.[83] The

---

[82] Glover Tr. 81–82; *see* Ivanhoe Tr. 525–28. Even as Gibson Dunn attorneys gathered more information about Hai Bin Zhou, they did not share it with Greenberg Traurig. *Compare* JX 5143, *with* Ivanhoe Tr. 525–28. On August 21, 2019, Lance represented explicitly to Greenberg Traurig that his side had "posted everything we have, which is a single fraudulent deed at each affected property other than the one property where we have a cover sheet but no deed." JX 848 at 3. That was not true.

[83] *See* JX 864; JX 906.

Chicago Title team elevated the issue to their chief underwriting counsel, who deemed the risk uninsurable.[84]

Based on what he knew at the time, Ivanhoe thought that Chicago Title was being too conservative. He asked Marty Kravet, a leading title insurance agent, to find replacement title insurance.[85] Kravet sought information from Gibson Dunn about the situation, and Lance gave him the same story about a lone twenty-something Uber drive.[86] Kravet succeeded in brokering an arrangement with a group of title insurers (the "Title Insurers") led by First American Financial Corporation, who indicated that they would provide insurance if Anbang obtained judgments expunging the Fraudulent Deeds and quieting title to the California Hotels.[87]

Greenberg Traurig made the Lenders aware of the situation, and they asked for all available information about the Fraudulent Deeds.[88] Greenberg Traurig relayed what Gibson Dunn had represented, namely that the "perpetrator is a 26 year old Uber driver from California with a criminal record" and that Anbang and Gibson Dunn had no other

---

[84] *See* Ivanhoe Tr. 530–31; JX 902 at 1; JX 924; JX 932.

[85] See JX 907; JX 913; JX 921.

[86] *See* JX 958; JX 975; JX 1092.

[87] *See* Ivanhoe Tr. 541–42, 545; *see also* JX 984; JX 1014; JX 2488 at 2.

[88] Wheeler Dep. 33–34; Towbin Dep. 43–48.

information.[89] The Lenders suspected "that Anbang knew about the deeds and deliberately concealed them," but Gibson Dunn represented that they had brought the issue to Mirae's attention "as soon as they learned about it." JX 1048. That was not true.[90]

After investigating the issue, the Lenders refused to provide financing, taking "a very hardline position that they cannot fund into a deal with a cloud on title." JX 1017. Greenberg Traurig and Gibson Dunn proposed having the Title Insurers insure the risk with Anbang providing additional indemnification. The Lenders made clear that even with title insurance, they would not provide financing, because the title insurance industry as a whole did not have sufficient net worth or liquidity to pay the claim. They also were not willing to rely on Anbang for indemnification, given Anbang's status as a Chinese entity.

The Lenders proposed that Anbang solve the problem through a cash holdback, by pledging additional assets in the United States as collateral, or by providing a letter of credit from a bank domiciled in the United States.[91] Anbang rejected the cash holdback because it wanted to repatriate the sale proceeds.[92] Anbang also would not post additional collateral;

---

[89] JX 1979; JX 1085 at 1–2; *see* Wheeler Dep. 33–34, 151–52; Li Tr. 298–99; Ivanhoe Tr. 533.

[90] The Lenders believed that Anbang had learned about the Fraudulent Deeds by running a title report before starting the sale process. Gibson Dunn claimed that it had not run a title report. *See* JX 1048. That was technically true but affirmatively misleading. Gibson Dunn received the December 2018 Title Commitments from a title insurer who ran them on its own initiative. *See* Part I.G, *supra*.

[91] JX 1017; *see* JX 1048; Li Tr. 286; Ivanhoe Tr. 537–38; Glover Tr. 111.

[92] *See* JX 1051; Li Tr. 287–89; Ivanhoe Tr. 538.

it would only offer a guarantee from a sister entity.[93] Anbang also would not provide a letter of credit from a domestic bank.[94] The parties tried various other permutations, but they could not find an acceptable arrangement.[95]

The only remaining solution was to quiet title to the California Hotels, but that process could not be completed under the existing timetable for closing. JX 842. Because of the belated disclosure of the Fraudulent Deeds, committed financing for the deal was not available. Ivanhoe Tr. 587–88.

### 4. The Restructured Sale Agreement

Due to the absence of committed debt financing, the parties restructured the Sale Agreement:

- They pushed out the closing to provide the time needed to quiet title. Ivanhoe Tr. 538–39.

- They eliminated Buyer's representation that it already had obtained financing.[96]

- They made Seller's representation that it had sufficient financing to close "subject to obtaining financing from third party lenders at the Closing . . . in amounts sufficient to pay the Purchase Price at Closing when combined with the proceeds of the [equity commitment letters]."[97]

- Both sides committed to use commercially reasonable efforts to take any actions required to "satisfy the contingencies and conditions established by any Lender in

---

[93] *See* JX 1053 at 1–2; JX 1058 at 1–2.

[94] *See* Li Tr. 289–90; Glover Tr. 111; JX 1079 at 1.

[95] *See, e.g.*, JX 1100; JX 1102; 1103; JX 1157.

[96] *Compare* JX 808 at 93–94, *with* JX 1126 § 4.4.

[97] JX 1126 § 4.4; *see* Li Tr. 293–94; Glover Tr. 114–16.

connection with the Buyer's financing of the transactions contemplated hereby." JX 1126 § 5.5(i).

- They added the Title Insurance Condition, which made it a condition to Buyer's obligation to close that the title insurer issue owner's and lender's policies that did not contain an exception to coverage for the Fraudulent Deeds. *Id.* § 7.3(c).

Buyer made clear that "Mirae MUST have . . . . [i]nsurance from the Title Insurance Companies" and that "[a]nything less . . . is not acceptable." JX 1155 at 2 (emphasis omitted). Buyer consistently maintained that it would not take any risk on the title issue.[98]

One feature of the restructured Sale Agreement was a "Litigation Plan" to address the issues posed by the Fraudulent Deeds. Gibson Dunn proposed the Litigation Plan on August 31, 2020, as part of the discussions with First American and the Lenders. *See* JX 1031. When proposing the plan, Gibson Dunn again represented that "the individual who signed the deeds is a 20-something year old who has a record of criminal behavior" and that "the fraudulent deeds are the unfortunate, unauthorized and criminal act of a malfeasor rather than a legitimate issue affecting title." JX 1031 at 2. Gibson Dunn did not mention Hai Bin Zhou, the years of trademark litigation with Hai Bin Zhou and his affiliates, the fact that Belitskiy had filed declarations in the trademark litigation in Hong Kong, the DRAA Chancery Action, or the overlap between the DRAA Counterparties and the entities named in the Fraudulent Deeds.

---

[98] *See* JX 1088 at 2 ("We just need clean title as any prudent investor would require."); *id.* at 3 ("we just want clean title before closing"); JX 1155 at 2 ("the record must be cleared"); JX 1173 at 1–2 ("Mirae was very clear with [Anbang] last week . . . . They want the deeds cleared. . . . They are not willing to take any risk on this issue.").

The Litigation Plan was a straw man that only addressed the narrow version of the problem as Gibson Dunn had described it. Glover Tr. 87–88. It was carefully tailored to address the Fraudulent Deeds. *Id.* at 91. It did not anticipate or address problems that might arise from the DRAA Chancery Action or the broader disputes with Hai Bin Zhou. Based on their understanding of the scope of the problem, Greenberg Traurig and the Title Insurers signed off on the Litigation Plan.

On September 5, 2019, Li emailed Needham and told her that Anbang wanted Strategic to "jointly engage Gibson as our legal adviser in clearing title for the six hotels asap." JX 1229 at 5. Li explained that "clearing these deeds is extremely vital to our transaction." *Id.*

On September 10, 2019, Buyer executed the Sale Agreement. PTO ¶ 31. As contemplated by the Sale Agreement, Buyer placed a deposit of $581,728,733 in escrow to secure the purchase of Strategic and the Hotels. PTO ¶¶ 31–32.

### 5. The Quiet Title Actions

Between September 6 and 11, 2019, Gibson Dunn filed actions seeking to quiet title to the six California Hotels (the "Quiet Title Actions").[99] From that point on, Gibson Dunn and Greenberg Traurig held calls roughly every two weeks in which Gibson Dunn provided

---

[99] *See* JX 1158; JX 1159; JX 1160; JX 1161; JX 1171; JX 1221.

49

updates about the Quiet Title Actions and the Fraudulent Deeds.[100] Gibson Dunn never mentioned the years of trademark litigation. *See* Li Tr. 364–66.

In each of the Quiet Title Actions, Gibson Dunn filed an application for a temporary restraining order ("TRO"). In support of each application, Gibson Dunn filed a declaration from Needham in which she averred that she first learned of the pertinent deeds in August 2019, three months later than she actually did. She averred that "[n]either I nor, to my knowledge, anyone else at Strategic had ever heard of Daniil Belitskiy."[101] That statement was narrowly true but in a misleading way, because Anbang knew about Belitskiy from the affidavits he filed in the trademark litigation in Hong Kong, and Anbang signed off on the filings.[102]

While pursuing the Quiet Title Actions, Gibson Dunn attorneys exchanged emails internally about the DRAA Chancery Action. Anbang withheld the substance of those emails on grounds of privilege. The Gibson Dunn attorneys working on the Quiet Title Actions also looked into Hai Bin Zhou's stay at the Montage Laguna Beach in November 2018.[103]

---

[100] Ivanhoe Tr. 566–67, 578; *see* JX 1445; JX 1506.

[101] JX 5040 at 3, 50, 63, 92.

[102] *See* JX 1309; JX 1310.

[103] *See* JX 1449; JX 1466; JX 1507; *see also* JX 1458; JX 5042.

While pursuing the Quiet Title Actions, Gibson Dunn continued to receive and discuss reports from the investigators, who explained that the situation "looks like it is more complicated than at first."[104] Summarizing the results, a Gibson Dunn attorney wrote,

> The investigators have been busy, and have learned quite a bit about Haibin Zhou aka Andy Bang. He has many aliases, and is associated with many different entities, some associated with these false deeds, many not. I have a large number of reports on the various entities associated with the false deeds, the Delaware court filing, and some similar-sounding entities.

JX 1463 at 1. Gibson Dunn shared and discussed the reports with Anbang.[105] Gibson Dunn also obtained the reports on the investigations that Anbang previously had conducted into Hai Bin Zhou and his affiliates in connection with the trademark litigation.[106]

Gibson Dunn did not share any of this information with Mirae, Greenberg Traurig, the Title Insurers, or the Lenders. Gibson Dunn only provided anodyne reports about the Quiet Title Actions.[107] Given what Gibson Dunn knew, those reports were materially incomplete and misleading.

---

[104] JX 1098 at 1; *see*, *e.g.*, JX 1095; JX 1096; JX 1450; JX 1460; JX 1474; JX 1475. The investigators looked into Hai Bin Zhou and his network. *See, e.g.*, JX 1388; JX 1395; JX 1423; JX 1424; JX 1425; JX 1448; JX 1465; JX 1503; JX 5143. They also looked into the DRAA Counterparties, the entities associated with the Fraudulent Deeds, and other entities associated with Hai Bin Zhou. *See*, *e.g.*, JX 1385; JX 1386; JX 1387; JX 1389; JX 1390; JX 1391; JX 1392; JX 1393; JX 1394; JX 1421; JX 1422; JX 5143; *see also* JX 1464; JX 1818.

[105] *See* JX 1461; JX 1462; JX 4766.

[106] *See* JX 1484; JX 1499; JX 1500; JX 1501.

[107] *See, e.g.*, JX 1468; JX 1541; JX 1639; JX 1668.

**L.	The Unfolding Of The DRAA Chancery Action**

Hai Bin Zhou's efforts to extract consideration from Anbang started with its trademarks. They progressed to the DRAA Agreement and the Fraudulent Deeds. The next step was to use the DRAA Chancery Action to manufacture fraudulent judgments.

**1.	The Origins Of The DRAA Chancery Action**

Delaware attorney Evan Williford filed the petition in the DRAA Chancery Action. Stephen Nielsen, a California attorney, informed Williford on July 31, 2019, that the client "MUST file August 1, 2019" because the client had received "respondent's service of the answer on July 30, 2019, and we must file notice of arbitrators [sic] within three days."[108] Those statements were false. Later that day, Nielsen followed up with a call and then a text message stating, "[T]he client insists that I ask you the following question. Is there an amount of money that the client could pay to get a case number tomorrow?" *Id.* at 1533.

To his credit, Williford would not be rushed. He insisted on receiving information that would give him a good faith basis to file the petition, a signed engagement letter, and a retainer. *Id.* at 1535–41. During his discussions about these matters, he engaged with Nielsen, an individual claiming to be "Andy Bang Zhou," an individual claiming to be

---

[108] JX 5181 at 1530–31. Nielsen previously tried to file an action in Delaware by himself. On July 19, 2019, he attempted to file a "Verified Petition for Appointment of Arbitrator" in the Delaware Court of Common Pleas. *Id.* at 1524–26. The petition bore a Chancery caption, referenced an arbitration agreement "dated March 5, 2019," and was signed by Nielsen as "Attorney for Petitioners." *Id.* at 1525–26. After the filing was rejected, Nielsen contacted Williford on July 26, 2019, stating that he was "interested in hiring local counsel in a DRAA filing" and that he had "docs ready to file." *Id.* at 1528.

"Mike Martin," and an individual claiming to be "David Traub." *Id.* Andy Bang tried to excite Williford with the prospect of additional work, saying in one email that "[w]e may have another two big cases for you in near future.' *Id.* at 1537. Martin tried the same gambit, telling Williford "[w]e have three big cases for you in these three months." *Id.* at 1535.

Before filing the DRAA Chancery Action, Williford met with Traub and an individual claiming to be "Joe Martin." *See id.* at 1535–39. The pair flew to Delaware to hand-deliver to Williford "notarized copies of the 8 documents that comprise[d] [Andy Bang's] case." *Id.* at 1538–39. The documents included what appeared to be three arbitration awards—denominated Awards I, II, and III. *Id.* at 1445–50. They also included what appeared to be a single page excerpt from the DRAA Agreement.[109]

Williford's clients told him not to serve the complaint. *See id.* at 1563. Instead, the DRAA Petitioners pushed Williford to obtain "court stamps" on the three purported

---

[109] *See id.* at 1546. The excerpt is not the same as the equivalent pages in the DRAA Agreement later produced to Anbang. The differences include the following: (i) the top of the excerpt starts on the third line of paragraph 85, whereas the corresponding page in the DRAA Agreement (page 15) starts at the top line of that paragraph, (ii) in the excerpt the paragraphs within paragraph 87 are not separated by hard returns, (iii) paragraph 89 of the excerpt refers to "DPOA" in English but there is no such reference on the corresponding page in the DRAA Agreement, (iv) punctuation appears in different places, (v) the last line of paragraph 87 of the excerpt contains five Chinese characters ("存款以及其执照等其它所有权益") that are not present on the corresponding line in the DRAA Agreement, and (vi) the bottom of the excerpt has a stamp from California notary Spencer John Chase. These differences provide yet more reasons to conclude that the DRAA Agreement is fraudulent.

arbitration awards. *Id.* at 1535. On August 9, 2019, Williford pointed out an obvious issue with the arbitral awards. He had filed a petition to appoint arbitrators, and yet supposedly the arbitrations had already taken place. *Id.* at 1566 ("There is an obvious issue with proceedings happening before arbitrators that have not even been appointed."). He believed that as a result, "[a]ny supposed prior 'proceedings' under the DRAA . . . are likely or certainly invalid." *Id.*

In response, his clients sent him practitioner materials discussing the DRAA and explained that the court did not need to appoint arbitrators. *See id.* at 1579–80. That begged the question about why the petition had been filed in the first place. Williford agreed that the DRAA did not require the court to appoint arbitrators, but he "remain[ed] concerned as to the validity of the awards." *Id.* at 1578. He observed that "they have not yet been confirmed by any court," that they did not include a form of judgment, and that there was "much that [he did] not understand about the awards and other aspects of these proceedings (like the Beijing IP court ruling)." *Id.* He recommended further analysis of the validity of the awards and asked for a fully translated copy of the DRAA Agreement. *Id.*

By August 29, 2019, Williford had not heard back from his clients. He reiterated his recommendation that he be authorized to analyze the validity of the wards. *Id.* at 1577. Mike Martin emailed back on September 3, 2019, telling Williford that they "need court stamps first" and suggesting, "How about you get another 20k right way after got [sic] court stamps?" *Id.* at 1561. Mike Martin also tried to entice Williford with future business: "[G]ood news, we talked about DRAA with Alibaba in DC already, you'll get another one, please get this done ASAP." *Id.* Williford also met with Joe Martin in person, who made

54

the same offer to pay Williford $20,000 just to obtain court stamps on the awards. *See id.* at 1560.

By this point, Williford was suspicious. In a lengthy email dated September 3, 2019, he pointed out obvious problems with the awards:

> The awards are oddly worded in many respects, create issues with how they will be interpreted, and may give rise to unknown issues. For example (there are other issues):
>
> 1. Each award's award of assets (particularly [Awards] II-III) is vague, such that it could be argued that they only recognize that claimant wanted it, not that it is actually awarded.
>
>    a. For example, Award II – "Claimant **requests** court enforcement of following . . . ."
>
> 2. Each of the awards can be interpreted as being for a sum of money or certain assets or properties, some of which may already have been transferred. How is it to be determined how transfer of the assets or properties reduces the money damages? For example, if half the properties are transferred does the respondent owe half the damages?
>
> 3. Award I awards income from certain properties but does not say whether that is separate from the $9B or in the alternative.
>
> 4. The provision that certain companies be transferred "minus their debt" could trigger challenges from creditors, who for obvious reasons . . . might be very angry, and argue that that is unenforceable against them, a third party.
>
> 5. The awards can be interpreted as requiring the transfers of certain assets/companies/banks. This may result in a lot of issues that a lawyers [sic] specializing in M&A work, that negotiate sales and transfers of companies, would be better equipped to recognize.
>
> There is thus the possibility that the Awards might generate a great deal of unanticipated litigation, and/or be not as helpful to you as you wanted. This concern is reinforced by the facts, among other things, that they are for billions of dollars and reference high-profile properties such as the New York Waldorf Astoria.

55

*Id.* at 1560. Williford "strongly recommended" that the DRAA Petitioners get a second opinion on the awards. *Id.*

Mike Martin told Williford to "just file two sets of final awards and get court stamps. You'll get another 20 k right away." *Id.* Williford reiterated his advice to get a second opinion, and Mike Martin again stressed that they needed "COURT STAMPS." *Id.* at 1559.

The next day, September 4, 2019, Williford proposed to review "the translated DRAA Agreement" and "redraft the awards." *Id.* at 1558. He asked for a $10,000 retainer to begin the analysis. *Id.* Mike Martin wired the money, but labeled it "DRAA AWARDS FILING RETAINER." *Id.* at 1572. Williford wrote back saying that he was not filing the awards, only analyzing them. When Williford would not budge, Mike Martin again offered Williford $20,000 just to obtain court stamps, telling him "Money is not a problem at all." *Id.* at 1571. Williford responded bluntly: "I cannot, and should not, petition the Court to enter the DRAA awards until I have more information, including translations of the DRAA Agreement." *Id.* By this time, Williford had "many questions." *Id.* Mike Martin refused to provide a translated copy, claiming that "[w]e can not [sic] translate the stuff, otherwise we'll pay $180 billion." *Id.*

## 2. The Notice Of Documents

By September 11, 2019, the DRAA Petitioners had talked with Williford about using the purported arbitration awards to hold up the Transaction. *Id.* at 1583–85. Williford pointed out numerous problems with this strategy and recommended that the DRAA Petitioners take their case to a larger firm. *Id.* Mike Martin pushed him to simply file the awards, and Williford responded with additional concerns. *Id.* 1582. He told Mike Martin:

56

> I am not willing to simply submit the awards to the Court without a complaint holding that a court clerk will stamp them. The Court would likely rule that this is incorrect procedure under the DRAA 10 *Del. C.* § 5810(b) and Court of Chancery Rule 97(d). It may well also think of this action as an attempt to trick the court.

*Id.* at 1582.

Having failed to convince Williford to docket the awards, Nielsen took matters into his own hands. Without Williford's knowledge, Nielsen mailed a set of documents to the court (the "Nielsen Documents") and asked that they be "stamped." JX 1345 at 13. The Nielsen Documents included a "Default Judgment," purportedly signed by six arbitrators, that granted relief in favor of the DRAA Petitioners and against Anbang, Great Hua Bang, and the CBIRC. *Id.* at 1–3. The "Default Judgment" indicated that service of the arbitral awards had been completed on August 2, 2019, three days before the filing of the DRAA Chancery Action, which ostensibly sought to appoint arbitrators. *Id.* at 1.

After receiving the Nielsen Documents, the court called Williford to ask what they were. *See* JX 1868 at 26–27. It was readily apparent that Williford knew nothing about them, and he asked for a copy. *See id.* The court informed Williford that it would docket the materials to avoid problems associated with an *ex parte* filing, but would do so under a notice making clear that the docketing had no legal effect. *See id.*

On September 26, 2019, Williford reported to Nielsen and the DRAA Petitioners on the call from the court. He stressed that the court "did not want the docketing of the filing to be interpreted as a docketing of a final award." JX 4205 at 17. He noted that he previously told Nielsen that he "did not think [submitting the Nielsen Documents] was a good idea and/or permissible" and that he "certainly (as you know) did not review, sign off

57

on, have filed, or know such was being filed." *Id.* In a second email that day, he reiterated that he had told Nielsen that submitting the documents was "not a good idea" and stated that he was inclined "to file a motion to withdraw immediately." *Id.* at 15. He warned the DRAA Petitioners that

> [t]here is a significant danger that the Court will view the filing as an attempt to trick it into doing something (or make it look like it had done something) that either could not be done or, at best, could only be done after significant further proceedings and proof that has not been presented.

*Id.* at 16. That is precisely how the court views the matter.

On October 1, 2019, the court docketed the Nielsen Documents under a cover page titled "Notice of Documents." JX 1505. The notice stated:

> PLEASE TAKE NOTICE that the court has received the following documents. This copy is being filed for informational purposes only. The filing of these materials by the court does not have any implications under Delaware Rapid Arbitration Act.

*Id.* Later that day, Williford emailed the DRAA Petitioners and Nielsen, noting that the court had stated during the teleconference on September 26 and again in the notice that "the filing has no effect under the DRAA." JX 5181 at 1609–10. He told the DRAA Petitioners that he had decided to withdraw, provided a draft motion to withdraw, and asked for any comments. *Id.*

### 3. The Delaware Judgments

With Williford planning to withdraw, Nielsen and the DRAA Petitioners looked for another Delaware attorney. On October 17, 2019, they hired Stamatios Stamoulis. *Id.* at 1617–18. They did not have the courtesy to tell Williford. As with Williford, the DRAA Petitioners promised Stamoulis money and future business to induce him to act quickly. In

58

one email, Mike Martin told Stamoulis, "Please try your best FILE NOW TODAY[.] Youll [sic] get a bid [sic] bonus." *Id.* at 1623. In another email, Martin wrote, "PLEASE RUSH TO FILE NOW, just as you did last Friday . . . ." *Id.* In another, he wrote, "PLEASE FILE NOW TODAY[.] WE PREPARED BIG BONUS for u." *Id.* Stamoulis answered, "Working on this now." *Id.*

On October 24, 2019, without seeing the DRAA Agreement, Stamoulis commenced an enforcement action in the Delaware Superior Court. *See* JX 1559. In support of the action, Stamoulis filed an affidavit in which he averred that the "Default Judgment" docketed as part of the Nielsen Documents was "a judgment deemed confirmed by the Court of Chancery" and an "October 1, 2019 confirmed final judgment." JX 1560. The affidavit did not disclose the "Notice of Documents" or the disclaimer that the docketing had no effect under the DRAA. The affidavit referenced the date of October 1, 2019, the date this court docketed the "Default Judgment," rather than the date it was purportedly signed by the arbitrators, implying that the court entered the "confirmed final judgment" on that date.

The affidavit attached a copy of Award III, which purported to grant the DRAA Petitioners "compensatory damages in the amount of $9,000,000,000.00 in cash, or twenty properties, including hotels and their full ownerships [sic], and to date, six properties [sic] deeds have already been transferred to claimant." JX 1559 at 3. It purported to grant the DRAA Petitioners "[f]ull ownership of the following 25 companies and 20 properties, including hotels, minus their debt," followed by a list that included the six California Hotels. *Id.* at 3–4. Under the DRAA, because the award was not "solely for money

59

damages," the Court of Chancery would have had to "enter a final judgment in conformity" with the award. 10 *Del. C.* § 5810(b). Yet the DRAA Petitioners had never filed the award in the Court of Chancery. Moreover, the award supposedly was signed in July 2019, yet somehow listed the Civil Action number for the DRAA Chancery Action, which had not been filed until August 2019.

Over the next six weeks, Stamoulis commenced five additional enforcement actions involving additional awards.[110] In each action, Stamoulis filed a similar affidavit that either referenced or attached an "October 1, 2019 confirmed final judgment" from this court or referenced a "judgment deemed confirmed by the Court of Chancery." Each of the supposed underlying arbitration awards differed in terms of the amount of cash and number of properties awarded. The first, second, and third affidavits averred that each accompanying arbitration award was a "true and correct copy of the July 21, 2019 Final Award," yet each attached a different version of the award.[111] The fourth, fifth, and sixth affidavits referred to final awards dated on or after November 22, 2019, even though the last entry on the docket in the DRAA Chancery Action was the Notice of Documents filed on October 1, 2019.[112] The last of the arbitration awards purported to award the DRAA

---

[110] *See* JX 1585 (filed November 1, 2019); JX 1602 (filed November 8, 2019); JX 1663 (filed December 10, 2019); JX 1682 (filed December 16, 2019); JX 1708 (filed December 16, 2019).

[111] *See* JX 5181 at 479–87, 508–15, 537–45.

[112] *Id.* at 575, 614, 655.

Petitioners at least $369 billion in cash plus "full ownership of . . . 26 companies and 20 properties, including hotels, minus their debt." JX 5181 at 662.

After filing the last of the six awards on December 16, 2019, Stamoulis congratulated Mike Martin and Nielsen: "You now have six (6) judgments accepted on the docket in Delaware for a total of about 1 Trillion dollars (936,000,000,000 to be exact)." *Id.* at 1628 (collectively, the "Delaware Judgments").

### 4. The California Judgment

On November 15, 2019, Stamoulis asked the Delaware Superior Court to provide exemplified copies of the judgments he had docketed.[113] He received an exemplified copy of the judgment docket in the third Delaware Superior Court case, as well as a purported arbitration award that supposedly awarded the DRAA Petitioners $180 billion in cash plus "7 banks, 23 branches, assets, and companies," including the six California Hotels. JX 1626 at 5.

On December 6, 2019, a California attorney named Bruce Methven filed these documents in Alameda County, California, and asked for recognition of the sister-state judgment (the "Alameda Action").[114] Methven claimed that the Delaware Superior Court had entered judgment on November 16, 2019, and that the amount remaining unpaid on the sister-state judgment was $177 billion, citing "six hotels as 3 billion paid already." JX

---

[113] *See* JX 1621; JX 1622; JX 1623.

[114] *See* JX 1651; JX 1652; JX 1659

5181 at 693. A clerk of a California court granted the application and entered a judgment in California (the "California Judgment").[115]

Also on December 6, 2019, Stamoulis entered his appearance in the DRAA Chancery Action and filed a document titled "NOTICE OF APPOINTMENT OF ARBITRATORS."[116] It recited that the DRAA Petitioners had named five arbitrators to resolve an alleged dispute under the DRAA Agreement.[117]

## M.    Anbang Responds To The California Judgment.

On December 11, 2019, Methven called Lance and informed him about the California Judgment. Later that night, Methven provided a Gibson Dunn litigator with the case number for the Alameda Action and a link to the docket.[118]

---

[115] *See* JX 5181 at 744; *see also id.* at 56.

[116] *See* JX 1649; JX 1650. After seeing the notice. the court contacted Williford to ask if he was still counsel in the case and to remind him that if he was not, then he and Stamoulis submit a stipulation of substitution of counsel. *See* JX 1868 at 27–33. Before the court's call, Williford did not know that Stamoulis was involved. *Id.*

[117] Gibson Dunn investigated the arbitrators. *See, e.g.*, JX 1809 (Marijke Edler); JX 2090 (Adrian Tyson Edler); JX 2091 (Melvin Lee Raby). Their backgrounds were not consistent with a legitimate arbitral proceeding.

While these actions were unfolding, Great Hua Bang filed an appeal in the Intermediate People's Court from the adverse ruling from the Beijing IP Court in its trademark dispute with Anbang. *See* JX 1635. The appellate court rejected the appeal and affirmed the ruling in favor of Anbang. *See* JX 5189. Great Hua Bang appealed to the Beijing Higher People's Court. *See* JX 5242.

[118] *See* JX 1679 at 1; JX 1680; JX 4566 at 13–14; *see also* JX 1690 at 2.

On December 12, the Gibson Dunn partner who was overseeing the Quiet Title Actions, Ben Wagner, emailed his colleagues about a "phony arbitration award document," explaining that it "was actually filed in Delaware recently" and "purported to take a default judgment against Anbang for billions of dollars." JX 1686 at 2. Wagner forwarded the information to Chan later that day. *Id.* at 1. Wagner concluded that the California Judgment "was intended to help manufacture some sort of claim to the hotels." JX 1690 at 2.

That same day, Wagner emailed Ivanhoe with an update on the status of the Quiet Title Actions. He did not mention the Alameda Action, California Judgment, the DRAA Chancery Litigation, the arbitration awards, or the Delaware Judgments. *See* JX 1688.

On December 13, 2019, Lance sent Li copies of the documents from the case that Methven had filed. *See* JX 4939. He also sent Li a collection of the "arbitration award documents" that had been filed with the Delaware Superior Court. *See* JX 1686 at 1. Li reviewed the documents, understood that they related to claims against the Hotels, and discussed them with Chan and Vice Chairman Luo. Li Tr. 369–70. Li and a group of Gibson Dunn attorneys exchanged privileged emails regarding a set of documents from the DRAA Chancery Action under the subject line "Urgent matter." *See* JX 1689.

Li and Gibson Dunn discussed whether these developments should be disclosed to Buyer, the Lenders, or the Title Insurers. Li Tr. 370–72. Li and Gibson Dunn recognized that the DRAA Chancery Action and the related judgments concerned the Hotels,

understood that the same parties were behind the Fraudulent Deeds, and connected the scheme with the long-running trademark dispute with Hai Bin Zhou.[119]

Li and Gibson Dunn decided not to say anything. Li Tr. 370–72. When reporting on the Litigation Plan to Greenberg Traurig, Gibson Dunn pretended as if nothing else was going on that had any bearing on the Hotels or the Transaction. Given what Gibson Dunn knew, its statements to Greenberg Traurig were materially misleading.

**1.      Anbang Appears In The DRAA Chancery Action And Obtains A TRO.**

On December 19, 2019. Anbang appeared in the DRAA Chancery Action and sought a temporary restraining order and sanctions against the DRAA Petitioners. JX 1729. In its supporting brief, Anbang connected the DRAA Chancery Action to the Fraudulent Deeds, explaining:

> [Anbang] brings this motion because it needs this Court's urgent intervention to stop Petitioners' brazen and far-reaching fraud that now spans two states, three courts and eight separate actions—and stems directly from this and other actions Petitioners have filed in Delaware courts. The scheme began in 2018 in a handful of county recording offices in California, when Petitioners, and those acting in concert with them, began recording false grant deeds purporting to transfer six luxury hotel properties in California that were owned by [Anbang] subsidiaries.

JX 1730 at 4–5. Anbang explained that the DRAA Chancery Action was "the next chapter of Petitioners' fraud." *Id.* at 5. Anbang linked the TRO application to the Transaction, arguing that "Petitioners' wholesale fraud on the Delaware Courts is a naked attempt to

---

[119] *See, e.g.*, JX 1701; JX 1719; JX 4939; JX 4940; JX 4943; JX 4944.

derail [Anbang's] agreement to sell several billion dollars' worth of luxury hotel properties across the United States held by [Anbang's] subsidiaries." *Id.* at 4.

Anbang represented that the fraud "began in the fall of 2018 when a convicted felon named Daniil Belitskiy executed false grant deeds to six luxury hotel properties in California, which were held by Dajia subsidiaries." *Id.* at 8. Anbang further represented that "[i]t is clear that the shell LLCs listed in these false grant deeds and the Petitioners in this case are part and parcel of the same fraud scheme." *Id.* at 9.

In presenting the dispute to the court, Anbang provided a misleadingly incomplete picture of what it knew. Anbang did not disclose the lengthy history of trademark disputes with the DRAA Petitioners and Hai Bin Zhou dating back to 2008. Anbang did not share what it had learned about the DRAA Petitioners and their connections to Hai Bin Zhou. Internally, Anbang and Gibson Dunn had literally connected the dots in the form of a network map of the many interconnections. *See* JX 1807 at 1, 8. In their internal depiction of the key players, Anbang and Gibson Dunn did not even mention Belitskiy, having recognized that he was a low-level patsy and not one of the orchestrators of the scheme. *See id.*

Anbang and Gibson Dun also connected the DRAA Chancery Action with the specific trademark dispute involving Great Hua Bang in the Beijing IP Court, where Great Hua Bang introduced the DRAA Summary. *See* JX 4688 at 4. The arbitration awards cited a hearing in the "BJIPC" on March 5, 2019. TianZhen Fan and YuLin Song had both attended a hearing before the Beijing IP Court on March 5, 2019, during which Great Hua Bang introduced the DRAA Summary, and they had signed an attestation confirming the

accuracy of the record from that hearing. But rather than acknowledging this fact and dealing with it candidly, both TianZhen Fan and YuLin Song filed declarations in support of Anbang's application for a TRO which stated, "I did not appear at, nor sign any documents relating to, any arbitration or arbitration award relating to Petitioners on March 5, 2019 or on any other date. In fact, I have not visited the State of California during 2019."[120] That was technically true in an misleading way, because it misdirected the court's attention from the hearing before the Beijing IP Court to a non-existent arbitral hearing in California.

On December 20, 2019, Wagner provided an update to Greenberg Traurig on the states of the Quiet Title Actions. JX 1780 at 1. Wagner did not mention the emergency petition that his team had filed in Delaware. Instead, he expressed optimism that "we should be able to . . . clear title" assuming "no further action by the defendants." *Id. That same day*, Gibson Dunn sent Anbang a memorandum that provided an update on *both* "the litigation in Delaware and in California involving the false deeds and false arbitration awards." JX 1776 at 2. Wagner's report to Greenberg Traurig omitted material information and was misleadingly incomplete.

This court scheduled a hearing on Anbang's TRO application for December 23, 2019. JX 1762. On December 20, the day after the application was filed, the DRAA

---

[120] JX 1727 at 3; *accord* JX 1728 at 3.

Petitioners stipulated to the entry of a TRO and an expedited schedule in anticipation of a hearing on an application for a preliminary injunction. JX 1765. It stated:

1.  Upon the Court's entry of this Temporary Restraining Order, Petitioners . . . and each of Petitioners' respective officers, managers, agents, servants, employees, attorneys, and persons in active concert or participation with Petitioners, are enjoined and restrained, pending further Order of this Court, from:

    a.  Purporting to arbitrate any dispute against [Anbang];

    b.  Representing to any other court that they have obtained a judgment from this Court or the Delaware Superior Court;

    c.  Prosecuting or seeking any action or relief in any of the [enforcement] actions pending in the Delaware Superior Court . . . ; and

    d.  Making any further filings in any court relating to any purported arbitration with [Anbang].

2.  [Anbang's] Motion to Expedite is granted, and the parties will engage in expedited discovery, including document production and depositions, with discovery to commence immediately upon entry of this Order and with discovery to conclude on January 31, 2020 . . . .

*Id.*

One day after Anbang obtained the TRO, Wagner provided a litigation update to Ivanhoe. He reported on the Quiet Title Actions in California. He did not mention the DRAA Chancery Action. *See* JX 1782. Wagner's report was misleadingly incomplete.

## 2. The DRAA January Judgment

On December 20, 2019, thirty minutes after the stipulated TRO was entered, Williford formally moved to withdraw. JX 1763. Anbang opposed the motion, contending that the DRAA Petitioners had engaged in a

brazen and far-reaching real estate fraud scheme that now spans two states, three courts and eight separate actions . . . . [which] followed on the heels of a fraudulent deed transfer scheme whereby Petitioners (or affiliates) had initially tried to transfer luxury hotel properties to entities they (or their agents and affiliates) control, in an effort to derail [Anbang's] multibillion dollar deal to sell those hotels.

JX 1785 ¶¶ 1–2. Anbang thus again linked the DRAA Chancery Action to the Fraudulent Deeds and the Transaction, despite not having mentioned the DRAA Chancery Action to Buyer or Greenberg Traurig.

Days later, Anbang moved for a TRO in the Alameda Action to block the DRAA Petitioners from taking any action to enforce the California Judgment. On December 23, 2019, the court granted the TRO. JX 1787. Methven moved to withdraw, and his motion was later granted.[121]

On December 31, 2019. Stamoulis asked the court to "hold a status conference as soon as practicable so that we may develop a plan to transition this matter to other counsel." JX 1815 at 4. Anbang opposed his withdrawal, relying again on the connection between the Delaware Litigation and the Transaction. JX 1821. Stamoulis formally moved to withdraw on January 6, 2020. JX 1834. The court scheduled a status conference for January 8, 2020. JX 1833.

During the status conference, Gibson Dunn again linked the DRAA Chancery Action to the Transaction. A Gibson Dunn attorney explained:

The problem is that we can't proceed to closing with these six judgments in the Superior Court outstanding and this judgment in California. So I think in

---

[121] *See* JX 1756; JX 1759; JX 1768; JX 1954; JX 1955.

the very immediate term, in order for us to get to closing – and we have a deal. We are waiting to clear title and clear the overhang of the litigation on this deal to get it done – we need the six judgments in Superior Court vacated, possibly an order from this Court to help us get that done, and then something we can take to California to show the California court in Alameda County that the judgment did not really exist and ought to be vacated there.

JX 1868 at 4–5. The attorney represented that closing was "contingent upon clearing title and clearing up this litigation overhang," that "the closing would have already occurred but for this fraudulent scheme," and that "as soon as we can clear up what's happening now, we can get the deal done." *Id.* at 5. The court asked counsel to confirm that "this is the last condition to closing" and that "[a]s soon as this happens, you-call can close?" *Id.* Counsel twice confirmed that this was the case. *Id.* Counsel later reiterated, "We want to make sure that we get these judgments vacated as quickly as we can so that this deal can proceed to closing. . . . [W]e've got a deal for multiple billions of dollars, and we need to get it done."[122] Yet Gibson Dunn had not told Buyer or Greenberg Traurig anything about the DRAA Chancery Action.

Sadly, the Gibson Dunn attorney misled the court about the state of Anbang and Gibson Dunn's knowledge about the DRAA Petitioners. The following exchange took place:

THE COURT: And so do you believe that, other than these lawyers, there are any human beings associated with the plaintiffs who are in this country?

---

[122] *Id.* at 10; *accord id.* at 11 ("we've got to get this stuff out of the way so we can get the deal done"); *id.* at 22 (representing that a four- or six-month delay in vacating the judgments would "risk derailing the deal").

69

COUNSEL:        We believe there is one in California.

THE COURT:     Who is that?

COUNSEL:        According to the incorporation papers, theres's a fellow named Hai Bin Chou. It's H-a-i, B-i-n, C-h-o-u. He signed incorporation papers for a number of the LLCs. He sometimes signs those papers as Andy Bang, H.B. Chou. So we believe that he is the natural person behind these LLCs. But without discovery, we don't know.

JX 1868 at 20–22. In reality, Anbang and Gibson Dunn knew quite a bit more. Anbang had known about Hai Bin Zhou for years, and not only because his name appeared on incorporation papers. Anbang had been litigating against Hai Bin Zhou since 2008 and had investigated him repeatedly. Gibson Dunn had been embarked on a massive investigation in August 2019, and it had uncovered considerable information.[123] Anbang and Gibson Dunn had also connected the DRAA Chancery Action with the DRAA Summary.[124]

After the presentation from Gibson Dunn, Williford and Stamoulis each argued why they should be permitted to withdraw. Stamoulis argued that he had a good faith basis to believe that the DRAA Petitioners had legitimate claims based on the following:

- He had been contacted by Nielsen, who had "prosecuted a fairly extensive patent portfolio for the principals of the petitioners." JX 1868 at 46–47.

---

[123] *See, e.g.*, JX 1794; JX 1795; JX 1799; JX 1800; JX 1802; JX 1803; JX 1804; JX 1805; JX 1806; JX 1811; JX 1880; JX 1823; JX 1894; JX 1895.

[124] On December 26, 2016, just before a call with Li and Gibson Dunn to discuss the trademark dispute and its connection to the DRAA Chancery Action, TianZhen Fan had the DRAA Summary scanned and emailed to herself. See JX 1794; JX 1800 at 3–21.

- Nielsen advised him that the DRAA Petitioners had been involved in a successful trademark dispute with Anbang before the USPTO, which was publicly docketed, and where the DRAA Petitioners had been represented by Venable. *Id.* at 47–49.

- He understood that the DRAA Petitioners were securing successor counsel and speaking with large, well-known firms. *Id.* at 51–54.

- He had two documents that the court would review *in camera* that would assist the court in evaluating his motion. *Id.* at 54–55.

The court agreed to review the two documents, both of which were in Chinese, and which Stamoulis represented were a copy of the DRAA Agreement and a filing in a Chinese court.

The court granted both motions to withdraw.[125] The court explained that before the hearing, there were many reasons to be skeptical about the DRAA Petitioners and their conduct. *See* JX 1868 at 62–64. The court noted that its suspicions "remain[ed] quite high" and that the "picture, as a whole, gave substantial color to the defendants' assertions that these were likely fraudulent actors and potentially insubstantial shell companies who were using the courts for nefarious purposes." *Id.* at 64. But Stamoulis's representations had presented "something of a different cast." *Id.*

> First, in the sense that World Award Foundation may indeed be an entity with some assets, be they patents or otherwise. He has also indicated that the plaintiffs are seeking successor counsel. And without describing or identifying the two documents that I reviewed *in camera*, I will say that they, in theory, if they are what they purport to be, provide some support for the plaintiffs' position.

---

[125] *See* JX 1869 (Williford); JX 1873 (Stamoulis). Because the court was concerned that the DRAA Petitioners had "gone dark" and that Anbang would not have any means of communicating with them, the court required Stamoulis to remain in the case solely for the purpose of relaying communications to his former clients. *See* JX 1868 at 67–68. The court later relieved Stamoulis of that obligation. *See* DRAA Chancery Action Dkt. 72.

*Id.*

In light of the expedited schedule, which contemplated discovery closing on January 31, 2020, the court required the DRAA Petitioners to retain successor counsel by close of business on Friday, January 10. The DRAA Petitioners had known about Stamoulis' desire to withdraw since December 31, 2019, and they had terminated his representation on January 4. Although they had received sufficient time to obtain successor counsel, the court gave the DRAA Petitioners

> a final chance to get their act together, obtain counsel, and defend this expedited proceeding. If they don't do that, then I think they have effectively opted, at least in the short term, to accept some form of default judgment vacating the default judgments that they obtained. They may then subsequently come in, and we can have a grand fight on an appropriate schedule about what, if anything, should be done beyond that. Maybe they would be able to show that the judgments, in fact, are valid and should be put back in place. Maybe the defendants will be able to show that this is, in fact, a fraudulent or criminal scheme, and consequences will flow from that likely here and elsewhere.

*Id.* at 70–71. The court ruled that if successor counsel did not appear, then Anbang could move for a default judgment.[126]

The DRAA Petitioners failed to retain successor counsel by the deadline, and Anbang moved for entry of a default judgment. JX 1889. Anbang submitted a proposed form of order that effectively tracked the earlier TRO. On January 15, 2020, the court granted the motion and entered the proposed form of order. Among other things, it stated:

---

[126] JX 1868 at 68–69; *see* JX 1873 ¶ 10.

a.  No arbitration award or judgment involving any of Petitioners has been entered, confirmed or deemed confirmed by this Court;

b.  The purported "Default Judgment" document filed in this action (Trans ID 64258346) is of no legal force or effect; and

c.  Petitioners are estopped and enjoined from challenging the vacatur of any and all purported judgments in the [enforcement] actions in the Delaware Superior Court . . . .

JX 1925 ¶ 3 (the "DRAA January Judgment"). Anbang retained the right "to seek any further relief or sanctions," and the order provided that "this action shall remain open and pending until such applications are resolved or [Anbang] notifies the Court that it does not intend to seek any further relief or sanctions in this matter." *Id.* ¶ 9.

With the entry of the DRAA January Judgment, except for a potential application for sanctions, the DRAA Chancery Action appeared to have reached a conclusion. The court viewed the case as resolved and turned to other matters.

On January 17, 2020, Anbang asked the Delaware Superior Court to vacate the Delaware Judgments. Again connecting the Delaware proceedings to the Transaction, Anbang represented that the Delaware Judgments "appear[ed] calculated to try to derail the sale of several billion dollars' worth of luxury hotel properties across the United States." JX 1949 at 2. By order dated January 21, 2020, the Delaware Superior Court vacated all of the Delaware Judgments. JX 1974.

Meanwhile, in the Quiet Title Actions, Seller's counsel participated in "prove-up" hearings to establish Strategic's ownership. At each hearing, a Gibson Dunn attorney led Needham through questions designed to create the impression that Seller had no prior involvement with or knowledge about Belitskiy and the entities that executed the

73

Fraudulent Deeds.[127] Gibson Dunn claimed explicitly that "[t]hese entities and Mr. Blitzky [sic] are completely unknown to the true title holders of these properties." JX 1640 at 25. That was not true. Anbang and Gibson Dunn had extensive information about the individuals who filed the Fraudulent Deeds, including their involvement in multiyear trademark disputes against Anbang.[128]

Throughout this period, Gibson Dunn communicated with Greenberg Traurig about the Quiet Title Actions. Gibson Dunn never mentioned the DRAA Chancery Action, the Delaware Judgments, the Alameda Action, or the California Judgment. Instead, Gibson Dunn reported that they had obtained default judgments in the Quiet Title Actions that resolved the difficulties involving the California Hotels.

Gibson Dunn took the same approach when communicating with the Title Insurers. Gibson Dunn provided responses to the Title Insurers that only addressed the Quiet Title Actions and did not disclose any information about the California Judgment, the Alameda Action, the Delaware Judgments, or the DRAA Chancery Action. On January 14, 2020,

---

[127] *See* JX 1640 at 12; JX 4945 at 15, 23–24; JX 4948 at 13–14.

[128] It appears that Anbang and Gibson Dunn intentionally kept Needham in the dark about the DRAA Chancery Action, the trademark disputes between Anbang and the DRAA Petitioners, and the Delaware Judgments. Even though Gibson Dunn represented Strategic for purposes of the Quiet Title Actions, Needham was not told about the details of the Delaware proceedings until late January or February 2020. Needham Dep. 270–74. Needham did not learn until this litigation about the history of trademark litigation with the DRAA Counterparties or Belitskiy's involvement in those disputes. *Id.* at 269–70, 281–82.

the Title Insurers asked for "[a]ny information about communicat[ions] with the defendants (if any)." JX 2488 at 12. Gibson Dunn responded,

> With respect to communications with the defendants, we have not had any. Although attorneys from the LA law firm of Larson O'Brien LLP appeared at three of the default judgment hearings (OC, SF, and SM), they knew nothing about the case and were only there to request a continuance. Importantly, nobody showed up on behalf of the defendants at today's LA default judgment hearing.

*Id.* at 11. Gibson Dunn thus answered as if the defendants in the Quiet Title Actions were wholly separate from the DRAA Petitioners, when Anbang and Gibson Dunn knew they were interrelated. Gibson Dunn's response was materially misleading.

By email dated January 22, 2020, the Title Insurers stated that based on what they knew, they were "prepared to remove the exceptions to title for the wild deeds against the California properties" if two conditions were met. JX 1994 at 1. First, the time for appeal from the default judgments had to expire, and second, the Title Insurers needed "written confirmation by [S]eller, or [S]eller's counsel on behalf of [S]eller, that no additional communication from any of the defendants, or any counsel for the defendants has been received." *Id.* Gibson Dunn again limited its response to the Quiet Title Actions, stating: "The defendants still have not filed anything in any of these cases. We also have not heard anything from any of the defendants or any counsel representing any of the defendants in these cases about potentially filing anything." JX 2488 at 2. Gibson Dunn again answered as if the defendants in the Quiet Title Actions were wholly separate from the DRAA Petitioners, when Gibson Dunn knew they were interrelated. Gibson Dunn's answer was materially misleading.

75

Based on what Greenberg Traurig and the Title Insurers knew, there would not be any issues with title once the appeal period elapsed in the Quiet Title Actions. *See* JX 1981. Based on that understanding, the parties planned for a closing at the end of March 2020. *See* JX 1991.

## N.     The Lenders Uncover The DRAA Chancery Action

In December 2020, Buyer informed Seller that it was reinitiating the bidding process for debt financing. Kim Tr. 1026. Because Buyer had negotiated the necessary documents with the Lenders in August 2019, before the discovery of the Fraudulent Deeds, the process was "smooth and seamless." *Id.* at 1027. The financial markets had improved for borrowers, and Ivanhoe expected the effort to be "very successful." Ivanhoe Tr. 581.

By mid-February 2020, Buyer was close to executing the documentation for financing. Kim Tr. 1027–28. All of the Lenders were "working toward issuing a commitment as soon as possible." JX 2139 at 1. The plan was to execute commitment letters during the week of February 17. Ivanhoe Tr. 582–83. Consistent with that expectation, Gibson Dunn told Greenberg Traurig on February 17, 2020, that it expected all of the conditions to closing to be met by March 15, 2020, so that the parties could close promptly thereafter. JX 2157. Greenberg Traurig agreed and suggested targeting April 1 as a closing date. *Id.*

On February 18, 2020, Buyer received final versions of the term sheets, commitment letter, flex letter, and rate lock agreement from Goldman.[129] But that same day, Goldman's counsel notified Gibson Dunn that "Goldman has become aware of a series of Delaware cases filed against Anbang that seem to relate to the Strategic portfolio" and sent Gibson Dunn the TRO application that Gibson Dunn had prepared. JX 2162. Goldman's counsel asked for a call that evening to understand the background on this and the current status of the cases. *See* JX 2164.

The Gibson Dunn lawyers claimed they could not put together a call that quickly.[130] Instead, Seller formally gave notice to Buyer that all conditions to closing would be satisfied on March 15 and that the parties should prepare "to close the transaction shortly after March 15." JX 2174. Still unaware of the DRAA Chancery Action, the Delaware Judgments, the Alameda Action, and the California Judgment, both Mirae and the Title Insurers expressed support for that schedule.[131] Mirae proposed a closing date of April 6. JX 2219.

On February 20, 2020, committed financing was just a signature away. Mirae had asked for the final wiring information and fee amounts from Goldman. *See* JX 2260. Mirae had wired the money to Buyer's bank account in the U.S. "so that upon signing the

---

[129] *See* JX 2240 at 2–3; Kim Dep. 92–95; Davis Dep. 199–202.

[130] JX 2165; *see* JX 2241.

[131] *See* JX 2216; JX 2219.

financing commitment letters and term sheets and et cetera, [it] would be able to quickly transfer necessary expense, deposits, and fees to Goldman instantly." Kim Tr. 1032–33. With everyone poised to sign, Goldman informed Jones Lang about the DRAA Chancery Action. *See* JX 2244. Jones Lang then notified Mirae, explaining that no one had determined "if these claims run to the seller, the assets or both," and although "it appear[ed] that the claims have been set aside by the courts," this was "all new information which Goldman [was] reviewing." JX 2266 at 1.

Goldman's discovery brought the financing process to a halt. The commitment letters did not get signed on February 19, and the signing was tentatively pushed until February 24 so that Mirae and the Lenders could investigate further.[132]

For both Mirae and the Lenders, the Delaware filings represented a second major hit to the credibility of Anbang and Gibson Dunn. When Gibson Dunn first disclosed the Fraudulent Deeds, the Lenders had expressed "concern . . . that Anbang knew about the deeds and deliberately concealed them from the bidders and their lenders." JX 1048 at 1. The revelation of the DRAA Chancery Action reinforced those concerns.[133]

---

[132] Wheeler Dep. 181; *see* JX 2312 at 2 (Wheeler telling Jones Lang, "We'll need to figure out the new litigation issue before we can execute.").

[133] *See* JX 2245 (Jones Lang expressing hope that the latest disclosure "doesn't turn into another fiasco"); JX 2272 (Ivanhoe telling Anbang and Gibson Dunn that he was "surprised, to say the least, that these new series of legal actions have been ongoing for over one month and no one brought this to our attention until after it was raised by Goldman a couple days ago").

Goldman sent the litigation documents to Greenberg Traurig, who began studying them.[134] Kim asked Li to explain, telling him "**We also need to know ASAP if this is about the Strategic Portfolio.**"[135] Li responded evasively, saying "We don't think there's anything that your side should be concern[ed] with." JX 2289 at 2. Kim followed up: "[C]an we take it that, whatever it is, it is NOT about the Strategic Portfolio?" *Id.* at 1. Li responded that the DRAA Chancery Action involved a "fraudulent arbitration judgment falsified by some criminals regarding Anbang's use of the Anbang trademark in the US" and that Gibson Dunn would provide the "necessary details." *Id.* The Lenders had already concluded that DRAA Chancery Action related to the Strategic portfolio. Glover Tr. 173.

On February 21, 2020, during a call with Greenberg Traurig and the Lender's counsel, Gibson Dunn downplayed the claims. The Gibson Dunn lawyers claimed that the DRAA Chancery Action was a fraud based on a "bizarre trademark dispute" that would "not be of much interest." JX 5086 at 1. They characterized the Delaware proceedings as "insignificant" and "not a big deal."[136] Those representations conflicted with what Gibson Dunn had told this court about the significance of the DRAA Chancery Action. The Gibson Dunn lawyers also said they had first learned about the DRAA Chancery Action in mid-December 2019.[137] That was not true. Gibson Dunn had learned about the DRAA Chancery

---

[134] *See* JX 2246; JX 2268.

[135] JX 2289 at 3; *see* Kim Tr. 1028–29.

[136] Davis Dep. 219; *see* JX 2305 at 1; JX 2273 at 1.

[137] Ivanhoe Tr. 595–96; *see* JX 2301.

Action four months earlier, in August 2019. Gibson Dunn said nothing about the connections among Belitskiy, Hai Bin Zhou, and the DRAA Petitioners. Gibson Dunn said nothing about Anbang's multi-year litigation history with Hai Bin Zhou over trademark issues. *See* Ivanhoe Tr. 588–89.

Based on Gibson Dunn's representations and the events up to that point in the DRAA Chancery Action, including the entry of the DRAA January Judgment, Greenberg Traurig and Mirae concluded that the DRAA Chancery Action, the Delaware Judgments, and the California Judgment posted "little to no risk" to the Transaction.[138] Internally, Mirae remained sufficiently concerned for Kim to ask Li specifically for any additional information that Anbang had about the parties involved:

> [I]f you have information or any idea about these fraudsters, please share with us ASAP . . . .
>
> It just does not make sense that the deed issue was caused by a [single U]ber driver who seemingly has nothing against Anbang.
>
> Also it is hard for us to understand that some companies (petitioners in the Delaware litigation) have committed such actions just as a simple vendetta.
>
> We need to understand the motives and also want to have absolute comfort that these fraudsters will walk away from our transaction/portfolio from now on for good.
>
> As you may imagine, we are getting tons of questions internally asking us if this is really it about the fraudster and if there are any other circumstances that we are not aware of.

---

[138] JX 2304; *see* JX 2305.

JX 2353 at 2. Li represented that Anbang was not attempting to hide anything from Mirae. *Id.* at 1. Kim's boss wrote back, noting the overlap between the DRAA Petitioners and the names of the entities on the Fraudulent Deeds. JX 2366 at 2. Li responded with another brief email that provided a few snippets about the trademark disputes. *Id.* at 1–2.

As these exchanges were taking place, Goldman continued to evaluate the issues posed by the DRAA Chancery Action.[139] The delay in securing financing could not have come at a worse moment. Over those critical days, the financial markets began gyrating as concern spread about COVID-19. Mirae pushed Goldman to finalize a financing package,[140] and Goldman assured Mirae that it was working as expeditiously as possible.[141]

On Monday, February 24, 2020, Goldman was still not prepared to commit to a financing.[142] With the market upheaval deepening, Goldman informed Mirae on February 26, 2020, that a committed CMBS financing was "off the table."[143] Goldman made a series of proposals, but all were far more expensive and would require additional negotiation.

---

[139] *See* JX 2309; JX 2311; JX 2313; JX 2324.

[140] *See* JX 2311 at 1; JX 2312 at 1–2; JX 2321; JX 2322; JX 2323.

[141] *See* Wheeler Dep. 188–190; *see also* JX 2316.

[142] *See* Wheeler Dep. 182–83, 187.

[143] JX 2358 at 1; *accord* Wheeler Dep. 194.

81

Mirae and Jones Lang reached out to the members of the lending syndicate directly and approached other funding sources.[144]

As February entered its final days, concern about the novel coronavirus increased exponentially.[145] Strategic's hotels began to receive COVID-related cancellations.[146]

## O. The DLA Letter

For Mirae, the risk posed by the DRAA Chancery Action increased on February 28, 2020, when Greenberg Traurig located a letter that Stamoulis had filed on February 25.[147] Stamoulis reported that DLA Piper LLP was considering whether to enter an appearance and attached a detailed, six-page, single-spaced letter from John Reed, a leading Delaware attorney and partner with DLA Piper (the "DLA Letter").[148]

The DLA Letter stated that DLA Piper had been retained by the DRAA Petitioners "in connection with their rights under a [DRAA Agreement] (written in Chinese)." JX 2347 at 2. The letter explained:

> We have learned a lot in a short period of time, and many things do not add up if all of this is supposed to be some outright fraud. For example, the Amer Group is no stranger to AnBang Insurance. The parties have been adverse to

---

[144] *See* JX 2370; JX 2404; JX 2408.

[145] *See* JX 2353; JX 2359; JX 2362; JX 2404 at 2–3.

[146] *See, e.g.,* JX 2376; JX 2378; JX 2380; JX 2381; JX 2382; JX 2383; JX 2384; JX 2385; JX 2386; JX 2387; JX 2388; JX 2389; JX 2390; JX 2391; JX 2392; JX 2393; JX 2394; JX 2395; JX 2396; JX 2397; JX 2398; JX 2399; JX 2433; JX 2542; JX 2543; JX 2544; JX 2545; JX 2546.

[147] *See* JX 2435; JX 2448; JX 5243.

[148] *See* JX 2347; JX 5056.

each other for many years with regard to trademark disputes in the United States and China. From what we have been able to find through the United States Patent and Trademark Office ("USPTO"), Amer Group has thus far prevailed against AnBang Insurance with regard to the "AnBang" trademarks and other matters (*see* http://ttabvue.uspto.gov/ttabvue/v?gs=78653636), so it does not appear that the Amer Group is some gang of unknown con-artists who suddenly targeted AnBang Insurance.

*Id.* at 3.

The DLA Letter next described the DRAA Agreement.

We understand it was executed in Beijing, China, on May 15, 2017, by AnBang Insurance's then-Chairman, Wu Xiaohui. It is our understanding, and the [DRAA Agreement] expressly states, that the Agreement itself was a concept proposed by AnBang Insurance's founder, Xiaolu Chen. Paragraph 88 of the [DRAA Agreement] states, that . . . it is governed by the "Delaware Rapid Arbitration Act (DRAA)" per the requirement of 10 *Del. C.* § 5803(a)(5). . . . The signature on the [DRAA Agreement] on behalf of AnBang Insurance appears to match the signatures on AnBang Insurance's trademark applications filed with the USPTO. We also note that the signature is not identical to the other ones we reviewed so as to be a cut-and-paste copy.

*Id.*

The DLA Letter also posited (correctly) that Anbang had misrepresented the extent of its knowledge about the DRAA Agreement.

AnBang Insurance's Motion for a TRO filed with the Court of Chancery states that "'[t]he Agreement' does not exist" (TRO Mot., p. 6), but the two Declarations from TianZhen Fan and YuLin Song of [Dajia] do not (at least as we read them) squarely deny the existence or validity of the [DRAA Agreement] and simply say that [Dajia] "does not have any agreement to arbitrate disputes with" the Amer Group. (Decls., ¶ 9.) Of course, [Dajia] is the new name of AnBang Insurance following the seizure of the company by Chinese regulators and it did not exist with that name, or in its current state, when the [DRAA Agreement] was executed, so it is not clear whether the contention that *it* "does not have an agreement" with the Amer Group is based on a legal argument as opposed to a dispute of fact (we have reason to believe it is the former as explained later herein). In any event, we have also obtained and translated documents from a dispute in the Beijing Intellectual

83

Property Court involving the "AnBang" trademarks, where AnBang Insurance was a third party and the [DRAA Agreement] was a subject of proceedings back on March 5, 2019. We are in the process of doing much more due diligence on this and obtaining more filings from that proceeding through our China-based offices to determine whether AnBang Insurance ever challenged the validity of the [DRAA Agreement] before the Beijing Court.

*Id.* at 3–4.

The DLA Letter also discussed the Fraudulent Deeds:

As to the history of the recorded deeds, that situation is tied to the long-standing trademark disputes and it appears the [DRAA Agreement] was specifically created to deal with the remedies to be implemented from the outcome of those disputes. For many years, AnBang Insurance did business in violation of the "AnBang" trademark and, at one point, AnBang Insurance had (and may still have) assets valued in excess of $300 billion (US), so the wildly large numbers identified in the [DRAA Agreement] and arbitration awards need to be understood in that context. While there have been actions to quiet title for the deeds that are alleged to have been fraudulently recorded (actions that were not vigorously defended for reasons we are still exploring). Paragraph 80 of the [DRAA Agreement] expressly states that if AnBang Insurance fails to cancel the Amer Group's trademarks within one year of the date of the Agreement (May 15, 2018), a certain large sum of funds specified in the Agreement is to be deposited and, in the event of a failure to do so by June 15, 2018, the Amer Group "may appropriate the deposit directly without petitioning any arbitration commission or court, and the person designated by [the Amer Group] may with the DPOA (Durable Power of Attorney) granted by this Clause, directly sign a Grant Deed before any notary public in order to transfer the assets directly." Not coincidentally. AnBang Insurance's former Chairman executed and authorized a filing with the USPTO on June 7, 2017 (three weeks after the [DRAA Agreement] is claimed to have been executed), in furtherance of the effort to cancel the Amer Group's trademarks as contemplated by Paragraph 88 of the [DRAA Agreement]. The assets to secure the required deposit are sixteen hotels and four properties specifically listed in Paragraph 79. Paragraph 80 further states that AnBang Insurance "shall guarantee that the aforesaid assets are free of liabilities." The [DRAA Agreement] also provides for specified monetary penalties and multipliers for a breach of the various terms, obligations and conditions in the Agreement, which also explains the large figures in the arbitration awards.

84

*Id.* at 3–4.

The DLA Letter explained that DLA Piper was still investigating these matters and that, given the serious allegations of fraud, the lawyers were proceeding "with as little client involvement as possible." *Id.* at 6. The DLA Letter stressed,

> *[W]e will not be entering our appearance and will not be making any representations to any Court until our investigation is complete*; however, we wanted you to know what we have uncovered thus far for purposes of your own situation. . . . We can tell you that we are taking this situation very seriously, especially in light of the allegations of fraud, and we are deploying the necessary resources to get to the bottom of everything.

*Id.* at 6.

Anbang learned about DLA Letter the same day it was filed. Li immediately informed his superior, Vice Chairman Luo. *See* JX 2351.

For Mirae and Greenberg Traurig, the DLA Letter was extremely concerning, because "all the substance [was] in direct contradict[ion] to what the seller was telling us." Kim Tr. 1038. Ivanhoe viewed it as a game changer. He contacted the firm's senior litigation partner and the head of its litigation practice and told them that they had "a very serious problem on a very large transaction." Ivanhoe Tr. 599–600. Making a generational reference, Ivanhoe viewed it as the equivalent of, "Houston, there's a problem." *Id.* at 601.

Anbang filed a response to the DLA Letter. *See* JX 2414. For the first time, Anbang began to share some of what it knew about Hai Bin Zhou and his associates in the form of an affidavit from the former FBI agent who had investigated the individuals who had purported to serve as arbitrators for the awards. *See* JX 2403. According to Anbang's investigation,

[S]ix of the eleven total purported arbitrators appear to have been named as defendants in criminal cases; one appears to have pled guilty to a felony assault weapons charge and two misdemeanors; another appears to have pled guilty to at least four misdemeanors; another appears to have spent 40 years with a company called A-1 Pool & Spa Services; three arbitrators appear to have lived in the same R.V. Park in San Rafael, California (a fourth arbitrator is the mother of one of those three residents); and one of the arbitrators, who is a Chinese restaurant worker, affirmatively told Agent Douglas that he did not participate in any arbitration but signed the arbitration awards as a "favor" to a loyal customer. He also confirmed that he showed his driver's license to the notary but was unaccompanied by the other "arbitrators" when he did so. We respectfully submit that these findings should be of interest in connection with the investigation new counsel claims to be conducting.

JX 2414 at 3–4. Anbang also noted that "the person that purportedly notarized Petitioners' verification in this action—Spencer John Chase—had his notary license revoked by the California Secretary of State pursuant to a stipulated decision entered weeks before Mr. Chase's notary stamp was placed on the verification in this action." *Id.* at 4 (emphasis omitted).

After seeing the DLA Letter, Mirae and Greenberg Traurig concluded that they could not evaluate the risk posed by the DRAA Chancery Litigation without seeing the DRAA Agreement. Over the ensuing weeks, they consistently and repeatedly asked Anbang to provide a copy of the DRAA Agreement.[149]

## P.     COVID-19 Causes The Debt Markets To Close.

As the calendar turned to March 2020, COVID-19 was causing "major headaches everywhere." JX 2507 at 1. By March 4, "[t]he CMBS market [was] shut down for large

---

[149] *See, e.g.*, JX 2353 at 2; JX 2359 at 1; JX 2375 at 2; JX 2718 at 2; JX 2737 at 1; JX 2797 at 2; JX 3376 at 5, 8, 11.

hotel deals," and debt funds were not entertaining any new hotel deals. JX 2508 at 1. A bridge loan was the only remaining option for the Transaction, and it was unclear whether that option could be executed successfully.[150] Goldman circulated a term sheet, and several lenders declined to bid. *See* JX 2553.

Buyer tried to convey the consequences of the market turmoil to Seller. *See* JX 2559. Anbang, however, refused to acknowledge that its decision to conceal the DRAA Chancery Action had delayed the financing process at a critical point. In an effort to get everyone on the same page, Jones Lang hosted a call on March 7, 2019, with Buyer, Seller, BAML, and Goldman. Kim Tr. 1048–51. The lead banker from Goldman explained that CMBS financing was not available and that putting together bridge financing was challenging.[151] Not only was it difficult for Goldman to propose terms for a loan, but the markets were changing dramatically every day, so by the time the lenders in the syndicate obtained internal committee approvals, the terms were outdated.[152]

With the pandemic worsening, Strategic's financial performance deteriorated at an accelerating rate.[153] It became unclear whether Strategic could refinance its debt in the

---

[150]  *See* JX 2516; JX 2508 at 6; JX 2546.

[151] Kim Tr. 1050–51; *see* JX 2564 at 1; JX 2566 at 1; JX 2676 at 1; JX 2577 at 1; JX 5053 at 1.

[152] JX 2643; *see* Kim Tr. 1045–46; JX 2407 at 1–3; JX 2411; Kim Dep. 225–28.

[153] *See* JX 2569; JX 2570; JX 2571; JX 2572; JX 2573; JX 2574; JX 2588; JX 2617; JX 2618; JX 2644.

ordinary course of business, and management and Strategic's outside auditors discussed whether the Company's financial statements needed to be a going-concern qualification.[154]

Given the worsening financial markets and the need to fully understand the issues raised by the DRAA Chancery Action, Buyer proposed to extend closing by three months.[155] Li presented his supervisor, Vice Chairman Luo, with "potential options" that included strategies to "get control of the US$581m" deposit through litigation. JX 2590 at 1. Li did not regard specific performance as an option. *See* Li Dep. 472–73.

On March 12, 2020, Anbang insisted on closing before April 8, 2020, unless Mirae agreed to Anbang's counterproposal. *See* JX 2797 at 6–7. In exchange for the three-month extension, Anbang asked Mirae to (i) double its deposit, (ii) agree that all closing conditions had been satisfied or waived, (iii) agree that no purchase price adjustments were required, (iv) freeze the balance sheet date for calculating the estimated purchase price, and (iv) compensate Anbang approximately $400 million in purported funding costs. *Id.* Anbang threatened litigation, stating that if Mirae did not agree to Seller's terms, "then we must close by April 8" and that "[i]f Mirae refuses to proceed to closing as contractually agreement, we will have no choice but to exercise all remedies available to us under the [Sale Agreement], including without limitation seeking specific performance compelling

---

[154] *See* JX 2645; *see also* JX 3575.

[155] *See* JX 2663 at 1; Ivanhoe Tr. 615–16; Kim Tr. 1047–48, 1051, 1055–56, 1212–13.

Mirae to close." *Id.* Gibson Dunn separately told Greenberg Traurig that Anbang was prepared to litigate. JX 5131.

Anbang's terms were so extreme that Mirae viewed them as a flat rejection of its extension request.[156] Mirae's response, sent later that day, adopted a noticeably more formal tone. *See* JX 2718. Mirae noted that the closing date under the terms of the Sale Agreement was April 17, 2020, not April 8. *Id.* at 1. Mirae rejected Anbang's terms as unrealistic. And Mirae noted that Seller's failure to disclose the DRAA Chancery Action could affect the Title Insurers' willingness to provide title insurance, resulting in a failure of a closing condition. *Id.* at 2. Mirae asked for a copy of the DRAA Agreement so that it could evaluate the issues raised by the DRAA Chancery Action. *Id.*

In its response, Anbang claimed that it had "complied with all of our disclosure obligations under the Agreement." JX 2727 at 1. Anbang represented that it did not have the DRAA Agreement and therefore could not provide it. *Id.* Anbang reiterated its threat of litigation, stating that it was "fully prepared to enforce our rights in court if it comes to that." *Id.*

On March 16, 2020, Mirae notified Anbang that "Buyer does not believe that the conditions obligating Buyer to close have been satisfied." JX 2777 at 1. Buyer nevertheless exercised its right under the Sale Agreement to extend the closing date to April 17, 2020.[157]

---

[156] Kim Tr. 1057–60; Ivanhoe Tr. 618; *see* JX 2942.

[157] *Id.*; *see also* JX 2797 at 1–2.

Anbang disputed the April 17 date and contended that the closing date was April 8. Mirae sent an email disputing Anbang's response. After a call between Gibson Dunn and Greenberg Traurig, the parties agreed to use April 17 as the closing date.[158]

Throughout March and early April 2020, Seller continued to seek financing.[159] With the expanding COVID-19 pandemic, it was not available.[160] During the same period, Strategic's business performance continued to plummet.[161] On March 24, Strategic temporarily closed the Four Seasons Palo Alto and the Four Seasons Jackson Hole "in response to very low demand as well as governmental orders." JX 3105 at 1. The closing of the Four Seasons Jackson Hole advanced its normal seasonal closure by approximately two weeks. JX 3107 at 3. Other hotels began operating in state where they were "closed but open." *See* JX 3159.

---

[158] *See* JX 2846; JX 2907 at 2, 5–6; JX 2992 at 1.

[159] *See, e.g.*, JX 2596; JX 2600; JX 2623; JX 2713; JX 2730; JX 2738; JX 2739; JX 2760; JX 2855; JX 2859; JX 2862; JX 2864; JX 2895; JX 2896; at 1; JX 3212; JX 3951; Kim Tr. 1055, 1062; Wheeler Dep. 194–95; Davis Dep. 270.

[160] *See* JX 3468; JX 3937; JX 4546 at 8, 25; Kim Tr. 1045–46; Hattem Dep. 121–22; *see also* Wheeler Dep. 84–85, 197; Cookke Dep. 155.

[161] *See, e.g.*, JX 2750; JX 2763; JX 2764; JX 2767; JX 2768; JX 2769; JX 2770; JX 2771; JX 2772; JX 2773; JX 2778; JX 2839; JX 2905; JX 2988; JX 2989; JX 2990; JX 2991; JX 3041; JX 3044; JX 3236; JX 3282.

**Q. The Title Insurers' Concerns About The DRAA Chancery Action.**

While these events were unfolding, Ivanhoe kept the Title Insurers informed about deal-related developments.[162] As a matter of personal and professional ethics, Ivanhoe wanted to be candid with the Title Insurers. He also knew that a failure to disclose information about the DRAA Chancery Action the Delaware Judgments, and the California Judgment could jeopardize Buyer's coverage under a standard exclusion in title insurance policies for matters that were within the "knowledge of the insured" but were withheld from the Title Insurers.[163] Lance and a colleague similarly engaged in regular communications with the Title Insurers throughout March and April.[164]

The Title Insurers were concerned about the DRAA Chancery Action, the DLA Letter, and the possibility that the DRAA Petitioners and their affiliates could reopen the various default judgments that Anbang and its affiliates had obtained. *See* JX 2791. On March 20, 2020, in response to Buyer's request for an update on the status of the title insurance, the Title Insurers advised the parties that they were continuing to review "what is generally referred to as the Delaware litigation, and its impact on our underwriting of the title insurance." JX 2997. Based on his conversations with the Title Insurers, Ivanhoe had expected the letter to take a stronger position. *See* JX 3006.

---

[162] *See* JX 2647; JX 2648; JX 2657; JX 2658; JX 2659; JX 2660; JX 2693; JX 3006.

[163] *See* Ivanhoe Tr. 604–06; JX 2649.

[164] *See* JX 2911; JX 2914; JX 2998; JX 3000.

91

Mirae immediately asked Anbang to provide the Title Insurers with whatever addition they needed, including a copy of the DRAA Agreement. JX 3064. Mirae argued,

> If the Delaware Litigation is 100% based on fraud by Amer Group, as Seller insists, then it seems like the DRAA Agreement is the single most important document that Amer Group's perpetration is based on. And if the DRAA Agmt does NOT exist as you say, then your assertion must be that it was fabricated by Amer Group. If so, have you, as defendant, tried to obtain a copy of it from the Delaware Court? The point is that if, as Amer Group insists, the DRAA Agreement is with Anbang (whether the agmt is authentic or not), then it would seem that Anbang must be able to obtain a copy of it from the court, without violating [the] confidentiality clause the document contains. If Seller can provide more information regarding the legitimacy of the DRAA Agreement to the title insurers, we believe that this would greatly help expediting their review of the Delaware Litigation.

JX 3077 at 2 (formatting added). Anbang disputed that there was any reason for concern. JX 3157.

To try to address the Title Insurers' concerns, Gibson Dunn engaged with DLA Piper and provided additional evidence that the DRAA Petitioners were engaged in fraud. *See* JX 2995. Gibson Dunn leveled accusations at DLA Piper and asked DLA Piper to withdraw the DLA Letter. DLA Piper sent a strongly worded response that rejected any suggestion of wrongdoing. *See* JX 3066. Gibson Dunn provided the exchange to the Title Insurers and Buyer. Gibson Dunn also sent Ivanhoe a letter arguing that there was no basis on which anyone could set aside the default judgments in the Quiet Title Actions.[165]

---

[165] *See* JX 3118; JX 3119; JX 3121.

On March 25, 2020, Anbang asked the Beijing Municipal Public Security Bureau to investigate Hai Bin Zhou and his activities.[166] In its report, Anbang connected the Fraudulent Deeds with the DRAA Chancery Action and the years of trademark disputes, stating:

> In this case, the involved parties are significantly related, such as Great Hua Bang, Amer Group, and World Award Foundation, etc.; there is a high degree of overlap of these entities in the trademark dispute, document forgery, and fraudulent arbitration cases. Moreover, all the cases are related to a person named ZHOU Haibin (the Chinese name was transliterated; the English name was Hai Bin Zhou), who is likely to be the alleged suspect in this case.

JX 3160 at 7.

## R.    The Failed Closing

The beginning of April 2020 saw activity on multiple fronts as the clock wound down toward the scheduled closing date on April 17, 2020. Anbang and Gibson Dunn continued to push for an immediate closing. Mirae and Greenberg Traurig identified problems and requested more time. As the parties' relationship became more adversarial, they exchanged dispute letters and took the positions that they would assert in litigation.

On April 3, 2020, Anbang notified Mirae that Strategic had responded to the COVID-19 pandemic by taking a number of actions involving the Hotels, including (i) closing the Four Seasons Palo Alto, (ii) closing the Four Seasons Jackson Hole in advance of its normal between-season closing, (iii) operating Strategic's other hotels at reduced

---

[166] *See* JX 3160; JX 3162; JX 3416.

levels with reduced staffing and with many restaurants closed, and (iv) pausing all non-essential capital spending JX 3444 at 2–3. Mirae asserted that it had the right to approve in advance any actions that Strategic might take that were outside the ordinary course of business and reserved its rights to challenge the actions that Strategic had taken. *Id.* at 1–2.

On April 7, 2020, the Title Insurers informed Gibson Dunn that they were having difficulty assessing the level of risk posed by the DRAA Agreement, which none of the Title Insurers had seen:

> [W]e are having a difficult time determining if the [DRAA Agreement] has any provisions in it that would have pledged, as collateral / security, or otherwise, the U.S. hotel properties. Or perhaps required Anbang not to sell any of these assets. We recognize your firm's and your client's position on the whole matter. We just do not know how to properly underwrite the risk without a copy of the DRAA Blanket Agreement, which we understand is not able to be provided us, apparently pursuant to its terms. Again, we understand that Anbang's position is that this is a massive fraud being perpetrated against it.

JX 3525 at 5. Anbang and Gibson Dunn possessed the DRAA Summary, which contained information pertinent to the Title Insurers' questions and would have helped the Title Insurers perceive the illegitimacy of the DRAA Agreement.[167] But Anbang and Gibson Dunn did not share the DRAA Summary with the Title Insurers, Mirae, or Greenberg Traurig.

---

[167] *See* JX 2785; JX 4748.

On April 9, 2020, Gibson Dunn had a lengthy call with the Title Insurers in an effort to convince them to issue clean title insurance. *See* JX 3584. The next day, the principal decision makers for the Title Insurers convened "to reach a conclusion about the state of title they would be willing to insure." Ivanhoe Tr. 621. The decision makers were the "deans of the insurance industry" and "a veritable who's who of the most senior title insurance professionals in America."[168] Approximately one hour into the call, one of the representatives emailed Ivanhoe and asked him to join the call. *See* JX 3645. When the Title Insurers asked Ivanhoe what he would do in their position, Ivanhoe said he would continue to take an exception for the Fraudulent Deeds until "the seller . . . undertook proper action to have them removed of record." Ivanhoe Tr. 632. The Title Insurers would then decide whether to provide affirmative coverage for the exception through an endorsement.[169]

On April 10, 2020, Gibson Dunn sent Greenberg Traurig an estimated closing statement for a closing on April 17, drafts of various closing deliverables, and a proposed closing checklist. JX 3607. Anbang was already planning for litigation, and on April 13, Gibson Dunn circulated a litigation strategy memo. *See* JX 3656. On August 14, Anbang circulated a litigation hold memo. *See* JX 3738.

---

[168] Ivanhoe Tr. 621; Kravet Dep. 206–07.

[169] *See id.*; Mertens Dep. 262; Chernin Dep. 104–06.

On April 13, 2020, Gibson Dunn wrote to the Title Insurers asking them to issue policies without taking exception for the Fraudulent Deeds.[170] In the letter, Gibson Dunn offered to have Seller and one of its affiliates indemnify the Title Insurers for any losses they incurred and to assume the defense of any claims relating to the DRAA Agreement. JX 3670 at 5. That offer resembled the proposal that Anbang had made in August and September 2019, when Anbang first revealed the existence of the Fraudulent Deeds and the Lenders and Title Insurers balked. Anbang did not receive a more welcoming reception the second time around.

After receiving the letter from Gibson Dunn, the Title Insurers issued title commitments for the Hotels that added the DRAA Exception. Under this broad exception, no coverage exists for

> [a]ny defect, lien, encumbrance, adverse claim, or other matter resulting from, arising out of, or disclosed by, any of the following: (i) that certain "[DRAA Agreement]," dated on or about May 15, 2017, to which AnBang Insurance Group Co., Ltd., Beijing Dahuabang Investment Group Co., Ltd., Amer Group LLC, World Award Foundation Inc., An Bang Group LLC, and AB Stable Group LLC are purportedly parties and/or also interested, and the rights, facts, and circumstances disclosed therein; (ii) that certain action styled World Award Foundation, et al. v. AnBang Insurance Group Co, Ltd, et al., in the Court of Chancery of the State of Delaware, as DRAA C.A. No. 2019-0605-JTL and the rights, facts, and circumstances alleged therein; (iii) those certain actions, each styled World Award Foundation, et al. v. AnBang Insurance Group Co Ltd, et al., in the Superior Court of the State of Delaware, as Nos. C.A. N19J-05055, C.A. N19J-05253, C.A. N19J-05458, C.A. N19J-05868, C.A. N19J-06026, and C.A. N19J-06027 and the rights, facts, and circumstances alleged therein; and (iv) that certain action styled World Award Foundation, et al., v. AnBang Insurance Group Co., Ltd., in

---

[170] JX 3670 at 2–6; *see also* JX 3639; JX 3642.

the Superior Court of State of California for the County of Alameda, as Case No. RG19046027 and the rights, facts, and circumstances alleged therein.

JX 3676 at 11. Both Buyer and Seller retained experts on title insurance who agreed that the language of the DRAA Exception was so broad as to eliminate coverage for the Fraudulent Deeds.[171]

It was only after the Title Insurers issued the commitments with the DRAA Exception that Anbang returned to this court in the DRAA Chancery Action in an effort to obtain a copy of the DRAA Agreement.[172] On April 14, 2020, Anbang filed an emergency motion to compel production of the DRAA Agreement, representing that

> based on statements characterizing the content of this document made [in the DLA Letter], the title insurers involved in the [Transaction] have expressed reservations about their ability, without having the opportunity to review the document, to write "clean" title insurance policies before the closing date . . . . Mirae too has expressed serious reservations about closing this transaction because of the existence of this so called "DRAA Blanket Agreement" and related issues. [Anbang] believes that the purported DRAA Blanket Agreement has been fabricated and is part of Petitioner's scheme to defraud [Anbang]. Thus, the DRAA Blanket Agreement should be irrelevant to the closing of the Mirae Transaction. Despite this, Mirae continues to attempt to hide behind the DRAA Blanket Agreement to delay the Mirae Transaction, which is why this motion is so urgent.

---

[171] Chernin Tr. 1263; Nielsen Tr. 1441–43; *accord* Ivanhoe Tr. 633, 767.

[172] Three months earlier, on January 6, 2020, Anbang had filed a motion to compel in connection with its TRO application, but that motion did not specifically seek production of the DRAA Agreement. *See* DRAA Chancery Action Dkt. 32. Anbang had also served subpoenas on the DRAA Petitioners' former counsel, which the lawyers had moved to quash. With the entry of the default judgment embodied in the DRAA January Order, the court had viewed the DRAA Chancery Action as effectively over, mooting the discovery sought in connection with the TRO.

JX 3763 at 2. The court granted the motion that same day. JX 3765.

On April 15, 2020, Stamoulis provided Anbang with the version of the DRAA Agreement that he possessed, which was missing a page.[173] Also on April 15, Buyer provided formal notice that the Seller had failed to satisfy its representation that Seller and its Subsidiaries had good and marketable title to all owned real property. JX 3770 at 2. Buyer contended that because this representation was inaccurate, Seller had not satisfied a condition to closing. *Id.* Buyer further asserted that if Seller did not cure the breach, then Buyer would have the right to terminate the Sale Agreement. *Id.*

On April 16, 2020, after obtaining the missing page of the DRAA Agreement from Nielsen, Stamoulis sent the page to Anbang.[174] Seller provided it to Buyer and the Title Insurers.[175] This was the first time that Buyer and the Title Insurers had seen the DRAA Agreement, which was written in Chinese. That evening, Greenberg Traurig obtained an English translation.[176]

On April 17, 2020, Buyer issued a formal notice of default based on the inaccuracy of Seller's representation that Seller and its Subsidiaries had good and marketable title to all owned real property. Buyer also claimed that five other representations were inaccurate and that Seller had failed to operate the Company and its subsidiaries in the ordinary course

---

[173] *See* JX 3775; JX 3796; JX 4968.

[174] JX 3797; *see* JX 3843.

[175] JX 3794; JX 3798.

[176] *See* JX 3871; JX 3873.

of business. Buyer asserted that Seller therefore had failed to satisfy the conditions to closing and that Buyer was not obligated to close. Seller informed Buyer that if the breaches were not cured on or before May 2, 2020, then Buyer would be entitled to terminate the Sale Agreement. *See* JX 3829.

In response, Seller delivered a certificate affirming that its representations were correct and that all conditions to closing were satisfied. Seller maintained that Buyer was obligated to close and that by failing to do so, Seller was in willful breach of the Sale Agreement. *See* JX 3848.

## S.    Post-Closing, Pre-Litigation Developments

On April 22, 2020, Gibson Dunn sent a copy of the DRAA Agreement to the Title Insurers. Gibson Dunn pointed out a series of issues with the DRAA Agreement that were indicative of fraud, including:

- Temporal anomalies, such as references to events that had not yet occurred when the DRAA Agreement was purportedly signed.

- Factual inaccuracies, such as references to a property that Strategic had sold two years before the DRAA Agreement was purportedly signed.

- Legal impediments, such as the inability of the purported signatories to the DRAA Agreement to bind Anbang without first obtaining shareholder approval.

- Patently unfair terms, such as a supposed arbitration provision that permitted Anbang to select one arbitrator and its counterparties to select five arbitrators.

*See* JX 3957 at 1–3. Gibson Dunn sent a similar letter to Greenberg Traurig. *See* JX 3955.

Greenberg Traurig asked Gibson Dunn for more information about the DRAA Agreement and its origins. JX 3891. Greenberg Traurig noted that at least of its face, the DRAA Agreement appeared to implicate the properties covered by the Sale Agreement and

99

seemed to be "sealed by Anbang's corporate seal and signed by (ex) Chairman Wu." *Id.* at 1. Greenberg Traurig also asked why the underlying trademark dispute was not identified when the Fraudulent Deeds first appeared in August 2019. *Id.* at 2.

To clarify matters further, Greenberg Traurig asked Gibson Dunn to address the following questions:

- Why does Seller contend that the [DRAA Agreement] is fraudulent or invalid and, if so, on what basis?

- Is AnBang Insurance Group Co. Ltd. an affiliate of AnBang Insurance Group LLC?

- What steps did AnBang take to locate a copy of this agreement within its organization since it became aware of its purported existence?

- Did AnBang Insurance Group Co Ltd or any related entity engage patent application counsel (including Fross, Zelnick, Lehrman & Zissou PC or another) and make or cause[] to be made patent applications in[] U.S. numbered 87088221, 87088208, 87088196, 87088201, 87088186, 86945225; or 86945267 (and the last number may be an incorrect reference but please identify any other patent application it filed in [the] U.S.)

- The [DRAA Agreement] states that there is an original English version of the document. May we obtain a copy of that version?

- Even if the [DRAA Agreement] is invalid, was there an agreement between AnBang Insurance Group, Amer Group Inc. and others to abandon and/or transfer the AnBang trademark(s)?

- Did AnBang Insurance Group Co. Ltd., Anbang Insurance Group LLC, or other AnBang-related entity transfer funds to any or all of the other parties listed in the [DRAA Agreement] per paragraph 79 of the [DRAA Agreement]?

*Id.* at 2–3. Anbang never provided answers.

100

On April 24, 2020, this court granted Anbang's motion to compel production of documents from counsel in the DRAA Chancery Action. In granting the motion, the court noted that there was "ample evidence to believe that Petitioners committed a fraud on [Anbang] and on the court" and there was "also reason to believe that Petitioners may have engaged in criminal conduct."[177]

On April 24, 2020, Greenberg Traurig sent Gibson Dunn another set of questions about the DRAA Agreement and the DRAA Chancery Action. JX 4037 at 1. Greenberg Traurig explained that answers to these questions would help Mirae evaluate Anbang's position that the DRAA Agreement was not authentic and assist Mirae in evaluating any claim to title. *Id.* Anbang never answered these questions.

## T.     This Litigation

On April 27, 2020, Seller filed this litigation, seeking a decree of specific performance compelling Buyer to perform its obligations under the Sale Agreement. In its complaint, Seller claimed that Buyer could have locked in its financing before signing the Sale Agreement, but that "[o]n information and belief, [Buyer] believed it could obtain preferential rates and terms if it waited to lock in terms, and thus did not attempt to seek

---

[177] JX 4033 ¶ 5. The court addressed the motions after holding a status conference on April 17, 2020, and learning that Anbang did not regard the DRAA Chancery Action as over or the pending discovery motions as moot, largely because of the problems that the DRAA Agreement had created for the Transaction. The Gibson Dunn partner who handled the conference stated that "there may need be at some point a decision or judgment made about the DRAA agreement, potentially something along the lines of it being inoperative." DRAA Chancery Action Dkt. 70 at 8.

financing until February 2020." Dkt. 1 ¶ 81. That allegation was not truthful. Seller and its counsel knew that Buyer had planned to lock in debt financing before signing but that the belated disclosure of the Fraudulent Deeds caused the lenders to balk.

On May 3, 2020, Buyer gave notice that it was terminating the Sale Agreement based on Seller's failure to cure the breaches of contract that Buyer had identified on April 17. JX 4101. Buyer noted that the equity commitment letters automatically terminated as well and accordingly were no longer in effect. *Id.* at 1.

On May 8, 2020, the court heard argument on Seller's motion to expedite. During the hearing, Gibson Dunn doubled down on its story about Buyer taking a business risk by delaying financing. *See* Dkt. 57 at 5–6 ("The defendants bet big. They bet that they could get better terms if they waited and waited and negotiated and negotiated. And, lo and behold, they bet big and they lost big."). That was not true. Buyer wanted to lock in debt financing in August 2019. It was Anbang and Gibson Dunn who prevented Buyer from doing so by withholding information about the Fraudulent Deeds until the eleventh hour, and then making partial and misleading disclosures about the extent of the fraud.

The court granted the motion to expedite and scheduled a trial for August 2020. Buyer answered and filed counterclaims.

Discovery unfolded, with the parties engaging in Herculean efforts to collect and produce documents and conduct depositions in multiple languages and across multiple continents, primarily by remote means, during the COVID-19 pandemic. In response to a subpoena, DLA Piper represented that it had disengaged from representing the DRAA Petitioners and would not be appearing on their behalf in any action. JX 5061.

During discovery, Anbang and Gibson Dunn sought to avoid revealing what they knew about Hai Bin Zhou and the years of trademark litigation, the DRAA Agreement, and the discovery of the Fraudulent Deeds.[178] Buyer was forced to file four motions to compel to fight through Anbang and Gibson Dunn's objections, and Seller put additional objections at issue through a motion for protective order.[179] The court addressed the parties' competing arguments in a series of rulings that granted the motions in part.[180]

---

[178] *See, e.g.*, Dkt. 4 at 3 ("The issues presented by this case are largely legal in nature, and resolution of AB Stable's claims will require limited discovery."); Dkt. 36 at 5 ("Defendants contend [their] counterclaims will require international discovery into 'who knew what, when,' and 'other parties'—presumably the fraudsters—'who have asserted interests in the Hotels.' This is nonsense." (citation omitted)); Dkt. 144 at 2 ("None of the sweeping discovery Defendants seek—regarding a decade's worth of trademark disputes, . . . further information regarding the false deeds . . . , and communications with a Chinese regulator—has anything to do with Defendants' ill-conceived claims."); *id.* at 5 ("when Plaintiff became aware of the fact that deeds had been falsely recorded for two of the Hotels . . . is irrelevant" (emphasis omitted)); *id.* at 20 ("What Defendants are really asking is to open up wide-ranging discovery into 'all claims or disputes' with the DRAA Petitioners 'since January 2, 2011, related to the use of the Anbang name and/or the trademarks referenced in the DRAA Agreement' This is a fishing expedition: the requested information is irrelevant." (citation omitted) (emphasis omitted)); Dkt. 297 at 25–26 (Gibson Dunn arguing against any internal production from Anbang's counsel).

[179] *See* Dkt. 129; Dkt. 303; Dkt. 373; Dkt. 391; Dkt. 408.

[180] The discovery difficulties were not one-sided. Buyer took aggressive positions in discovery as well, most notably by delaying the production of documents from Greenberg Traurig. Seller was forced to file motions to compel of its own to challenge certain positions. *See* Dkt. 367; Dkt. 393. As with Buyer's motions, the court granted the motions in part.

The court appointed a discovery facilitator who provided invaluable assistance by promoting transparency, acting as an honest broker, and reducing the overall number of disputes. In addition, the court acknowledges the role of Delaware counsel, who fulfilled

On June 20, 2020, Anbang moved for entry of final judgment in the DRAA Chancery Action.[181] Anbang sought an order that would have made permanent the expansive relief granted in the DRAA January Order. By this point, both as a result of the contents of the DLA Letter and the course of discovery in this litigation, the court had become sufficiently concerned about Anbang and Gibson Dunn's lack of candor that the court was not willing to enter the broad relief requested.[182] The court entered a final order that provided narrower relief limited to the matters raised in the DRAA Chancery Action. *See* JX 4519 (the "DRAA Final Order").[183]

Despite the court's concerns that Anbang and Gibson Dunn were not telling the whole truth, the court continued to believe there was a significant likelihood that the DRAA Petitioners had engaged in fraud. On July 21, 2020, the court and the judge who presided over the Delaware Superior Court actions referred the DRAA Petitioners to the Delaware Attorney General based on concerns that "crimes may have been committed in the State of Delaware." JX 4588 at 1. The court and the judge who presided over the Delaware Superior

---

their obligations as officers of the court by working cooperatively, communicating regularly, and restraining the adversarial instincts of their forwarding counsel.

[181] JX 4403; *see* JX 4404.

[182] *Compare* JX 4406 *with* JX 4521.

[183] The DRAA Petitioners attempted to notice a series of appeals from the final judgment. Those appeals were all procedurally defective, and the Delaware Supreme Court rejected them. The DRAA Final Order has therefore become final.

Court actions made clear that they "defer[red] completely" to the prosecutorial discretion of the Attorney General as to "what action, if any," to take. *Id.*

## II.  AN OVERVIEW OF THE LEGAL ANALYSIS

The briefs contain a deluge of legal arguments. Each side's goals, however, are straightforward. Seller seeks to force Buyer to close or, in the alternative, to keep Buyer's deposit plus interest and receive an award of attorneys' fees and expenses. Buyer seeks declarations that it was not required to close and that it validly terminated the Sale Agreement. Buyer seeks the return of its deposit plus interest, to recover transaction-related expenses as damages, and an award of attorneys' fees and expenses. As between Buyer and Seller, Buyer is generally the party seeking to establish propositions of fact or law, so this decision focuses primarily on Buyer's arguments.

Buyer's manifold legal theories can be grouped into three general categories: (i) contractual theories that rely on express provisions, (ii) contractual theories that rely on the implied covenant of good faith and fair dealing, and (iii) tort theories based on fraudulent inducement and post-signing fraud. Buyer also contends that the Sale Agreement should be rescinded based on unilateral mistake and that specific performance should not be ordered. The contractual theories that rely on express provisions are dispositive, so this decision does not delve into the other categories.[184]

---

[184] Although this decision does not reach Buyer's other arguments, some of them could have merit given my factual findings. Most notably, there is reason to think it would be inequitable to award specific performance, given that the root cause of the parties' difficulties is traceable to the initial decision by Anbang and Gibson Dunn not to disclose

The express contractual theories remain diverse and plentiful. They too can be grouped into three board categories: (i) theories that relieved Buyer of its obligation to close, (ii) theories that allowed Buyer to terminate, and (iii) theories that enable Buyer to recover the deposit, its transaction costs, and its attorneys' fees and expenses. This decision addresses Buyer's theories in that order.

Because all of the issues addressed in this decision turn on express contractual provisions, the legal analysis relies on principles of contract interpretation. The elements of a claim for breach of contract are (i) a contractual obligation, (ii) a breach of that obligation by the defendant, and (iii) a causally related injury that warrants a remedy, such as damages or in an appropriate case, specific performance. *See WaveDivision Hldgs. v. Millennium Digit. Media Sys., L.L.C.*, 2010 WL 3706624, at *13 (Del. Ch. Sept. 17, 2010). When determining the scope of a contractual obligation, "the role of a court is to effectuate the parties' intent." *Lorillard Tobacco Co. v. Am. Legacy Found.*, 903 A.2d 728, 739 (Del. 2006). Absent ambiguity, the court "will give priority to the parties' intentions as reflected in the four corners of the agreement, construing the agreement as a whole and giving effect to all its provisions." *In re Viking Pump, Inc.*, 148 A.3d 633, 648 (Del. 2016) (internal

_____

the Fraudulent Deeds earlier in the sale process, followed by misleading partial disclosures that fatally undermined their credibility. *See Turchi v. Salaman*, 1990 WL 27531, at *8 (Del. Ch. Mar. 14, 1990) (explaining that a request for a decree of specific performance "will always be refused when the plaintiff has obtained the agreement by sharp and unscrupulous practices, by overreaching, by concealment of important facts, even though not actually fraudulent, by trickery, by taking undue advantage of [its] position, or by any other means which are unconscientious." (quoting 2 John Norton Pomeroy, *Equity Jurisprudence* § 400, at 100–01 (5th ed. 1941))).

quotation marks omitted). "Unless there is ambiguity, Delaware courts interpret contract terms according to their plain, ordinary meaning." *Alta Berkeley VI C.V. v. Omneon, Inc.*, 41 A.3d 381, 385 (Del. 2012).

## III.    BUYER'S OBLIGATION TO CLOSE

The first category of issues involves whether Buyer was obligated to perform at closing. Buyer offers a series of reasons why it was not obligated to perform, and those reasons fall into two groups. The first group implicates what this decision refers to as the DRAA Issues, which relate to the DRAA Agreement, the Fraudulent Deeds, the DRAA Chancery Action, the Delaware Judgments, the Alameda Action, and the California Judgment. The second group implicates what this decision refers to as the COVID Issues, which relate to the effects of the COVID-19 pandemic.

To excuse its failure to close, Buyer relies on the Title Insurance Condition, the Bring-Down Condition, and the Covenant Compliance Condition. For the Title Insurance Condition, Buyer only advances arguments based on DRAA Issues. For the Bring-Down Condition and the Covenant Compliance Condition, Buyer advances arguments based on both COVID Issues and DRAA Issues.

The Title Insurance Condition conditioned Buyer's obligation to close on Seller having obtained documentation sufficient to enable the Title Insurers to issue a policy of title insurance to Buyer in its capacity as the owner of the Hotels that either (i) did not contain an exception for the Fraudulent Deeds or (ii) contained an exception for the Fraudulent Deeds but expressly provided coverage through an endorsement. The Title Insurers have not issued title commitments that satisfy the Title Insurance Condition. The

107

Title Insurers only have issued title commitments that contain the DRAA Exception, which is broad enough to exclude coverage for the Fraudulent Deeds. The Title Insurance Condition therefore failed, and Buyer was not obligated to close.

As noted, the outcome of the analysis of the Title Insurance Condition turns solely on the DRAA Issues. Having concluded that the DRAA Issues caused the Title Insurance Condition to fail, this decision does not reach Buyer's other arguments based on the DRAA Issues.[185]

For purposes of the COVID Issues, Buyer makes two arguments. Under the Bring-Down Condition, Buyer was not obligated to close if Seller's representations were not true and correct as of the closing date, unless "the failure to be so true and correct . . . would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect."[186] The covered representations included the No-MAE Representation, in which

---

[185] Some of Buyer's other DRAA-related arguments have merit given my factual findings. Most notably, Buyer relies on covenants which required Seller to provide Buyer with notice of communications from governmental authorities, to use commercially reasonable efforts to eliminate impediments to closing, to keep Buyer reasonably informed about the Fraudulent Deeds, and to operate in the ordinary course of business. *See* SA §§ 5.1, 5.5(a), 5.5(d), 5.5(i), 5.10(a). Buyer has strong arguments that Seller did not fulfill these covenants in connection with the DRAA Issues, causing the Covenant Compliance Condition to fail. By contrast, Buyer's arguments about Seller's breaches of its representations are weaker, as those representations are highly technical, would have to be construed broadly to extend to the DRAA Issues, and require a variance from the as-represented condition that would be sufficient to qualify as a Material Adverse Effect. It is therefore less likely that the DRAA Issues caused a failure of the Bring-Down Condition. To reiterate, this decision has not reached these issues.

[186] SA § 7.3(a). This description simplifies the Bring-Down Condition, which contemplates that when the Sale Agreement provides that a representation by Seller must

108

Seller's represented that since July 31, 2019, the business of Strategic and its subsidiaries had not suffered a contractually defined "Material Adverse Effect." SA § 3.8.

Buyer argues that the COVID-19 pandemic and its effects caused the No-MAE Representation to become inaccurate and the Bring-Down Condition to fail. The contractual definition of a Material Adverse Effect (the "MAE Definition") follows standard form, consisting of an initial definition followed by a series of exceptions. Assuming for purposes of analysis that the business of Strategic and its subsidiaries suffered an effect that was material and adverse, Seller proved that the cause of the effect fell within an exception to the MAE Definition for "natural disasters and calamities." Consequently, the effect could not constitute a Material Adverse Effect under the MAE Definition. The Bring-Down Condition therefore did not fail because of the effects of the COVID-19 pandemic.

Buyer also relies on the Covenant Compliance Condition, which makes it a condition to Buyer's obligation to close that "Seller shall have performed in [all] material respects all obligations and agreements and complied in all material respects with all covenants and conditions required by this Agreement." SA § 7.3(a). Seller's covenants included the Ordinary Course Covenant, which was a commitment that "the business of

be true and correct as of a specific date, then for purposes of the Bring-Down Condition, "such representations and warranties shall be true and correct as of such specified date." SA § 7.3(a). This detail is not relevant to the representations analyzed in this case, so for simplicity, this decision refers to the representations being true and correct as of the closing date.

the Company and its Subsidiaries shall be conducted only in the ordinary course of business consistent with past practice in all material respects." SA § 5.1.

Buyer proved that Seller failed to comply with the Ordinary Course Covenant because the effects of the COVID-19 pandemic led to massive changes in the business of Strategic and its subsidiaries. As a result, the business of Strategic and its subsidiaries was not operated only in the ordinary course of business consistent with past practice in all material respects. The Covenant Compliance Condition therefore failed, and Buyer was not obligated to close.

## A. The Allocation Of The Burden Of Proof For Purposes Of The Conditions

Under Delaware law, parties can allocate the burden of proof contractually.[187] In this case, the Sale Agreement did not do so explicitly, and its imprecise language did not do so implicitly. This decision therefore relies on common law principles to allocate the burden of proof.

In disputes over contractual conditions, the *Restatement (Second) of Contracts* instructs courts to look to the nature of the condition at issue. If a condition must be satisfied before a duty of performance arises (formerly known as a condition precedent), then the burden of proof rests with the party seeking to enforce the obligation. If a condition would

---

[187] *See, e.g.*, *Hexion Specialty Chems., Inc. v. Huntsman Corp.*, 965 A.2d 715, 739 n.60 (Del. Ch. 2008) ("Of course, the easiest way that the parties could evidence their intent as to the burden of proof would be to contract explicitly on the subject."); *Frontier Oil Corp. v. Holly Corp.*, 2005 WL 1039027, at *34 (Del. Ch. Apr. 29, 2005) ("The parties could have expressly allocated the burdens as a matter of contract, but they did not do so.").

extinguish a party's duty of performance (formerly known as a condition subsequent), then

the burden of proof rests with the party seeking to avoid the obligation.[188]

When interpreting conditions in transaction agreements, Delaware decisions

generally have not looked to the *Restatement* and the nature of the condition at issue.[189]

They instead have jumped over the *Restatement* inquiry by treating the transaction

agreement as an existing contractual obligation, then allocating the burden of proof to the

party seeking to invoke the condition. The Delaware cases fall into two broad categories.

The first involves conditions that ordinarily would be satisfied absent a departure from the

status quo that existed at signing. The second involves conditions where non-satisfaction

---

[188] *See Restatement (Second) of Contracts* § 224 cmt. e (Am. L. Inst. 1981). The principles that govern the allocation of the burden of proving the non-occurrence of a condition may differ from the principles that apply in other contractual settings. For example, when a party seeks to exercise a termination right, this court has held that the party invoking the termination right bears the burden of establishing that the requirements for its exercise have been met. *Channel Medsystems, Inc. v. Bos. Sci. Corp.*, 2019 WL 6896462, at *37 (Del. Ch. Dec. 18, 2019).

[189] The principal exception is *Shareholder Representative Services LLC v. Shire US Holdings, Inc.*, which explained the difference between the *Restatement*'s approach and Delaware precedent and grappled with the resulting tension. 2020 WL 6018738, at *17–19 (Del. Ch. Oct. 12, 2020) (considering whether the "Fundamental Circumstance Clause" was a condition precedent or condition subsequent and using *Restatement* framework). The other exception is *Hexion*, where the parties argued about whether a no-MAE condition was a condition precedent or a condition subsequent, and the court sidestepped the issue by characterizing MAE conditions as "strange animals, *sui generis* among their contract clause brethren." *Hexion*, 965 A.2d at 739. The court ultimately allocated the burden of proof to the buyer. *Id.* at 739–40. That result "effectively treated the clause as a condition subsequent." Eric L. Talley, *On Uncertainty, Ambiguity, and Contractual Conditions*, 34 Del. J. Corp. L. 755, 800 (2009).

111

depends on proof of contractual non-compliance. Both categories involve conditions that are best understood as extinguishing a duty of performance.

The representative example for the first category involves a buyer citing an MAE as a basis for non-performance.[190] Upon signing the transaction agreement, the buyer assumes an obligation to perform unless the seller suffers an MAE. If the status quo that existed at signing had continued, then the seller would be obligated to close. It is therefore logical to treat a no-MAE condition as one in which the existence of an MAE extinguishes the buyer's obligation to perform, such that the burden of proof rests with the buyer. Placing the burden on the buyer also requires the buyer to prove an affirmative fact, rather than forcing the seller to prove a negative.[191]

---

[190] *See Akorn v. Fresenius Kabi AG*, 2018 WL 4719347, at *47 (Del. Ch. Oct. 1, 2018) ("Because Fresenius seeks to establish a General MAE to excuse its performance under the Merger Agreement, Fresenius bore the burden of proving that a General MAE had occurred."); *Hexion*, 965 A.2d at 739 ("[I]t seems the preferable view, and the one the court adopts, that absent clear language to the contrary, the burden of proof with respect to a material adverse effect rests on the party seeking to excuse its performance under the contract.").

[191] *See, e.g.*, *Quantum Tech. P'rs IV, L.P. v. Ploom, Inc.*, 2014 WL 2156622, at *19 (Del. Ch. May 14, 2014) (allocating burden to prove public disclosure of information to the party relying on that exception to a confidentiality order, rather than requiring opposing party to prove that the information was not publicly disclosed); *Behrman v. Rowan Coll.*, 1997 WL 719080, at *2 (Del. Super. Ct. Aug. 29, 1997) (reallocating burden of proof to avoid requiring a party to prove a negative); *Wilm. Tr. Co. v. Culhane*, 129 A.2d 770, 773 (Del. Ch. 1957) (questioning allocation requiring a party to bear "the burden to prove a negative"). *See generally* 29 Am. Jur. 2d *Evidence* § 173 ("Courts generally do not require litigants to prove a negative, because it cannot be done. Thus, the affirmative of an issue has to be proved, and the party against whom the affirmative defense is asserted is not required to prove a negative." (footnote omitted)).

The second category contains two illustrative examples, one involving a bring-down condition and another involving the interaction of a covenant compliance condition with an ordinary course covenant. This court has held that when a buyer claims that a bring-down condition failed because of the inaccuracy of a representation, then the buyer has asserted a theory analogous to a claim for breach of warranty and therefore bears the burden of proof.[192] This court also has held that when a buyer claims that a covenant compliance condition failed because the seller failed to operate its business in the ordinary course, then the buyer has asserted a theory analogous to a claim for breach of the underlying covenant and bears the burden of proof.[193] In both settings, the baseline assumption is contractual compliance; parties are assumed to make accurate representations and operate in the ordinary course. Unless the buyer can prove that the seller departed from the baseline of

---

[192] *See Akorn*, 2018 WL 4719347, at *62 (holding that where buyer claimed that bring-down condition failed because of a representation about regulatory compliance had become inaccurate, the buyer bore the burden of proof). The operation of burden for proving the failure of a bring-down condition parallels the assignment of the burden of proof in a case where, without such a condition, the buyer seeks to avoid performance by proving that one of the seller's representation was inaccurate. *See Frontier Oil*, 2005 WL 1039027, at *34 (assigning burden to party claiming that warranty was inaccurate; observing that "[t]o obtain relief for a breach of warranty, one would expect to be required to demonstrate an entitlement to that relief."); *id.* at *38 n.233 (same); *In re IBP Inc. v. Tyson Foods Inc.*, 789 A.2d 14, 53 (Del. Ch. 2011) (assigning burden of proof to party seeking to establish that representation was inaccurate because "a defendant seeking to avoid performance of a contract because of the plaintiff's breach of warranty must assert that breach as an affirmative defense").

[193] *See Akorn*, 2018 WL 4719347, at *82–83 (assigning burden of proof to buyer to show failure of condition that required seller to comply with all covenants where buyer asserted that seller had not complied with ordinary course covenant).

113

contractual compliance, then the buyer is obligated to close. It is therefore logical to treat these conditions as extinguishing the buyer's obligation to perform, such that the burden of proof rests on the seller. Allocating the burden in that fashion also requires the buyer to prove an affirmative fact rather than forcing the seller to prove a negative.

In the future, parties and courts can promote clarity by starting with the *Restatement* approach and asking explicitly whether the condition is one that must be satisfied before an obligation to perform arises or whether the condition extinguishes an existing obligation to perform. Because existing precedent has assigned the burden consistent with the outcome that the *Restatement* would suggest, future decisions can rely on those cases when assigning the burden for similar conditions. For conditions that Delaware courts have not yet addressed, relevant factors would include (i) whether the condition turns on a specific and easily verified fact, such as the receipt of regulatory clearance or a favorable stockholder approval,[194] (ii) whether the condition turns on a departure from what normally would occur between signing and closing, and (iii) which party would have to prove a negative.[195]

---

[194] *See Hexion*, 955 A.2d at 739 ("Typically, conditions precedent are easily ascertainable objective facts, generally that a party performed some particular act or that some independent event has occurred.").

[195] The principal interpretive difficulty is usually linguistic. Drafters of transaction agreements typically frame no-MAE conditions, bring-down conditions, and covenant compliance conditions as conditions that must be satisfied for closing to occur. That framing opens the door to the argument that satisfying the condition is necessary before the buyer's obligation to perform arises. But the use of conditional language is often not dispositive. "Conditions subsequent are often expressed using conditional language. For

As noted, the issues in this case involve the Bring-Down Condition, the Covenant Compliance Condition, and the Title Insurance Condition. Consistent with precedent, Buyer bore the burden to prove that the Bring-Down Condition failed because it is a condition that would extinguish Buyer's obligation to perform. By signing the Sale Agreement, Buyer undertook an obligation to perform unless Seller's representations became so inaccurate that they would result in a Material Adverse Effect. Seller did not have to take any action to satisfy the Bring-Down Condition, and the baseline expectation was for Seller's representations to be accurate. Buyer therefore bore the burden of proving that a representation became sufficiently inaccurate to relieve Buyer of its obligation to perform.

One nuance flows from the structure of the MAE Definition, which generally requires an effect that is material and adverse, but which is subject to a series of exceptions. As a matter of hornbook law, "[a] party seeking to take advantage of an exception to a contract is charged with the burden of proving facts necessary to come within the

_____

this reason, the difference between a condition precedent and a condition subsequent 'is one of substance and not merely of the form in which the provision is stated.'" *Shire*, 2020 WL 6018738, at *18 (quoting *Restatement*, *supra*, § 230 cmt. a). Drafters could nevertheless assist courts by framing conditions to use the language of extinguishment when they intend that outcome. It should be possible, for example, to frame the core bring-down condition to say something like, "If Seller's representations are not true and correct at the time of measurement, and the extent of the inaccuracy (individually or in the aggregate) is sufficient to make it reasonably likely that Seller has suffered or would suffer a Material Adverse Effect, then Buyer's obligation to perform at closing is extinguished."

exception." 29 Am. Jur. 2d *Evidence* § 173. Delaware decisions follow this rule.[196]

Accordingly, Buyer had the burden to prove that Seller suffered an effect that was material and adverse. After that, Seller had the burden to prove that the source of the effect fell within an exception. *See Akorn*, 2018 WL 4719347, at *59 n.619.

The substance of the Covenant Compliance Condition reveals it also to be a condition where non-satisfaction extinguishes Buyer's obligation to perform. By signing the Sale Agreement, Buyer undertook an obligation to perform unless Seller failed to comply with its own contractual obligations. Unlike the Bring-Down Condition, the existence of contractual covenants meant that Seller was required to take action to comply with the Covenant Compliance Condition. Some of the underlying contractual covenants could operate as conditions that had to be satisfied to give rise to Buyer's obligation to

---

[196] *See, e.g.*, *Akorn*, 2018 WL 4719347, at *91 ("Akorn contends that Fresenius could not terminate the Merger Agreement because it breached both the Reasonable Best Efforts Covenant and the Hell-or-High-Water Covenant. Akorn bore the burden of proof on these issues because Akorn sought to invoke an exception to Fresenius's termination right."); *Hollinger Int'l, Inc. v. Black*, 844 A.2d 1022, 1070 (Del. Ch. 2004) ("Black bears the burden to establish that this contractual exception applies."); *see also, e.g.*, *E.I. du Pont de Nemours & Co. v. Admiral Ins. Co.*, 1996 WL 111133, at *1 (Del. Super. Feb. 22, 1996) ("The undisputed application of Delaware law in an insurance coverage suit requires the insured . . . to prove initially . . . that the loss is within a policy's coverage provisions. Once the insured meets that burden, the burden shifts to the insurer to establish a policy exclusion applies."); *E.I. du Pont de Nemours & Co. v. Admiral Ins. Co.*, 711 A.2d 45, 53–54 (Del. Super. 1995) (placing burden of proof on insured to prove exception to exclusion from coverage; noting that the insured had better access to information about whether the exception to the exclusion applied and was better positioned to prevent events that might trigger coverage).

perform; others could operate as conditions where non-fulfillment extinguished Buyer's obligation to perform. The analysis must extend to the underlying covenant.

In this case, Buyer contends that Seller failed to fulfill the Ordinary Course Covenant. Consistent with prior precedent, Buyer bore the burden of proving that Seller breached this covenant and caused the Covenant Compliance Condition to fail. The baseline contractual expectation was for Seller to operate in the ordinary course of business. By asserting a departure from the ordinary course, Buyer sought to prove the fact of a deviation. It is logical to require Buyer to bear the burden of proving that assertion. For purposes of the Ordinary Course Covenant, the Covenant Compliance Condition operates as a condition under which non-satisfaction extinguishes Buyer's obligation to close.

Here, too, a nuance arises. Seller claims that to the extent it operated outside of the ordinary course, it was contractually obligated to do so to comply with other contractual requirements and legal obligations. As the party asserting that its actions fell within an exception to the Ordinary Course Covenant, Seller bore the burden of proving its position regarding compliance with competing contractual obligations.

The last condition is the Title Insurance Condition, which obligates Buyer to obtain documentation sufficient to enable the Title Insurers to provide insurance in a form that satisfied the condition. This provision fits the model of a condition that must be satisfied before a duty of performance arises, as it identifies specific items that Seller must obtain. Under the *Restatement* approach, Seller should have had to carry the burden of proving that it satisfied the Title Insurance Condition. The parties, however, approached the burden

117

of proof as if it rested with Buyer, based on the proposition that Buyer relied on the failure of the condition to avoid its obligation to perform. This decision adopts that allocation, which does not affect the outcome in this case. Whether the issuance of title insurance containing the DRAA Exception satisfied the Title Insurance Condition is a question of law to be resolved based (i) on the plain language of the title commitments and (ii) undisputed facts about the DRAA Chancery Action, the Alameda Action, and the DRAA Agreement.

Notwithstanding the initial allocation of the burden of proof to Buyer, Seller bore the burden of proving its contention that Buyer took action that caused the Title Insurance Condition to fail. Under the *Restatement* framework, which Delaware has adopted,[197] "[w]here a party's breach by non-performance contributes materially to the non-occurrence of a condition of one of his duties, the nonoccurrence is excused." *Restatement*, *supra*, § 245. *See generally In re Anthem-Cigna Merger Litig.*, 2020 WL 5106556, at \*90–91 (Del. Ch. Aug. 31, 2020) (discussing applicable principles). As the party seeking to show that Buyer caused the Title Insurance Condition to fail by breaching a contractual obligation, Seller bore the burden of proving both the breach of a contractual obligation and the requisite causal contribution.

The "contributed materially" standard is a common law rule, and parties "can by agreement vary the rules" as long as the replacement "is not invalid for unconscionability

---

[197] *See Williams Cos. v. Energy Transfer Equity, L.P.*, 159 A.3d 264, 273 (Del. 2017); *WaveDivision*, 2010 WL 3706624, at \*14–15.

or on other grounds." *Restatement*, *supra*, § 346 cmt. a (citation omitted). Here, the parties agreed contractually to modify the "contributed materially" rule by substituting a requirement of causation. The Sale Agreement states,

> Frustration of Closing Conditions. No party may rely on the failure of any condition set forth in this Article VII to be satisfied if such failure was caused by such party's failure to use efforts to cause the Closing to occur as required [by] the terms hereof.

SA § 7.4. Under Section 7.4, Seller bore the burden of proving that Buyer's breach caused the Title Insurance Condition to fail.

## B. The Bring-Down Condition

The Bring-Down Condition extinguished Buyer's obligation to close if Seller's representations were not true and correct as of the closing date, except "where the failure to be so true and correct . . . would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect." SA § 7.3(a). This section considers whether the Bring-Down Condition failed due to the inaccuracy of the No-MAE Representation, in which Seller represented that since July 31, 2019, "there have not been any changes, events, state of facts or developments, whether or not in the ordinary course of business that, individually or in the aggregate, have had or would reasonably be expected to have a Material Adverse Effect." SA § 3.8(b).

The combination of the No-MAE Representation and the Bring-Down Condition creates a double-materiality problem, which here takes the form of a double-MAE problem. The No-MAE Representation already incorporates the concept of a Material Adverse Effect. The Bring-Down Condition then measures deviation from the as-represented

119

condition using the concept of a Material Adverse Effect. To solve this problem, the Bring-Down Condition contains a clause known as a "materiality scrape,"[198] which provides that compliance with the Bring-Down Condition is measured "without giving effect to any limitation of qualification as to 'materiality' (including the word 'material'[] or 'Material Adverse Effect' set forth therein." SA § 7.3(a).

For purposes of evaluating whether the Bring-Down Condition failed, the materiality scrape eliminates the phrase "would reasonably be expected to have a Material Adverse Effect" from Section 3.8(b), resulting in a flat representation that since July 31, 2019, "there have not been any changes, events, state of facts or developments, whether or not in the ordinary course of business." The Bring-Down Condition then reintroduces the concept of a Material Adverse Effect by providing that any deviations from Seller's as-represented condition are acceptable so long as they "would not . . . reasonably be expected to have a Material Adverse Effect." The end result is a condition that turns on whether there have been "any changes, events, state of facts or developments, whether or not in the ordinary course of business that, individually or in the aggregate, have had or would

---

[198] *See* Lou R. Kling & Eileen T. Nugent, *Negotiated Acquisitions of Companies, Subsidiaries and Divisions* § 14.02[3], at 14-12 to -13 (2020 ed.) (discussing materiality scrape as a solution to the double materiality problem).

reasonably be expected to have a Material Adverse Effect." Such is the verbal jujitsu of transaction agreements.

The MAE Definition defines "Material Adverse Effect" as follows:

"Material Adverse Effect" means any event, change, occurrence, fact or effect that would have a material adverse effect on the business, financial condition, or results of operations of the Company and its Subsidiaries, taken as a whole,

other than any event, change, occurrence or effect arising out of, attributable to or resulting from

(i) general changes or developments in any of the industries in which the Company or its Subsidiaries operate,

(ii) changes in regional, national or international political conditions (including any outbreak or escalation of hostilities, any acts of war or terrorism or any other national or international calamity, crisis or emergency) or in general economic, business, regulatory, political or market conditions or in national or international financial markets,

(iii) natural disasters or calamities,

(iv) any actions required under this Agreement to obtain any approval or authorization under applicable antitrust or competition Laws for the consummation of the transactions contemplated hereby,

(v) changes in any applicable Laws or applicable accounting regulations or principles or interpretations thereof,

(vi) the announcement or pendency of this Agreement and the consummation of the transactions contemplated hereby, including the initiation of litigation by any Person with respect to this Agreement or the transactions contemplated hereby, and including any termination of, reduction in or similar negative impact on relationships, contractual or otherwise, with any customers, suppliers, distributors, partners or employees of the Company and its Subsidiaries due to the announcement and performance of this Agreement or the identity of the parties to this Agreement, or the performance of this Agreement and the transactions contemplated hereby, including compliance with the covenants set forth herein,

121

(vii) any action taken by the Company, or which the company causes to be taken by any of its Subsidiaries, in each case which is required or permitted by or resulting from or arising in connection with this Agreement,

(viii) any actions taken (or omitted to be taken) by or at the request of the Buyer, or

(ix) any existing event, occurrence or circumstance of which the Buyer has knowledge as of the date hereof.

For the avoidance of doubt, a Material Adverse Effect shall be measured only against past performance of the Company and its Subsidiaries, and not against any forward-looking statements, financial projections or forecasts of the Company and its Subsidiaries.

SA § 1.1 (formatting added).[199]

The MAE Definition adheres to the general practice of defining a "Material Adverse Effect" self-referentially as "a material adverse effect."[200] Also consistent with general

---

[199] The MAE Definition is obviously wordy and full of synonyms. For simplicity, except where the additional terminology advances the analysis, this decision abbreviates the multi-word phrases that appear in the definition. Thus, this decision substitutes "effect" for the lengthier phrase "event, change, occurrence or effect." It substitutes "Strategic" or "the business of Strategic" or for the "business, financial condition, or results of the operations of the Company and its Subsidiaries, taken as a whole." And it substitutes "resulting from" for "arising out of, attributable to or resulting from." No change in meaning is intended, and readers may refer back to the longer phrases for comfort.

[200] *See Akorn*, 2018 WL 4719347, at *52 ("[T]he MAE definition adheres to the general practice and defines 'Material Adverse Effect' self-referentially as something that 'has a material adverse effect.'"); *Frontier Oil*, 2005 WL 1039027, at *33 ("It would be neither original nor perceptive to observe that defining a 'Material Adverse Effect' as a 'material adverse effect' is not especially helpful."); Y. Carson Zhou, Essay, *Material Adverse Effects as Buyer-Friendly Standard*, 91 N.Y.U. L. Rev. Online 171, 173 (2016), http:// www.nyulawreview.org/sites/default/files/NYULawReviewOnline-91-Zhou.pdf (noting that in the typical MAE provision, the core concept of materiality is "left undefined"); Steven M. Davidoff & Kristen Baiardi, *Accredited Home Lenders v. Lone Star Funds: A MAC Case Study* 17 (Wayne State Univ. L. Sch. Legal Stud. Rsch. Paper Series, Paper No. 08-16, 2008),

practice, the definition follows the basic statement of what constitutes an MAE with a list

of exceptions.[201] Because of these exceptions, if an effect occurs that is both material and

---

https://papers.ssrn.com/sol3/papers.cfm?abstract_id=1092115 ("MAC clauses are typically defined in qualitative terms and do not describe a MAC in quantitative terms."); Albert Choi & George Triantis, *Strategic Vagueness in Contract Design: The Case of Corporate Acquisitions*, 119 Yale L.J. 848, 854 (2010) ("[T]he typical MAC provision is not quantitative and remains remarkably vague."); Andrew A. Schwartz, *A "Standard Clause Analysis" of the Frustration Doctrine and the Material Adverse Change Clause*, 57 UCLA L. Rev. 789, 826 (2010) ("A few MAC clauses include a quantitative definition of materiality, but the overwhelming majority offer no definition for the key term 'material.'" (footnote omitted)); Kenneth A. Adams, *A Manual of Style for Contract Drafting* 229 (4th ed. 2017) [hereinafter *Contract Drafting*] ("[Q]uantitative guidelines are little used."). One commentator sees no reason to criticize the MAE definition for its self-referential quality. *See* Kenneth A. Adams, *A Legal-Usage Analysis of "Material Adverse Change" Provisions*, 10 Fordham J. Corp. & Fin. L. 9, 22 ("It has been suggested that there is some circularity or tautology involved in using the phrase material adverse change in the definition of MAC. . . . [I]n contracts it is routine, and entirely appropriate, for a definition to include the term being defined." (footnotes omitted)); Adams, *Contract Drafting*, *supra*, at 169 ("Dictionaries shouldn't use in a definition the term being defined, as that constitutes a form of circular definition. . . . In a contract, a defined term simply serves as a convenient substitute for the definition, and only for that contract. So repeating a contract defined term in the definition is unobjectionable.").

Professor Robert Miller has provided a helpful set of terminology for analyzing MAE definitions. *See* Robert T. Miller, *Material Adverse Effect Clauses and the COVID-19 Pandemic* 30–31 (Univ. Iowa Coll. L. Legal Stud. Rsch. Paper, No. 2020-21, 2020) [hereinafter Miller, *COVID-19*].

[201] *See* Miller, *COVID-19*, *supra*, at 4 ("After [the] Base Definition, there typically follows a list of exceptions . . . that remove from the definition adverse changes or events arising from the materialization of particular kinds of risks."); Robert T. Miller, *The Economics of Deal Risk: Allocating Risk Through MAC Clauses in Business Combination Agreements*, 50 Wm. & Mary L. Rev. 2007, 2047 (2009) [hereinafter *Deal Risk*] ("From this definition [of a Material Adverse Effect], one or more exceptions . . . are then usually made . . . ."); Kling & Nugent, *supra*, § 11.04[9], at 11-61 ("Sellers often seek to negotiate certain generic exceptions to the no material adverse change representation, in addition to any specific issues they might be aware of."); John C. Coates IV, *M&A Contracts: Purposes, Types, Regulation and Patterns of Practice*, *in* Research Handbook on Mergers

adverse and yet results from a cause falling within one of the exceptions, then that effect—despite being material and adverse—is not a contractually defined "Material Adverse Effect."

Buyer asserts that Strategic suffered a Material Adverse Effect due to the consequences of the COVID-19 pandemic. The parties debated at length whether the effect was material and adverse. To that end, both sides amassed factual evidence, expert analyses, and arguments in favor of their positions. They also debated at length whether the effect fell within an exception.

Ordinarily, this court would determine first whether Strategic suffered an effect that was sufficiently material and adverse to meet the strictures of Delaware case law. *See Hexion*, 965 A.2d at 736–38. At times, however, it is more straightforward to determine whether the effect was attributable to a cause that fell within one of the exceptions. *See Genesco, Inc. v. The Finish Line, Inc.*, 2007 WL 4698244 (Tenn. Ch. Dec. 27, 2007) ("Having concluded that [the seller] fits within one of the MAE carve-outs, it is not

---

and Acquisitions 29, 48 (Claire A. Hill & Steven Davidoff Solomon, eds., 2015) (describing the "many and increasing exceptions to MACs"); JX 4549 ¶ 59 [hereinafter Coates Report] ("Generally speaking, MAE clauses have two or three components – (1) the basic definition and (2) exclusions, and in many agreements, (3) exceptions to the exclusions.").

necessary for the Court to decide whether an MAE has occurred."). This is one of those cases.

This decision assumes for purposes of analysis that Strategic suffered an effect due to the COVID-19 pandemic that was sufficiently material and adverse to satisfy the requirements of Delaware case law. Based on that assumption, the burden rested with Seller to prove that the effect fell within at least one exception. *See* Part III.A, *supra*. For the reasons that follow, Seller carried its burden of proof.

### 1. The Potential Exceptions

To argue that the effects of the COVID-19 pandemic did not constitute a contractually defined Material Adverse Effect, Seller relies on four exceptions:

- exception (i) for "general changes or developments in any of the industries in which the Company or its Subsidiaries operate,"

- exception (ii) for "changes in regional, national or international political conditions (including any outbreak or escalation of hostilities, any acts of war or terrorism or any other national or international calamity, crisis or emergency) or in general economic, business, regulatory, political or market conditions or in national or international financial markets,"

- exception (iii) for "natural disasters or calamities," and

- exception (v) for "changes in any applicable Laws."

Dkt. 467 at 73–74 (quoting SA § 1.1).

Notably, none of these exceptions uses the word "pandemic." None of the other exceptions in the MAE Definition use the term "pandemic" either. Buyer fixates on this

omission and argues that without an explicit reference to "pandemic," the risk of a pandemic remained with Seller.[202]

Seller initially responds that exceptions (i), (ii), and (v) apply even without an express reference to "pandemic." Seller argues, for example, that exception (i) applies because Strategic's business suffered due to a general change in the hotel industry, namely a significant drop-off in demand. In response, Buyer returns to the absence of an explicit exception for "pandemic." According to Buyer, the court must determine the root cause of the MAE. Buyer argues that if an exception does not explicitly refer to the root cause, then it is not implicated.[203] Translated for purposes of exception (i), Buyer argues that the root cause of the drop-off in demand was not a general change in the hotel industry, such as a newfangled type of hotel, but rather the COVID-19 pandemic. As Buyer sees it, exception (i) therefore does not apply, and the question remains whether any exception specifically refers to a pandemic.[204]

---

[202] The same is true for close synonyms of "pandemic," such as "epidemic," "disease," or "health crisis." When referring to "pandemics," this decision uses that term broadly to incorporate its close synonyms as well.

[203] *See* Dkt. 470 at 51 ("Seller wrongly relies on exclusions (i), (ii) and (v) for general changes or developments in [Strategic's industry], changes in 'general economic, business, regulatory, political or market conditions,' and changes in applicable Laws. . . . Seller cannot meet its burden by arguing . . . that the dramatic decline in demand that affected the Company's results *did* result from such changes." (citation and internal quotation marks omitted)).

[204] *See* Dkt. 463 at 93–94 ("The COVID-19 pandemic indisputably did not arise out of, is not attributable to, and did not result from general changes or developments in any of the industries in which the Company or its Subsidiaries operate." (alterations and

Buyer's argument runs contrary to the plain language of the MAE Definition. The definition does not require a determination of the root cause of the effect. The definition lists nine categories of effects, which are separated by the word "or." Section 9.5 of the Sale Agreement, titled "Interpretation," provides that "[t]he term 'or' is not exclusive." The use of "or" in its non-exclusive sense means that each exception applies on its face, not based on its relationship to any other exception or some other root cause.

Buyer's interpretation of these exceptions also contradicts the plain language of the MAE Definition because it amounts to an implicit exclusion. In substance, Buyer's interpretation is the equivalent of language stating, "provided, however, that exceptions (i), (ii), and (v) shall not apply unless the cause of any event that otherwise would fall within those exceptions is itself subject to an exception." Parties can contract for exclusions from the exceptions. In fact, parties typically agree to an exclusion for any event that otherwise

internal quotation marks omitted)). Professor Miller has suggested that courts may need to parse causes when applying MAE exceptions. *See* Miller, *COVID-19*, *supra*, at 22 ("[I]n evaluating the adverse effects suffered by a company in the current pandemic, it may be important to attempt to separate adverse effects arising (a) proximately from the COVID-19 pandemic itself, from (b) effects arising proximately from governmental orders suspending or curtailing the company's operations and only remotely from COVID-19, and from (c) effects arising proximately from actions taken by the company itself in response to COVID-19 or governmental lockdown orders or both."). Professor Miller also anticipated and argued against a root-cause argument similar to Buyer's. *See id.* at 25 ("Conceivably, if a company is adversely affected by a governmental lockdown, an acquirer could argue that the materializing risk is not really a change in law but the underlying COVID-19 pandemic, and thus if pandemic risks are not shifted to the acquirer by the agreement, then all of the risk remains with the seller. In my opinion, that argument should fail.").

would fall within an exception but has a disproportionate effect on the seller—an exclusion that is absent from the definition in this case.[205] Here, the parties did not agree to any exclusions.[206]

---

[205] *See* ABA Mergers & Acqs. Comm., *Model Merger Agreement for the Acquisition of a Public Company* 238, 242 (2011) [hereinafter *Model Merger Agreement*] (explaining that a standard exclusion from the buyer's acceptance of general market or industry risk returns the risk to the seller when the seller's business is uniquely affected, which is accomplished by having the relevant exceptions "qualified by a concept of disproportionate effect."); Kling & Nugent, *supra*, § 11.04[9], at 11-61 n.106 ("Often there is an exception to the exception, requiring that the impact not be disproportionate to the company relative to other participants in the industry or to other participants in the industry in the geographical areas where the company operates."); Miller, *COVID*-19, *supra*, at 5–6 ("MAE Exceptions related to systematic risks are typically further qualified by language that excludes from the exception, and thus shifts back to the company, systematic risks to the extent that they adversely affect the company disproportionately relative to some control group of companies, generally other companies operating in the same industries . . . ."); Miller, *Deal Risk*, *supra*, at 2047–48 ("In some agreements, exceptions . . . are then further qualified so that events otherwise falling within the exception . . . will nevertheless count as MACs after all if they affect the company disproportionately relative to some control group, such as companies operating in the same industry . . . ."); *see also* Choi & Triantis, *supra*, at 867 ("The most common carve outs remove from the MAC definition changes in the general economic, legal, or political environment, and conditions in the target's industry, except to the extent that they have 'disproportionate' effects on the target.").

[206] Buyer's root-cause argument also effectively treats the other potentially applicable exceptions as indicator risks. *See* Miller, *COVID-19*, *supra*, at 25 (noting that "the distinction involved in the suggested argument . . . . is exactly the distinction that appears in MAE Exceptions related to indicator risks"). An indicator risk is an event that signals that an MAE may have occurred, such as a drop in the seller's stock price, a credit rating downgrade, or a failure to meet a financial projection. *See* Miller, *Deal Risk*, *supra*, at 2071–72. MAE definitions often contain exceptions for indicator risks, and those exceptions are typically qualified by exclusionary language, which makes clear that the exceptions do not foreclose the underlying cause of the negative events from being used to establish an MAE, unless it otherwise falls within a different carve-out. *See Akorn*, 2018 WL 4719347, at *49–51 (describing indicator risks and analyzing their use in the MAE definition at issue); Miller, *Deal Risk*, *supra*, at 2072, 2082–83 (discussing indicator risks).

Although the plain language of the MAE Definition forecloses Buyer's argument, Buyer's reasoning helpfully concentrates on a single exception. According to Buyer, under its root-cause approach, the only exception that could encompass the COVID-19 pandemic is exception (iii), which applies to "natural disasters or calamities." *See* Dkt. 463 at 95–98; Dkt. 470 at 53–54. Buyer maintains that the COVID-19 pandemic is not a natural disaster or calamity, but Buyer agrees that if it were, then that exception would apply. It would not be necessary, as with the other exceptions, to look for some other root cause. This decision therefore examines exception (iii) to determine whether it covers the effects of the COVID-19 pandemic.

## 2. "Natural Disasters Or Calamities"

As noted, exception (iii) provides that if Strategic suffers an effect that is material and adverse but resulted from a "natural disaster" or a "calamity," then the resulting effect does not qualify as a contractually defined "Material Adverse Effect." Under a plain reading of the MAE Definition, the exception for "calamities" encompasses the effects that

The fact that parties typically call out indicator risks implies that if the parties intended an exception to be read as an indicator risk, then the exception would say so explicitly. *See* Miller, *COVID-19*, *supra*, at 25 ("MAE Exceptions related to indicator risks . . . almost always expressly distinguish between, for example, a downgrade of the company's debt securities and the underlying causes for such a downgrade. This strongly suggests that if an MAE exception for changes in law was to be read as involving a distinction between the event itself and the underlying cause of the event, then the agreement would be explicit on this point." (footnote omitted)). This rationale provides yet another reason to reject the root-cause argument.

resulted from the COVID-19 pandemic, excluding the pandemic's effects from the MAE Definition.

### a. The Plain Meaning Of "Natural Disasters Or Calamities"

When assessing plain meaning, Delaware courts look to dictionaries.[207] The dictionary meaning of "calamity" encompasses the COVID-19 pandemic.

*Black's Law Dictionary* defines "calamity" as

A state of extreme distress or misfortune, produced by some adverse circumstance or event. Any great misfortune or cause of loss or misery, often caused by natural forces (*e.g.*, hurricane, flood, or the like). *See* Act of God; Disaster.

*Calamity*, Black's Law Dictionary (6th ed. 1990). A vernacular definition of "calamity" is "a serious accident or bad event causing damage or suffering."[208] The following example illustrates the proper vernacular use of calamity: "A series of calamities ruined them—

---

[207] *In re Solera Ins. Coverage Appeals*, 2020 WL 6280593, at *9 (Del. Oct. 23, 2020) ("This Court often looks to dictionaries to ascertain a term's plain meaning."); *Lorillard Tobacco Co. v. Am. Legacy Found.*, 903 A.2d 728, 738 (Del. 2006) ("Under well-settled case law, Delaware courts look to dictionaries for assistance in determining the plain meaning of terms which are not defined in a contract.").

[208] *Calamity*, Cambridge English Dictionary, https://dictionary.cambridge.org/dictionary/english/calamity (last visited Nov. 21, 2020); *accord Calamity*, Merriam-Webster, https://www.merriam-webster.com/dictionary/calamity (last visited Nov. 21, 2020) ("a disastrous event marked by great loss and lasting distress and suffering" or "a state of deep distress or misery caused by major misfortune or loss"); *Calamity, Oxford English Dictionary Online* (2020) ("1. The state or condition of grievous affliction or adversity; deep distress, trouble, or misery, arising from some adverse circumstance or event. 2. A grievous disaster, an event or circumstance causing loss or misery; a distressing misfortune.").

floods, a failed harvest, and the death of a son."[209]

The COVID-19 pandemic fits within the plain meaning of the term "calamity." Millions have endured economic disruptions, become sick, or died from the pandemic.[210] COVID-19 has caused human suffering and loss on a global scale, in the hospitality industry,[211] and for Strategic's business.[212] The COVID-19 outbreak has caused lasting suffering and loss throughout the world.

Buyer's argument against the scope of the term "calamity" does not turn on its meaning, but rather on the meaning of "natural disasters." Buyer invokes the canon of

---

[209] *Calamity*, *Cambridge English Dictionary*, https://dictionary.cambridge.org/dictionary/english/calamity (last visited Nov. 21, 2020).

[210] *See* JX 3132 at 3 ("The global economy is now in recession, and we forecast a 1.1% [year-over-year] decline in global GDP this year, the sharpest decline since [World War II]."); JX 4535 (timeline of the COVID-19 pandemic including unemployment, infections and deaths); JX 4826 at 3 (reporting 1.5 million cases and 92,000 deaths in the United States as of May 20, 2020); JX 5261 at 1 ("COVID-19's unprecedented adverse shock to the economy brought an end to the longest economic expansion in U.S. history.").

[211] *See, e.g.*, JX 3443 at 1 ("In the wake of the coronavirus pandemic, few industries have fallen as far and as fast as tourism.").; JX 4271 at 1 ("We have never seen this level of illiquidity in the hotel market. It is effectively a frozen marketplace."); JX 4600 at 5–10 (detailing the impacts of COVID-19 on various hotel operators); JX 4853 ¶ 55 ("COVID-19 has affected every sector across the globe, and the hotel industry is among the hardest hit." (internal quotation marks omitted)); JX 5116 at 1 ("[W]e have not as an industry experienced anything like this before."); Fischel Tr. 1361 (agreeing that COVID-19 caused "a dramatic decline in the demand for hotel rooms"); Tantleff Dep. 41 (stating that COVID-19 "has had a widespread impact on the hotel industry in general").

[212] *See* JX 4480 (financial statements showing sharp decline in Strategic's operating profit); JX 4730 at 12 [hereinafter Lesser Report] (comparing Strategic's post-COVID-19 performance with that of its competitors); Lesser Tr. 1283–84 (stating that Strategic's operations "were dramatically negatively impacted by the pandemic").

131

*noscitur a sociis*, which means that "a word in a contract is to be read in light of the words around it." Dkt. 463 at 96 (quoting *Smartmatic Int'l Corp. v. Dominion Voting Sys. Int'l Corp.*, 2013 WL 1821608, at \*10 (Del. Ch. May 1, 2013)). Buyer asserts that because the word "calamity" appears in the phrase "natural disasters or calamities," it must be read as referring to phenomena that have features similar to natural disasters.

*Black's Law Dictionary* does not define "natural disaster." A vernacular definition is a "a sudden and terrible event in nature (such as a hurricane, tornado, or flood) that usually results in serious damage and many deaths."[213]

The COVID-19 pandemic arguably fits this definition as well. It is a terrible event that emerged naturally in December 2019, grew exponentially, and resulted in serious economic damage and many deaths.[214]

Buyer's contrary interpretation depends on a narrower interpretation of "natural disaster." According to Buyer, natural disasters share some or all of three features: (i) they are generally sudden, singular events; (ii) they are usually attributable to the four classical

---

[213] *Natural disaster*, Merriam-Webster, https://www.merriam-webster.com/dictionary/natural%20disaster (last visited Nov. 21, 2020); *accord Natural disaster*, Cambridge English Dictionary, https://dictionary.cambridge.org/dictionary/english/natural-disaster (last visited Nov. 21, 2020) ("a natural event such as a flood, earthquake, or tsunami that kills or injures a lot of people").

[214] Some individuals, concerned about conspiracies, have suggested that humans created COVID-19 as a bioweapon. If true, that could undermine its status as a *natural* disaster. The record in this case does not support a finding that the virus was anything other than a natural product of germ evolution.

elements of nature (earth, water, fire, and air), as in the cases of earthquakes, floods, wildfires, and tornados; and (iii) they generally cause direct damage to physical property. Dkt. 463 at 96. Buyer invokes *noscitur a sociis* to contend that the term "calamities" should be understood as having similar limitations. *Id.* It therefore should encompass only sudden, single events that threaten direct damage to physical property, such as "an oil-well blowout or the collapse of a building due to structural defects." Dkt. 463 at 97. According to Buyer, the COVID-19 pandemic does not qualify as a calamity under this definition because it spread over time, was not attributable to the classical elements of nature, and harmed humans rather than property.

Buyer's argument is creative but unconvincing. Buyer has identified three characteristics that describe some natural disasters, but not all. A natural disaster need not be sudden—drought conditions develop and persist over years, and the ultimate natural disaster of climate change has developed over decades. And although many natural disasters result from the four earthly elements, others do not. The harm from a meteor strike or massive solar flare could qualify as a natural disaster, but would not have an earthly source. There is also no reason to prioritize property damage over the suffering of living beings.

Buyer's argument also depends on using *noscitur a sociis* to yoke "calamities" to "natural disasters," but that interpretative canon only applies when a contractual term is ambiguous. *Zimmerman v. Crothall*, 2012 WL 707238, at *7 (Del. Ch. Mar. 5, 2012). The term "calamities" is not ambiguous. And when the doctrine applies, its principal function is to imbue a collective term with the content of other terms in a list. *Del. Bd. of Nursing*

133

*v. Gillespie*, 41 A.3d 423, 427 (Del. 2012). Thus, if an agreement gave a broker the exclusive right to sell a farm's "oranges, lemons, grapefruit, and other fruit," a court might rely on the doctrine to interpret "other fruit" to mean familiar types of citrus fruit and exclude melons, pineapples, and durians.[215] The phrase "natural disasters and calamities" does not fit this model. And ultimately, a canon of interpretation like *noscitur a sociis* serves as aid to interpretation; it does not mandate a particular outcome.

The plain language of the term "calamities" therefore controls. It encompasses the COVID-19 pandemic and its effects.

### b. The Structure Of The Definition Of "Material Adverse Effect"

In addition to the dictionary meaning of "calamities," the structure and content of the MAE Definition point in favor of a plain-language interpretation that encompasses the COVID-19 pandemic. From a structural standpoint, MAE definitions allocate risk through exceptions and exclusions from exceptions.[216] The typical MAE clause allocates general market or industry risk to the buyer and company-specific risk to the seller.[217] The standard

---

[215] *See, e.g.*, *id.* (interpreting "any other person" in light of "specifically enumerated professionals" in the preceding list); *cf.* Adams, *Contract Drafting*, *supra*, at 360 (providing citrus fruit example).

[216] *See* Miller, *Deal Risk*, *supra*, at 2013 n.7 ("There is virtually universal agreement, among both practitioners and academics, that MAC clauses allocate risk between the parties."); Gilson & Schwartz, *supra*, at 339–54 (analyzing how MAE clauses allocate risk).

[217] Zhou, *supra*, at 173; *accord* Choi & Triantis, *supra*, at 867 ("The principal purpose of carve outs from the definition of material adverse events or changes seems to be to remove systemic or industry risk from the MAC condition, as well as risks that are

MAE provision achieves this result by placing the general risk of an MAE on the seller, and then using exceptions to reallocate specific categories of risk to the buyer.[218] Exclusions from the exceptions return risks to the seller. As noted previously, one standard exclusion applies when a particular event has a disproportionate effect on the seller's

---

known by both parties at the time of the agreement."). "A possible rationale" for this allocation "is that the seller should not have to bear general and possibly undiversifiable risk that it cannot control and the buyer would likely be subject to no matter its investment." Davidoff & Baiardi, *supra*, at 15; *see also* Gilson & Schwartz, *supra*, at 339 (arguing that "an efficient acquisition agreement will impose endogenous risk on the seller and exogenous risk on the buyer"). Another likely explanation is that when a business risk is "preventable at a cost less than the expected cost of the loss if the risk materializes[,] . . . the efficient solution is to take precautions to forestall the risk," and the seller ordinarily "will have a clear cost advantage over the [buyer] to forestall this risk." Robert T. Miller, *Canceling the Deal: Two Models of Material Adverse Change Clauses in Business Combination Agreements*, 31 Cardozo L. Rev. 99, 160–61 (2009). As with any general statement, exceptions exist, and "different agreements will select different exogenous risks to shift to the counterparty, and in stock-for-stock and cash-and-stock deals, parties may shift different exogenous risks to each other." Miller, *Deal Risk*, *supra*, at 2070.

[218] *See* Miller, *Deal Risk*, *supra*, at 2073 ("Because of the drafting conventions used in MAC Definitions—all the risks are on the [seller] except for those shifted to the [buyer] by the MAC Exceptions—this class of risks would, strictly speaking, probably be best defined negatively."); Schwartz, *supra*, at 822 ("[T]he risk of a target MAC resulting from a carved-out cause is allocated to the acquirer, while the risk of a target MAC resulting from any other cause is allocated to the target."). *See generally Hexion*, 965 A.2d at 737 ("The plain meaning of the carve-outs found in the [MAE clause's] proviso is to prevent certain occurrences which would *otherwise* be MAE's being found to be so."); ABA Mergers & Acqs. Comm., *Model Stock Purchase Agreement with Commentary* 33–34 (2d ed. 2010) [hereinafter *Model Stock Purchase Agreement*] (discussing exceptions as a way for sellers to narrow MAE provisions).

business.[219] Both MAE exceptions and disproportionality exclusions have become increasingly prevalent.[220]

For purposes of finer-grained analysis, the risks that parties address through exceptions can be divided into four categories: systematic risks, indicator risks, agreement risks, and business risks. *See generally* Miller, *Deal Risk*, *supra*, at 2071–91.

- Systematic risks are "beyond the control of all parties (even though one or both parties may be able to take steps to cushion the effects of such risks) and . . . will generally affect firms beyond the parties to the transaction."[221]

---

[219] *Model Merger Agreement*, *supra*, at 242; *see* Kling & Nugent, *supra*, §11.04[9], at 11-61 n.106; Miller, *COVID-19*, *supra*, at 5. "For example, a buyer might revise the carve-out relating to industry conditions to exclude changes that disproportionately affect the target as compared to other companies in the industries in which such target operates." *Model Merger Agreement*, *supra*, at 242; *accord* Miller, *Deal Risk*, *supra*, at 2048; *see* Choi & Triantis, *supra*, at 867 ("The most common carve outs remove from the MAC definition changes in the general economic, legal, or political environment, and conditions in the target's industry, except to the extent that they have 'disproportionate' effects on the target.").

[220] *See* Nixon Peabody LLP, *MAC Survey NP 2019 Report*, at 2 (2019) [hereinafter *2019 MAC Survey*], https://www.nixonpeabody.com/ideas/articles/2019/11/19/2019-mac-survey (reporting an "increase in MAC exceptions in the years since the [Global Financial Crisis]). *Compare* Gilson & Schwartz, *supra*, at 351 (0% of deals in 1993, 0% of deals in 1995, and 17% of deals in 2000 had disproportionality exclusions), *with* Nixon Peabody LLP, *2019 MAC Survey*, *supra*, at 7 (87% of agreements had disproportionality exclusions).

[221] Miller, *Deal Risk*, *supra*, at 2071; *see* Richard A. Brealey & Stewart C. Myers, *Principles of Corporate Finance* 168 & n.22 (7th ed. 2003) (explaining that market risk, also known as systematic risk, "stems from the fact that there are . . . economywide perils that threaten all businesses").

- Indicator risks signal that an MAE may have occurred. For example, a drop in the seller's stock price, a credit rating downgrade, or a failure to meet a financial projection would not be considered adverse changes, but would evidence such a change.[222]

- "Agreement risks include all risks arising from the public announcement of the merger agreement and the taking of actions contemplated thereunder by the parties," such as potential employee departures, *Id.* at 2087.

- Business risks are those "arising from the ordinary operations of the party's business (other than systematic risks), and over such risks the party itself usually has significant control." *Id.* at 2073. "The most obvious" business risks are those "associated with the ordinary business operations of the party—the kinds of negative events that, in the ordinary course of operating the business, can be expected to occur from time to time, including those that, although known, are remote." *Id.* at 2089.

Generally speaking, the seller retains the business risk. The buyer assumes the other risks.[223]

The MAE Definition in the Sale Agreement follows the typical structure. Most notably, it broadly shifts systematic risk to Buyer through exceptions (i), (ii), and (v). *See* SA § 1.1. The risk from a global pandemic is a systematic risk, so it makes sense to read

---

[222] Miller, *Deal Risk*, *supra*, at 2072, 2082–83.

[223] *See, e.g.*, *id*. at 2073 (explaining that "(a) systematic risks and agreement risks are usually, but not always, shifted to the [buyer], (b) indicator risks are so shifted in a significant minority of cases, and (c) business risks are virtually always assigned to the party itself"); *accord* Coates Report ¶ 11(f) ("MAE clauses customarily . . . exclude 'systematic' risks (such as economic recessions) and . . . include non-systematic risks . . . ."); JX 4602 ¶ 6 [hereinafter Davidoff-Solomon Report] (transaction agreements ordinarily allocate "idiosyncratic risk (or risk that is specific to a firm) to the seller and systemic risk to the buyer"); *id.* at 45 ("[T]he focus in negotiating MAE exclusions is with systemic issues, typically allocating the risk of such issues with the buyer.").

the term "calamity" as shifting that risk to Buyer. The structural risk allocation in the definition thus points in the same direction as the plain-language interpretation.

The content of the MAE Definition also supports allocating the risk from the COVID-19 pandemic to Buyer. The MAE Definition contains additional, Seller-friendly features that under which Buyer assumed a greater-than-normal range of risks.[224] For example, exception (ix) eliminates any effect from "any existing event, occurrence or circumstance of which the Buyer has knowledge as of the date hereof." SA § 1.1. That broad language dramatically favors Seller by contemplating that any subject covered in due diligence, in the data room, or that otherwise is within Buyer's knowledge cannot give rise to a "Material Adverse Effect." In *Akorn*, this court refused to imply a knowledge-based exception of this type, precisely because of its breadth and the sweeping implications it would have for the parties' allocation of risk through representations. *See Akorn*, 2018 WL 4719347 at *79–80. The *Akorn* decision noted that "[i]f parties wish to carve out anything disclosed in due diligence from the scope of a representation, then they can do so." *Id.* at *80. Here, Seller obtained that expansive carve-out.

As this decision already noted, the MAE Definition does not contain an exclusion for events that have a disproportionate effect on Strategic. A disproportionate-effect exclusion favors the seller by shifting risk back to the buyer. *See Akorn*, 2018 WL 4719347,

---

[224] *See* Davidoff-Solomon Report ¶ 73 ("The industry carve-out . . . . is significantly more seller-friendly because its net effect is to allocate all adverse effects related to the 'industry' of the target to the buyer.").

at *52. The overwhelming majority of contemporary deals include disproportionality exclusions, so the omission of a disproportionality exclusion signals a seller-friendly MAE clause.[225]

Yet another seller-friendly aspect of the MAE Definition consists of two features designed to limit the forward-looking nature of the definition. The concept of a material adverse effect is inherently forward looking, and necessarily so because of "the basic proposition of corporate finance that the value of a company is determined by the present value of its future cash flows." *Hexion*, 965 A.2d at 743 n.75. The forward-looking nature of the concept also flows from the language of a standard MAE provision, which asks

---

[225] *See* Nixon Peabody LLP, *2019 MAC Survey*, *supra*, at 7 (87% of agreements in 2019 annual transaction agreement survey contained disproportionality exclusions); Miller, *COVID-19*, *supra*, at 5, 26 ("MAE Exceptions related to systematic risks are typically further qualified by a Disproportionality Exclusion which shifts the applicable systematic risks back to the seller to the extent their materialization adversely affects the seller disproportionately . . . ."); *see also* Davidoff-Solomon Report ¶ 6 (the Sale Agreement lacks "customary and usual" disproportionality language); *id.* at 49 ("The lack of [a disproportionality exclusion] makes the MAE significantly more seller-friendly because its net effect is to allocate all adverse effects related to 'economic,' 'business,' or 'regulatory' reasons, among others, to the buyer."); Coates Report ¶ 11(f) (MAE clauses usually "include non-systematic risks . . . such as disproportionate impacts of recessions on a target"). Buyer's expert on transaction agreements analyzed 144 agreements containing MAE clauses. *See* Coates Report App'x D. Seller's expert on transaction agreements pointed out that the overwhelming majority of MAE clauses in the sample which contained MAE exclusions for economic and industry developments in Buyer's expert's sample also contained disproportionality exclusions. Davidoff-Solomon Report ¶¶ 97–98.

whether an effect "has had *or is reasonably expected to have*" a material adverse effect.[226] And it flows from *IBP*'s gloss on the concept of a material adverse effect, which requires a "durationally-significant" change that is "material when viewed from the long-term perspective of a reasonable acquirer."[227] Nevertheless, deal lawyers negotiate vigorously over language that is designed to make an MAE definition relatively more or relatively less forward-looking with the goal of limiting a buyer's ability to assert an MAE based on deviations from the seller's projected performance. A more explicitly forward-looking definition is more favorable to the buyer, who can more easily claim that the seller suffered a material adverse effect if the seller fell short of its projected results. A less explicitly forward-looking definition is more favorable to the seller, because the seller can argue for comparing its results to a historical trend,

The MAE Definition uses the standard framing of the conditional future tense— "*would have* a material adverse effect." So does the No-MAE Representation, which represents that there have not been any changes, events, state of facts, or developments that "have had *or would reasonably be expected to have* a Material Adverse Effect." But the MAE Definition itself contains two aspects designed to limit its forward-looking nature.

---

[226] *See id.*; *accord Frontier*, 2005 WL 1039027, at *33 (explaining that "the definition chosen by the parties emphasizes the need for forward looking analysis" by using the phrase "would not reasonably be expected to have" an MAE).

[227] *IBP, Inc. v. Tyson Foods, Inc.*, 789 A.2d 14, 68 (Del. Ch. 2001); *see Hexion*, 965 A.2d at 738 (holding that to qualify as an MAE, "poor earnings must be expected to persist into the future").

First, the term "prospects" does not appear in the list of dimensions of "the business of the Company and its Subsidiaries" that could suffer a material and adverse effect.[228] The MAE Definition refers to "the business, financial condition, or results of operations of the Company and its Subsidiaries, taken as a whole," but it does not refer to their "prospects." A lively debate exists about whether omitting "prospects" matters, with those who favor its omission claiming that it limits the forward-looking nature of an MAE.[229] Because an MAE is inherently forward-looking, there is reason to doubt whether that is true, but the absence of a reference to "prospects" is generally regarded as favorable to the seller.[230]

---

[228] Professor Miller helpfully defines this list as the "MAE Objects," which is a useful term. *See* Miller, *COVID-19*, *supra*, at 2 ("[T]he typical MAE clause begins with a base definition . . . that defines "Material Adverse Effect" for purposes of the agreement to be any event . . . that has had . . . a material adverse effect . . . on the company or various aspects of it, such as its business, financial condition, or results of operations (the 'MAE Objects')."); Miller, *Deal Risk*, *supra*, at 2045 ("Generally speaking, a MAC is defined as being any event . . . that . . . would reasonably be expected . . . to have a material adverse effect . . . on various items (MAC Objects) . . . .").

[229] *See* Miller, *COVID-19*, *supra*, at 3 n.12 (collecting authorities); Miller, *Canceling the Deal*, supra, at 137 n.122 (same).

[230] *See, e.g.*, Michelle Shenker Garrett, *Efficiency and Certainty in Uncertain Times: The Material Adverse Change Clause Revisited*, 43 Colum. J.L. & Soc. Probs. 333, 36 (2010) ("Sellers generally want to exclude 'prospects . . . .'"); Jonathon M. Grech, *"Opting Out": Defining the Material Adverse Change Clause in a Volatile Economy*, 52 Emory L.J. 1483, 1488–89 (2003) ("[T]he seller will not want to be responsible for sustaining the buyer's vision of the future and will seek to exclude its prospects from the definition of a MAC."); Sherri L. Toub, Note, *"Buyer's Regret" No Longer: Drafting Effective MAC Clauses in a Post-IBP Environment*, 24 Cardozo L. Rev. 849, 868 (2003) ("Typically, one focus of Seller's efforts will be to delete any reference in the MAC definition to 'prospects' or to other forward-looking concepts"). *Compare* Choi & Triantis, *supra*, at 881 n.95 (citing practitioner study which referenced "sellers' desire for increased deal certainty" by eliminating forward-looking language), *with* Daniel Gottschalk, *Weaseling Out of the*

The second and more striking feature is a proviso which states that "a Material Adverse Effect shall be measured only against past performance of the Company and its Subsidiaries, and not against any forward-looking statements, financial projections or forecasts of the Company and its Subsidiaries." SA § 1.1. Ostensibly included "[f]or the avoidance of doubt," the proviso can only inject doubt into an inherently forward-looking inquiry. But from the standpoint of evaluating whether the MAE Definition is favorable to the seller or the buyer, this feature goes beyond the omission of "prospects" by attempting to make the MAE Definition exclusively backwards looking. All else equal, that is highly favorable to Seller.

Consistent with the allocation of systematic risk to Buyer, the generally seller-friendly nature of the MAE Definition supports interpreting the exception for "calamities" as including pandemic risk. To interpret the term narrowly would cut against the flow of the definition. Buyer has not offered any explanation why the parties would have excluded pandemic risk from their overarching risk allocation despite assigning all similar risks to Buyer. Absent a persuasive (or at least rational) explanation, there is no reason to think that the term "calamities" should be construed narrowly to achieve that result.

---

*Deal: Why Buyers Should Be Able to Invoke Material Adverse Change Clauses in the Wake of a Credit Crunch*, 47 Hous. L. Rev. 1051, 1078 (2010) ("The buyer should draft the MAC clause with forward-looking language.").

### c. Evidence Of Deal Studies

Finally, studies of transaction agreements support reading the term "calamities" as encompassing pandemics. These studies rebut Buyer's argument that the MAE Definition does not encompass the COVID-19 pandemic because it does not expressly use the term "pandemic."

According to Buyer, the failure to include the term "pandemic" must have been intentional, and its omission therefore should be dispositive. *See* Dkt. 463 at 97. To support this argument, Buyer observes that because Anbang is based in China, it must have been aware of the risk of an epidemic or pandemic, given China's experience with the avian flu in 1997, SARS in 2002, H1N1 swine flu in 2009, and MERS in 2012. *Id.* Buyer also points out that during its life as a public company, between 2009 and 2014, Strategic consistently identified the outbreak of a pandemic as a material risk to its business.[231] As further support for its argument that Seller intentionally omitted the term "pandemic," Buyer cites precedent transaction agreements. Buyer observes that Anbang acquired a company in 2015 under a transaction agreement that contained an explicit carve-out for pandemics.[232]

---

[231] Dkt. 463 at 97–98; *see* JX 26 at 15; JX 32 at 17; JX 35 at 18; JX 37 at 16; JX 46 at 16; JX 61 at 15. In its disclosures, Strategic identified "natural disasters such as earthquakes, hurricanes, floods or fires" as a separate risk to its business model. JX 26 at 19; JX 32 at 17; JX 35 at 18; JX 37 at 16; JX 46 at 16–17; JX 61 at 15.

[232] Dkt. 463 at 97; *see* JX 71 at 9 (exception for "the outbreak or escalation of war, military action, sabotage or acts of terrorism, or changes due to any pandemic, natural disaster or other act of nature, in each case involving or impacting the United States and arising or occurring after the date of this Agreement").

Buyer also observes that Seller's counsel included explicit references to "epidemics" or similar language in the exceptions from the MAE definitions in other transaction agreements that they prepared contemporaneously with the Sale Agreement.[233]

Broader studies of transaction agreements help put this anecdotal evidence in perspective. Both sides retained legal experts who conducted studies of the prevalence of pandemic-specific exceptions. Professor John Coates of Harvard Law School provided expert analysis for Buyer. Professor Steven Davidoff-Solomon of the University of California, Berkeley School of Law provided expert analysis for Seller.

Coates assembled a sample of 144 publicly available transaction agreements for deals that were announced in the year before Buyer and Seller signed the Sale Agreement and had a deal value greater than $1 billion. *See* Coates Report ¶¶ 42–43. Both experts examined this sample.[234]

---

[233] JX 389 at 11 (exception for "any acts of war (whether or not declared), sabotage, terrorism or any epidemics, or any escalation or worsening of any such acts of war (whether or not declared, sabotage or terrorism, or any epidemics"); JX 558 at 8 (exception for "earthquakes, volcanic activity, hurricanes, tsunamis, tornadoes, floods, mudslides, wild fires or other natural disasters, weather conditions, pandemics and other force majeure events").

[234] Davidoff-Solomon also examined a broader sample that included acquisitions with a value greater than $1 billion announced between January 1, 2017, and December 31, 2019. *See* Davidoff-Solomon Report ¶ 79. His general observations on the frequency and use of "pandemics" were comparable to the smaller sample. Davidoff-Solomon also reviewed the broader sample for deals in which Buyer and Seller's counsel were involved. He found only one transaction agreement in which Greenberg Traurig used the word "pandemic" or its synonyms, and it was not used as a subset of "calamity," "natural disaster," or "force majeure." *Id.* ¶ 94. He found nine agreements in which Gibson Dunn

Based on the sample, Coates made the following observations:

- All MAE definitions in the sample contained one or more specific exclusions for general economic, political, or industry changes.

- Nearly all (99%) contained specific exclusions for changes in laws and regulations.

- A supermajority (87%) contained exclusions for natural disasters, crises, or calamities.

- A large minority (33%) specifically excluded one or more of pandemics, epidemics, public health crises, or influenzas.

Coates Report ¶ 72.

Coates noted that in agreements that contained a specific exclusion for "pandemics,"

there was no consistent pattern of treatment:

- Some agreements distinguished "pandemics" from "natural disasters" or "calamities" by including them in separately enumerated exceptions.

- Some agreements included "pandemics" and "natural disasters" in the same exception, but treated them as separate concepts.

- Some agreements included "pandemics" as a co-equal but distinct item in a list with "acts of war" and "natural disasters."

- Some agreements included "pandemics" as an example of an "Act of God" within the same class as "natural disasters."

- Some agreements included "pandemics" as an example of an "Act of God" within the category of "natural or man-made disaster."

*Id.* ¶ 74.

After examining Coates' sample, Davidoff-Solomon made the following additional

---

used the term "pandemic" or its synonyms. In six of those instances, the term was a subset of "calamity," "natural disaster," or "force majeure." *Id.*

observations:

- The term "pandemic" appeared in twenty-nine agreements.

    o Seventeen agreements (59%) used the term "pandemic" as a subtype of "natural disaster," calamity," or "force majeure." *See* Davidoff-Solomon Report ¶ 84.

    o The words "pandemic" and "calamity" appeared together in only four agreements. In two of those four agreements, the terms appeared in separate exceptions. In a third agreement, they appeared in the same exception, with pandemic being treated as a type of calamity. In the fourth agreement, both appeared as examples of force majeure events. *Id.* ¶ 80.

- The term "calamity" appeared in twenty-one agreements.

    o Six agreements used "calamity" and "force majeure" interchangeably. *Id.* ¶ 81.

    o Nine agreements used "calamity" as a catchall for other events. *Id.*

- The term "natural disaster" appeared in 114 agreements.

    o Seventy-seven agreements used the term as a catchall for other types of misfortunes, sometimes including epidemics and pandemics. *Id.* ¶ 82.

    o In twenty-nine agreements, the words "pandemic" and "natural disaster" appeared together. *Id.*

    o Only one agreement included "pandemic" and "natural disaster" in separate exceptions. *Id.*

    o In eight agreements, "pandemic" appeared as a subtype of "natural disaster." *Id.*

It is difficult to reach strong conclusions based on these data, but it is possible to reject the proposition that general terms like "calamity," "natural disaster," "Act of God," or "*force majeure*" never can encompass pandemic risk because a meaningful number of

agreements make explicit connections among these terms.[235] The fact that the Sale Agreement omitted an express reference to "pandemics" is therefore not dispositive, providing an additional reason to reject Buyer's argument.[236]

Policy considerations also counsel against adopting Buyer's proposed narrow interpretation of the broader term "calamities." Drafters of MAE definitions must contemplate the three Rumsfeldian categories of risk: known knowns, known unknowns,

---

[235] The authors of a working paper cited by both experts drew the same inference from a study of 1,702 MAE provisions for deals from 2003 until the end of 2020. *See* Matthew Jennejohn et al., *COVID-19 as a* Force Majeure *in Corporate Transactions* 7, (Columbia L. Econ. Working Paper, Paper No. 625, 2020), https://ssrn.com/abstract=3577701. That study found that over the full sample, less than 12% of MAE provisions identified pandemics explicitly, another 36.2% used broad terms like force majeure, Act of God, or calamities, and 52.8% did not contain either specific language referencing pandemics or broader language referencing calamities or force majeure concepts. *Id.* at 4. Over time, however, the percentages of deals that included these concepts increased, with general force majeure language becoming more common after the 2008 financial crisis, and pandemic-related language starting to appear during the same period, perhaps as a byproduct of the H1N1 crisis. *See id.* at 5. The authors note that by 2019, approximately 23% of deals specifically referenced pandemics. *Id.*

[236] Except for excluding the possibility that the term "calamity" can never include the concept of "pandemics," the data from the deal studies are inconclusive. The deal studies do not reveal a consistent pattern in how drafters of transaction agreements treat pandemics. *See* Coates Report ¶ 74. They provide some support for the proposition that drafters view a "pandemic" as a subtype of "calamity," "natural disaster," or "force majeure" event, consistent with the plain meaning of the term "pandemic." *See* Davidoff-Solomon Report Ex. B. But a minority of agreements treat pandemics differently, implying that not all drafters view the broader terms (i.e., "calamity," "natural disaster," or "force majeure" event) as sufficient. Of course, that may be the result of lawyerly belt-and-suspenders drafting.

and unknown unknowns.[237] Drafters can use specific terms to address known knowns and known unknowns, but only broad terms can encompass unknown unknowns. To read a term like "calamities" narrowly would interfere with drafters' ability to allocate systematic risk for as-yet-unknown and as-yet-unimaginable calamities. By contrast, reading a term like calamities broadly allows drafters to carve out known knowns and known unknowns through exclusions. For instance, if parties believe that the seller is better suited to shoulder the risk of a pandemic than the buyer, then the drafters can say "natural disasters and calamities (excluding pandemics)."

### 3. The Finding Regarding The Bring-Down Condition

The Bring-Down Condition did not fail due to the No-MAE Representation becoming inaccurate. Even assuming that Strategic suffered an effect that was both material and adverse, the cause of that effect was the COVID-19 pandemic, which falls within an exception to the MAE Definition for effects resulting from "calamities." Accordingly, a COVID-19-related failure of the Bring-Down Condition did not relieve Buyer of its obligation to close.

---

[237] *See* Donald Rumsfeld, *Known and Unknown: A Memoir* 23 (2011) ("[A]s we know, there are known knowns: there are things we know we know. We also know there are known unknowns: that is to say we know there are some things [we know] we do not know. But there are also unknown unknowns—the ones we don't know we don't know." (alteration in original)).

## C.  The Covenant Compliance Condition

The next issue is whether Buyer validly refused to close because the Covenant Compliance Condition failed. Buyer argues that the Covenant Compliance Condition failed because Seller did not comply with the Ordinary Course Covenant. According to Buyer, Strategic made significant changes in its business in response to the COVID-19 pandemic, resulting in a departure from the ordinary course. Buyer established that the Covenant Compliance Condition failed.

### 1.  The Ordinary Course Covenant

The Ordinary Course Covenant appears in the first sentence of Section 5.1 of the Sale Agreement. It states,

> Except as otherwise contemplated by this Agreement or as set forth in <u>Section 5.1</u> of the Disclosure Schedules, between the date of this Agreement and the Closing Date, unless the Buyer shall otherwise provide its prior written consent (which consent shall not be unreasonably withheld, conditioned or delayed), the business of the Company and its Subsidiaries shall be conducted only in the ordinary course of business consistent with past practice in all material respects, including using commercially reasonable efforts to maintain commercially reasonable levels of Supplies, F&B, Retail Inventory, Liquor Assets and FF&E consistent with past practice, and in accordance with the Company Management Agreements.

SA § 5.1.

The parties have parsed the Ordinary Course Covenant closely. They disagree about the "business" in question, what it means to conduct the business in the "ordinary course of business," what it means to operate "only" in the ordinary course of business "consistent with past practice," whether the Ordinary Course Covenant created a flat or efforts-qualified contractual obligation, and how the covenant relates to the MAE Definition.

149

### a. The "Business" In Question

In its lead argument, Seller maintains that the "business" in question is Strategic's business as an asset management firm, which Seller claims does not involve the day-to-day operation of the Hotels. Seller frames Strategic's business at a high level and claims that it primarily involves deploying capital and overseeing the Hotels' managers, reducing Strategic's role to a supervisory manager of managers. According to Seller, the COVID-19 pandemic did not result in any changes to these high-level tasks, which Strategic continued performing as the pandemic raged and as the hotels radically changed their operations. Seller thus concludes that the Ordinary Course Covenant was not breached.[238]

The plain language of the Ordinary Course Covenant forecloses this argument. The covenant provides that "the business *of the Company and its Subsidiaries* shall be operated in the ordinary course." This obligation includes the business of Strategic, but it does not end there. It encompasses the business of each of the "Subsidiaries," necessarily including the entities that own the Hotels.

The Ordinary Course Covenant also includes a lengthy, non-restrictive adverbial phrase that appears in the middle of the main clause that constitutes the Ordinary Course Covenant. It confirms that operating the "business" in the ordinary course includes "using

---

[238] *See* Dkt. 467 at 82 ("Buyer points to certain temporary changes to the affairs of the *Hotels*, but the question is whether the *Company* continued to operate in the ordinary course. It did[.]" (citation omitted)); Dkt. 472 at 47–48 ("The ordinary course of Strategic's business included adapting its asset management strategy to meet prevailing conditions, including industry downturns. . . . Buyer will receive what it bargained for—a premier portfolio 'managed by an industry leading, best-in-class management team' . . . .").

150

commercially reasonable efforts to maintain commercially reasonable levels of Supplies, F&B, Retail Inventory, Liquor Assets and FF&E consistent with past practice." SA § 5.1 (the "Inventory Maintenance Covenant"). The Sale Agreement defines those terms as follows:

- "Supplies" means "all of any Subsidiary's right, title and interest in all china, glassware, silverware, linens, uniforms, engineering, maintenance, cleaning and housekeeping supplies, matches and ashtrays, soap and other toiletries, stationery, menus and other printed materials, and all other similar materials and supplies, which are located at a Company Property and used or to be used in the operation of the Company Property." SA § 1.1.

- "F&B" means "all of any Subsidiary's right, title and interest in all unexpired food and beverages which are located or to be located at a Company Property (whether opened or unopened), but expressly excluding the Liquor Assets." *Id.*

- "Retail Merchandise" means "all of any Subsidiary's right, title and interest in all merchandise located at the Company Property, including any gift shop or newsstand maintained by Seller, that is held or to be held for sale to guests and customers of any Company Property, but expressly excluding the F&B and Liquor Assets." *Id.*[239]

- "Liquor Assets" means "the alcoholic beverage inventory at any Company Property owned by a Subsidiary," but excludes "licenses to sell alcohol." *Id.*

- "FF&E" means "all of any Subsidiary's right, title and interest in all of the furniture, furnishings, fixtures and equipment, machinery, building systems, vehicles, appliances, computer hardware, art work, security systems, key cards (together with all devices for coding and monogramming such key cards) and other items of corporeal (tangible) movable (personal) property which are located or are to be located at a Company Property and used in the operation of the Company Property,

---

[239] The Ordinary Course Covenant deploys the term "Retail Inventory," which the Sale Agreement does not define or use elsewhere. In other provisions, the Sale Agreement uses the defined term "Retail Merchandise." It seems likely that the use of "Retail Inventory" rather than "Retail Merchandise" was a scrivener's error.

but expressly excluding any such items that constitute Supplies, F&B, Liquor Assets or Retail Merchandise." *Id.*

These definitions demonstrate that the "business of the Company and its Subsidiaries" extends to the day-to-day operation of the Hotels themselves, including minutia such as "matches and ashtrays, soap and other toiletries."[240]

The Ordinary Course Covenant thus does not focus narrowly on Strategic, nor does it treat Strategic as simply an asset management firm. The "business of the Company and its Subsidiaries" for purposes of the Ordinary Course Covenant includes the operation of the Hotels.[241] Seller's lead argument is a non-starter.

---

[240] The Inventory Maintenance Covenant notably extends to "any gift shop or newsstand maintained by Seller." Seller is a holding company that owns Strategic. But Seller does not maintain any gift shop or newsstand. The parties' reference to "Seller" thus demonstrates that for purposes of the Ordinary Course Covenant, the parties did not draw bright-line distinctions based on specific corporate entities and the business conducted by any particular entity. Rather, they understood and intended for the provision to encompass the business in its entirety, including the operation of the fifteen Hotels.

[241] To the extent that the analysis moves beyond the Ordinary Course Covenant to the Sale Agreement as a whole, it is even clearer that the "business" in question involved owning and operating fifteen luxury hotels, rather than merely deploying capital like a private equity fund. The representations and warranties in the Sale Agreement address the business of "the Company and its Subsidiaries," including the Hotels, and encompass matters such as their employees, material contracts, pending litigation, legal compliance, and financial statements. *See, e.g.*, SA §§ 3.7, 3.9–12, 3.18.

If the analysis extended to encompass extrinsic evidence, then mountains of documentation point to the same result, ranging from the language of the teaser document and the contents of the confidential information memorandum, to the materials in the data room. The factual record also establishes that the business of Strategic as an asset manager includes an "INTENSE FOCUS ON HOTEL OPERATIONS." JX 403 at 35 (emphasis in original); *see id.* at 7, 10. And the record demonstrates that Strategic oversaw, approved, and in many cases directed the operational changes that the Hotels made in response to the

### b. "The Ordinary Course Of Business"

The parties next debate what it means for the business to be "conducted only in the ordinary course of business." Buyer contends that this language means operating in accordance with how the business routinely operates under normal circumstances. *See* Dkt. 463 at 76–77. Buyer argues that the radical changes that management implemented to respond to the COVID-19 pandemic obviously deviated from how the Hotels normally operated and therefore fell outside the ordinary course of business. Seller responds that management must be afforded flexibility to address changing circumstances and unforeseen events, including by engaging in "ordinary responses to extraordinary events." Dkt. 467 at 83 (internal quotation marks omitted). Seller argues that the COVID-19 pandemic necessitated an extraordinary response, such that management operated in the ordinary course of business based on what is ordinary during a pandemic.

Although prior cases have not framed the interpretive question so starkly, the weight of Delaware precedent supports Buyer. In a seminal decision, this court gave meaning to a representation that the company had operated "only in the usual and ordinary course" using the following dictionary definitions:

> Black's Law Dictionary defines "usual" as "1. Ordinary; customary. 2. Expected based on previous experience," defines "ordinary" as "occurring in the regular course of events; normal; usual," and defines "course of

COVID-19 pandemic, including employee layoffs and furloughs. *See* JX 3282 at 1–2 (memorandum from Strategic management detailing responses to COVID-19); Hogin Dep. 283–85 (discussing "major adjustments" that Strategic made in response to COVID-19); *id.* at 289–91 (discussing changes that Strategic made, including closing amenities).

business" as "[t]he normal routine in managing a trade of business-Also termed ordinary course of business."

*Ivize of Milwaukee, LLC v. Compex Litig. Support, LLC*, 2009 WL 1111179, at *8 (Del.

Ch. Apr. 27, 2009) (emphasis omitted) (footnotes omitted).[242] The court thus treated the

---

[242] The sell-side management team in *Ivize* made plans to start a competing entity in violation of their non-competition agreements, solicited the company's key salespeople, diverted company business, stole or destroyed company records, and stole company equipment. Understandably, the court had little difficulty concluding that "[t]he normal and ordinary routine of conducting business does not include destroying business assets and planning to transfer the essence of the business to a competitor." *Id.* at *9. Consistent with *Ivize*, a series of decisions have held that a target company failed to operate in the ordinary course of business when it engaged in fraudulent or deceptive conduct. *See, e.g.*, *Anschutz Corp. v. Brown Robin Cap., LLC*, 2020 WL 3096744, at *12 (Del. Ch. June 11, 2020) (holding that buyer stated claim for breach of ordinary course covenant where buyer alleged that target company "knowingly inserted fanciful sales data" into its pipeline of projects because it was "reasonably conceivable that manipulating pipeline data in May, 2018, as a means to quiet the concerns of an anxious buyer, is not conduct undertaken 'in the ordinary course of business consistent with past practices), *rearg. granted on other grounds*, 2020 WL 4249874 (Del. Ch. July 24, 2020); *Akorn*, 2018 WL 4719347, at *88 (finding after trial that generic pharmaceutical company failed to act in the ordinary course of business by submitting regulatory filings to the FDA based on fabricated data); *ChyronHego Corp. v. Wight*, 2018 WL 3642132, at *8 (Del. Ch. July 31, 2018) (holding that buyer stated a claim for breach of a representation that the company had "conducted its business in all material respects in the ordinary course of business consistent with past practice" based on allegations that the company inappropriately "smoothed" its revenue over monthly periods to mislead the buyer (internal quotation marks omitted)); *Osram Sylvania Inc. v. Townsend Ventures, LLC*, 2013 WL 6199554, at *7–8 (Del. Ch. Nov. 19, 2013) (finding that buyer stated claim for breach of ordinary course covenant based on allegations that target company manipulated its financial information and sales results by billing and shipping excess product without applying proper credits or discounts, delaying the issuance of invoices to customers, and altering the size and nature of its business segments). These cases demonstrate that some categories of conduct are so extreme as to fall outside the ordinary course of business, even if a company theoretically might have engaged in them as part of its normal practice. It is extraordinary in the sense of being beyond the bounds of permissible conduct for a company to deceive regulators, fail to

ordinary course of business as the customary and normal routine of managing a business in the expected manner.

Relying on *Ivize*, subsequent decisions have interpreted "the contractual term 'ordinary course' to mean '[t]he normal and ordinary routine of conducting business.'"[243] Consistent with this approach, this court has explained that an ordinary course provision is "included to reassure a buyer that the target company has not materially changed its business or business practices during the pendency of the transaction."[244] This court also

comply with the law, or engage in fraud. Activities of that nature cannot constitute the ordinary course of business under any circumstances.

[243] *Cooper Tire & Rubber Co. v. Apollo (Mauritius) Hldgs. Pvt. Ltd.*, 2014 WL 5654305, *17 (Del. Ch. Oct. 31, 2014) (alteration in original) (quoting *Ivize*, 2009 WL 1111179, at *9); *accord Project Boat Hldgs., LLC v. Bass Pro Gp., LLC*, 2019 WL 2295684, at *20 (Del. Ch. May 29, 2019); *see Anschutz*, 2020 WL 3096744, at *11 (quoting *Cooper Tire*, 2014 WL 5654305, at *17).

The *Project Boat* decision did not involve an ordinary course covenant, but rather a more specific obligation that a boat manufacturer undertook to disclose warranty claims "made outside of the ordinary course of business" and "not consistent with past practice." *Project Boat*, 2019 WL 2295684, at *20. In a post-trial decision, the court examined the seller's "past practice of receiving and processing warranty claims" and held that the claims at issue were "not claims made within the ordinary course of business" because the claims in question involved "unusual" cracks in the hulls of the boats. *Id.* at *20–21.

[244] *Anschutz*, 2020 WL 3096744, at *11. The *Anschutz* case involved two claims by a buyer that the target company failed to operate in the ordinary course of business. One involved a contention that the seller "knowingly inserted fanciful sales data" into its pipeline of projects, which the court easily found constituted a failure to operate in the ordinary course. *Id.* at *11–12. The other rested on allegations that when a major customer of the target company sought to renegotiate a material contract, the seller resisted, ostensibly to avoid having to disclose the renegotiated contract to the seller. *Id.* at *10. The court held that the second aspect of the buyer's theory did not state a claim on which relief

has observed that "[p]arties include ordinary-course covenants in transaction agreements to . . . help ensure that 'the business [the buyer] is paying for at closing is essentially the same as the one it decided to buy at signing.'"[245]

The *Cooper Tire* decision illustrates how these principles operate on somewhat analogous facts. There, the acquirer contracted to buy a large American tire company (Cooper), largely because it was the majority owner of a joint venture that manufactured and sold tires in China. An individual known as Chairman Che controlled the minority partner in the joint venture. Chairman Che vehemently opposed the merger, and he used his position of authority over the joint venture's workers "to physically seize the [joint venture's] facility, prevent the production of Cooper products there, and deny access of the parties to the facility and to [the joint venture's] financial records." *Cooper Tire*, 2014 WL 5654305, at *1. These events were unprecedented, and in an effort to force Chairman Che and the workers to capitulate by stopping production at the plant, Cooper "adopted a policy of suspending payments to suppliers who continued to ship supplies [to the plant]." *Id.* at *4. When the seller sought to force a closing, the buyer asserted that Cooper had failed to comply with its obligation under the agreement to "conduct its business in the ordinary course of business consistent with past practice." *Id.* at *14.

---

could be granted because it was not reasonably conceivable "that fighting to keep a customer was somehow out of [the seller's] ordinary course of business." *Id.*

[245] *Akorn*, 2018 WL 4719347, at *83 (alteration in original) (quoting Kling & Nugent, *supra*, § 13.03, at 13-19).

In the ensuing litigation, this court agreed with the buyer. The court found that Cooper failed to operate in its normal and ordinary routine of conducting business when "[a]s a result of Chairman Che's instigation, Cooper's largest subsidiary . . . stopped producing Cooper-branded tires or generating financial statements, and physically prevented Cooper employees from accessing records and facilities." *Id.* at *17. The court did not regard Chairman Che's intervention as an extraordinary external event beyond management's control to which management necessarily had to respond. The unforeseen event itself and its consequences on Cooper's business resulted in a deviation from the ordinary course.

The *Cooper* decision further held that Cooper deviated from the ordinary course of business when it stopped paying suppliers to the joint venture. The court acknowledged that Cooper's actions were "perhaps a reasonable reaction to the extralegal seizure of [the joint venture]," implying that management had taken action that might be thought of as an ordinary response to an extraordinary event. *Id.* But the court held that this arguably reasonable response nevertheless reflected "a conscious effort to disrupt the operations of the facility" and therefore fell outside of the ordinary course of business. *Id.* (emphasis omitted). Cooper thus failed "to cause [its largest subsidiary] to conduct business in the ordinary course, and demonstrate[d] just the opposite." *Id.* Even though management took actions that could have been characterized as an ordinary course response to an extralegal seizure, what mattered for the covenant was the departure from how the company had operated routinely in the past.

157

Citing *FleetBoston Financial Corp. v. Advanta Corp.*, 2003 WL 240885 (Del. Ch. Jan. 22, 2003), Seller responds that management cannot be limited to a playbook containing only plays that management has run previously on a regular basis. Dkt. 472 at 50–51. In *FleetBoston*, the seller of a consumer credit card business agreed that between signing and closing, the business would conduct solicitation campaigns "in the ordinary course of business consistent with past practices." *FleetBoston*, 2003 WL 240885, at *25. Instead, the business launched a "relationship management" campaign that offered very low interest rates to its current customers. *Id.* The buyer argued that the campaign was "unprecedented" and hence breached the ordinary course covenant. *Id.*

The court rejected the buyer's argument for two reasons. First, the court found that "the volume of relationship management accounts and [the interest rates] were consistent with [the business's] past practices and current marketing plans." *Id.* at *26. Second, the court noted that "during the Summer and Fall of 1997, competition for customers among the credit card companies had become increasingly fierce, manifesting itself in the form of lower [interest rates]." *Id.* The court explained that when "[f]aced with the threat of an exodus of existing balances, [the business] had only one alternative: match its competitors' strategy by offering attractive [interest rates] to its existing customers." *Id.* The court concluded that nothing in the transaction agreement suggested that the parties intended for the business "to be contractually precluded from making relationship management offers that would be competitive." *Id.*

Citing the second rationale, Seller contends that a seller can take unprecedented actions as long as they are reasonable under the circumstances. *See* Dkt. 467 at 81. The

158

*FleetBoston* case makes clear that an ordinary course covenant is not a straitjacket, but it nevertheless constrains the seller's flexibility to the business's normal range of operations. To that end, the court indicated that the buyer's argument that gave it "the most pause" was the buyer's contention that the business lowered its credit standards to attract less creditworthy customers and made inherently unprofitable offers. *FleetBoston*, 2003 WL 240885, at *27. The court seemed to believe that a significant change in credit standards could have fallen outside the ordinary course of business, but the court found that the evidence was "too thin" to support a factual finding to that effect. *Id.* The court also concluded that the evidence supported a finding that the low-interest-rate offers were profitable over time. *Id.*

The *FleetBoston* case thus does not suggest that when faced with an extraordinary event, management may take extraordinary actions and claim that they are ordinary under the circumstances. Put differently, the *FleetBoston* case does not support reading the Ordinary Course Covenant to permit management to do whatever hotel companies ordinarily would do when facing a global pandemic. Instead, *Cooper Tire* and other precedents compare the company's actions with how the company has routinely operated and hold that a company breaches an ordinary course covenant by departing significantly from that routine.[246]

---

[246] The fact that the Ordinary Course Covenant includes a requirement to obtain Buyer consent for actions outside the ordinary course of business supports the *Cooper Tire* approach. Under Seller's interpretation of the covenant, the ordinary course of business permits management to do whatever they "ordinarily" would do in the absence of the

### c. "Only In The Ordinary Course Of Business Consistent With Past Practice"

The parties also argue about what it means for the Ordinary Course Covenant to include the adverb "only" and the express language "consistent with past practice." SA § 5.1. Buyer views these additions as meaningful limitations. Seller treats them as inconsequential.

Generally speaking, there are two principal sources of evidence that the court can examine to establish what constitutes the ordinary course of business. First, the court can look to how the company has operated in the past, both generally and under similar circumstances. Second, the court can look to how comparable companies are operating or have operated, both generally and under similar circumstances. In *Akorn*, the ordinary course covenant did not include the phrase "consistent with past practice," and the court considered both sources. *See Akorn*, 2018 WL 4719347, at *88. The seller was a generic pharmaceutical company, and when analyzing whether the seller breached the ordinary course covenant, the court contrasted the seller's actions with "a generic pharmaceutical company operating in the ordinary course of business." *Id.* That dimension of the analysis

transaction agreement, even if extraordinary times call for extraordinary actions. That view would mean that Seller rarely (if ever) would need to seek Buyer's consent because virtually any action could be justified as situationally ordinary. The obligation to seek Buyer's consent before engaging in action outside of the ordinary course of business implies an understanding consistent with *Cooper Tire*'s concept of the normal and routine operation of the business.

looked at comparable companies. The court also considered that the seller had stopped engaging in important activities that it historically conducted, such as regularly auditing its operations, remediating deficiencies, and devoting IT resources to data integrity projects. *Id.* That dimension of the analysis looked at the company's past practice.

By including the adverb "only" and the phrase "consistent with past practice," the parties created a standard that looks exclusively to how the business has operated in the past.[247] When determining whether a party has acted "consistent with past practice," the court must evaluate the company's operations "before and after entering into" the transaction agreement to determine whether those operations are "consistent." *Mrs. Fields Brand, Inc. v. Interbake Foods, LLC*, 2017 WL 2729860, at *32 (Del. Ch. June 26, 2017). Because of the standard that the parties chose, the court cannot look to how other companies responded to the pandemic or operated under similar circumstances.

### d. "Commercially Reasonable Efforts"

Surprisingly, the parties even disagree about whether the Ordinary Course Covenant imposes a flat contractual obligation or whether it only imposes an obligation to use

---

[247] *See* Kling & Nugent, *supra*, § 13.03, at 13-19 n.1 ("Arguably, an obligation to conduct business only 'in the ordinary course, consistent with past practice' is a stricter standard than one which merely refers to the 'ordinary course.'"); *Model Merger Agreement*, *supra*, at 123 ("The target might object to the limitation 'consistent with past practices,' particularly when its business has been changing in recent periods or where its business or its industry is troubled or is growing rapidly.").

commercially reasonable efforts. Contrary to the plain language of the provision, Seller

argues that the covenant only required commercially reasonable efforts.[248]

"[L]iability for breach of contract under common law turns on a concept of strict

liability and parties are held to the standard expressed in the words of the contract. If a

---

[248] *See* Dkt. 467 at 84–85 ("The absence of commercially reasonable 'efforts' language before 'ordinary course' does not affect the analysis. The 'past practice' language permits a court to look . . . to the company's practices to determine what is commercially reasonable under the circumstances." (citation omitted)). Glover, Seller's deal counsel, testified that he believed adding "commercially reasonable efforts" before the ordinary course obligation would be redundant, and that the commercial reasonability standard was "implicit in the ordinary course." Glover Dep. 296–99. Given the plain language of the text and Glover's experience, that testimony was not credible.

Seller argues obliquely that the Ordinary Course Covenant only requires that Strategic and its subsidiaries act with the intent to preserve their business. *See* Dkt. 467 at 85 ("Whether compared to past practices or industry conduct, the fundamental question is whether the Company acted consistent with the normal intent to preserve its business in all material respects."). A contract provision can turn on a party's mental state. *See*, *e.g.*, *Hexion*, 965 A.2d at 746–49 (interpreting merger agreement in which contractual limitation on liability did not apply to a "knowing and intentional breach"). But absent specific language, proving a breach of contract claim does not require *scienter*. *See Hifn, Inc. v. Intel Corp.*, 2007 WL 1309376, at *13 (Del. Ch. May 2, 2007) ("[T]o the extent that [plaintiff] is contending that [defendant's] subjective motivations for wanting out of the contract give rise to an inference that it acted in bad faith, that argument fails under settled law."); *Myer Ventures, Inc. v. Barnak*, 1990 WL 172648, at *5 (Del. Ch. Nov. 2, 1990) ("[T]he contract does not require scienter for a breach to exist."); *Gilbert v. El Paso Co.*, 490 A.2d 1050, 1055 (Del. Ch. 1984) (holding that when party enforces conditions that "are expressed, the motivation of the invoking party is, in the absence of fraud, of little relevance"), *aff'd*, 575 A.2d 1131 (Del. 1990); *see also NACCO Indus., Inc. v. Applica, Inc.*, 997 A.2d 1, 35 (Del. Ch. 2009) (noting Delaware's recognition of efficient breach). *See generally Restatement*, *supra*, ch. 16 intro. ("The traditional goal of the law of contract remedies has not been compulsion of the promisor to perform his promise but compensation of the promisee for the loss resulting from breach. 'Willful' breaches have not been distinguished from other breaches . . . ."). The Ordinary Course Covenant does not contain any language suggesting an intent-based obligation.

party agrees to do something, he or she must do it or be liable for resulting damages." Kling & Nugent, *supra*, § 13.06, at 13-44. Clauses that obligate a party to use a certain degree of efforts to achieve a particular contractual outcome "mitigate the rule of strict liability for contractual non-performance that otherwise governs." *Akorn*, 2018 WL 4719347, at *86. Efforts clauses also recognize that "a party's ability to perform its obligations depends on others or may be hindered by events beyond the party's control."[249] In those situations, drafters commonly add an efforts clause to define the level of effort that the party must deploy to attempt to achieve the outcome.[250] "The language specifies how hard the parties have to try." *Akorn*, 2018 WL 4719347, at *86.

The Ordinary Course Covenant imposes an overarching obligation that is flat, absolute, and unqualified by any efforts language. The core obligation mandates that between signing and closing, absent Buyer's prior written consent, "the business of the Company and its Subsidiaries shall be conducted only in the ordinary course of business consistent with past practice in all material respects . . . and in accordance with the

---

[249] *Akorn*, 2018 WL 4719347, at *86; *see* Kling & Nugent, *supra*, § 13.06, at 13-44 ("[P]arties will generally bind themselves to achieve specified results that are within their control . . . , and reserve a 'reasonable best efforts,' 'commercial[ly] reasonable best efforts,' or 'best efforts' standard for things outside of their control . . . ."); *accord Model Stock Purchase Agreement*, *supra*, at 212; *see also* Coates Report ¶ 11(b) (ordinary course covenants "vary in content . . . particularly regarding decisions that are within the control of the target, including how it responds to materialized risks of changes that may never have been within its control").

[250] *See Model Stock Purchase Agreement*, *supra*, at 212 ("'Efforts' clauses are commonly used to qualify the level of effort required in order to satisfy an applicable covenant or obligation.").

Company Management Agreements." SA § 5.1. No efforts-based language modifies the core obligation. The Ordinary Course Covenant therefore "imposes an unconditional obligation" to operate in the ordinary course consistent with past practice. *Cooper Tire*, 2014 WL 5654305, at *15.

The sentence that establishes the Ordinary Course Covenant contains the phrase "commercially reasonable efforts," but that phrase does not modify the overarching ordinary-course obligation. Rather, it appears as part of the Inventory Maintenance Covenant. The overarching contractual duty to operate in the ordinary course *includes* "using commercially reasonable efforts to maintain commercially reasonable levels of Supplies, F&B, Retail Inventory, Liquor Assets and FF&E consistent with past practice." SA § 5.1. The location of the phrase "commercially reasonable efforts" demonstrates that it only modifies the Inventory Maintenance Covenant, not the overarching obligation. *See ITG Brands, LLC v. Reynolds Am., Inc.*, 2017 WL 5903355, at *6–7 (Del. Ch. Nov. 30, 2017) (explaining the implications of an independent clause with a non-restrictive dependent clause for purposes of contractual interpretation).

The phrase "commercially reasonable efforts" also appears in a separate obligation found in Section 5.1:

> The Seller shall cause the Company and its Subsidiaries to use their respective commercially reasonable efforts to preserve intact in all material respects their business organization and to preserve in all material respects the present commercial relationships with key Persons with whom they do business.

SA § 5.1 (the "Organizational Preservation Covenant"). This provision combines a flat obligation with efforts-based language. It begins by imposing an unqualified obligation on

164

Seller ("[t]he Seller shall cause"), but then qualifies the obligation that Seller must cause "the Company and its Subsidiaries" to fulfill with effort-based language ("[t]he Seller shall cause the Company and its Subsidiaries to use their respective commercially reasonable efforts").

The use of efforts-based language in the Inventory Maintenance Covenant and the Organizational Preservation Covenant demonstrates that the drafters of the Sale Agreement knew how to craft an efforts-based provision when they intended to do so. By contrast, the Ordinary Course Covenant imposes a flat contractual obligation. Seller's argument for an implicit efforts qualifier is plainly wrong.

### e. The Relationship Between The Ordinary Course Covenant And A Material Adverse Effect

Finally, the parties differ on the relationship (if any) between the Ordinary Course Covenant and the existence of a Material Adverse Effect. Seller argues that the Ordinary Course Covenant necessarily permits changes to the business of "the Company and its Subsidiaries" as long as those changes would not satisfy the MAE Definition. According to Seller, any other interpretation "would negate the careful risk allocation negotiated by the parties—under which the MAE clause expressly assigned to Buyer the risk that materialized here, namely the pandemic and consequent decline in demand." Dkt. 467 at 84. Seller claims that pandemic risk "was not then assigned back to Seller through the ordinary course provision, which would necessarily prohibit the Company from taking any action to contend with the pandemic (even actions required by law), a result wholly

165

inconsistent with the covenant's purpose." *Id.* The plain language of the Ordinary Course Covenant and the structure of the Sale Agreement foreclose this argument.

The plain language of the Ordinary Course Covenant does not support Seller's reading. An ordinary course covenant could provide that only a departure from the ordinary course that constituted a Material Adverse Effect would breach the covenant. A covenant drafted in that fashion would incorporate any exceptions in the definition of Material Adverse Effect so that if a deviation from the ordinary course fell within one of those exceptions, then the deviation would be excluded for purposes of the ordinary course covenant.

The Ordinary Course Covenant in this case does not incorporate the concept of a Material Adverse Effect. The parties selected a different materiality standard, which requires compliance with the Ordinary Course Covenant "in all material respects." That standard does not require a showing equivalent to a Material Adverse Effect, nor a showing equivalent to the common law doctrine of material breach.[251] The purpose of the standard is to "eliminate the possibility that an immaterial issue could enable a party to claim breach or the failure of a condition. The language seeks to exclude small, *de minimis*, and nitpicky

---

[251] *See Channel Medsystems*, 2019 WL 6896462, at *24 (rejecting an argument equating "in all material respects" with a material adverse effect as "devoid of merit"); *Akorn*, 2018 WL 4719347, at *85–86 (distinguishing "in all material respects" from common law doctrine of material breach); *Frontier Oil*, 2005 WL 1039027, at *38 (explaining that the "concept[s] of 'Material Adverse Effect' and 'material' are analytically distinct").

issues that should not derail an acquisition." *Akorn*, 2018 WL 4719347, at \*85 (footnote omitted). To qualify as a breach, the deviation must significantly alter the total mix of information available to the buyer when viewed in the context of the parties' contract.[252] The plain language of the Ordinary Course Covenant neither incorporates nor turns on whether the event prompting the departure from the ordinary course would qualify as an exception in the contractual definition of a Material Adverse Effect.[253]

---

[252] *See Channel Medsystems*, 2019 WL 6896462, at \*17 ("Based on the analysis in *Akorn*, the court will apply here the disclosure-based standard that *Akorn* endorses in evaluating the alleged inaccuracies of representations in the Agreement."); *Akorn*, 2018 WL 4719347, at \*85–86 (adopting the *Frontier Oil* materiality test because it "strives to limit the operation of the Covenant Compliance Condition and the Ordinary Course Covenant to issues that are significant in the context of the parties' contract, even if the breaches are not severe enough to excuse a counterparty's performance under a common law analysis"); *Frontier Oil*, 2005 WL 1039027, at \*38 ("A fact is generally thought to be 'material' if [there] is 'a substantial likelihood that the . . . fact would have been viewed by the reasonable investor as having significantly altered the "total mix" of information made available.'" (omission in original) (quoting *TSC Indus., Inc. v. Northway, Inc.*, 426 U.S. 438, 449 (1976))).

[253] When analyzed in combination, the Ordinary Course Covenant and the Covenant Compliance Condition create a double-materiality problem. The Ordinary Course Covenant requires that the business be operated in the ordinary course "in all material respects." SA § 5.1(a). The Covenant Compliance Condition only fails if Seller has not performed its obligations "in all material respects." SA § 7.3(a). Unlike the Bring-Down Condition, the Covenant Compliance Condition lacks a materiality scrape, resulting in double materiality. Lawyers sometimes obsess about these things, and logicians could write theses about their implications, but the parties have not argued that the double-materiality combination changes the nature of the materiality analysis. As in *Akorn*, the twice-material combination simply emphasizes that Covenant Compliance Condition will not fail unless the breach of the Ordinary Course Covenant is material. The departure from the ordinary course of business for the Company and its Subsidiaries must be a significant deviation from past practice and result in a meaningful change from Buyer's reasonable expectations about how the business would be operated between signing and closing. *See Akorn*, 2018 WL 4719347, at \*86.

The plain language of the No-MAE Representation points in the same direction. There, Seller represented that "there have not been any changes, events, state of facts [sic] or developments, *whether or not in the ordinary course of business* that, individually or in the aggregate, have had or would reasonably be expected to have a Material Adverse Effect." SA § 3.8(b) (emphasis added). The No-MAE Representation thus distinguishes between the question of whether the business operated in the ordinary course and whether the business suffered a Material Adverse Effect, and it makes the former irrelevant to the latter. The No-MAE Representation also does not specifically contemplate that Seller, Strategic, or their subsidiaries might take particular actions that otherwise would deviate from the ordinary course of business, and it does not authorize any such actions. The No-MAE Representation thus does not implicate the introductory clause in the Ordinary Course Covenant, which provides that its obligations apply "[e]xcept as otherwise contemplated by this Agreement." SA § 5.1.

The overall structure of the Sale Agreement reinforces this interpretation. The Ordinary Course Covenant and the No-MAE Representation are separate provisions, and they implicate separate closing conditions. The Ordinary Course Covenant is a covenant that implicates the Covenant Compliance Condition. The No-MAE Representation is a representation that implicates the Bring-Down Condition. Absent express contractual language, which the Sale Agreement lacks, neither provision would operate as a constraint on or exception to the other.

Moving beyond the Sale Agreement, a material adverse effect provision and an ordinary course covenant serve different purposes and rest on different assumptions.

168

Conditioning the buyer's obligation to close on the absence of a material adverse effect addresses the risk of a significant deterioration in the value of the seller's business between signing and closing that threatens the fundamentals of the deal.[254] A condition that turns on the absence of a material adverse effect is concerned primarily with a change in valuation, irrespective of any change in how the business is being operated. *See generally* Miller, *COVID-19*, *supra*, at 12–18 (explaining that a "material adverse effect . . . is really a change in the *reasonable valuation of the company*"). The provision assumes that the business has continued to operate in the ordinary course and protects the buyer against a significant decline in valuation.

The ordinary course covenant recognizes that the buyer has contracted to buy a specific business with particular attributes that operates in an established way. The buyer has not contracted to purchase a basket of fungible goods. As a result, even without any change in valuation, a significant change in how the business operates can threaten the fundamentals of the deal. The seller's representations and warranties provide some

---

[254] *See Akorn*, 2018 WL 4719347 at \*47 ("In any M & A transaction, a significant deterioration in the selling company's business between signing and closing may threaten the fundamentals of the deal."); Schwartz, *supra*, at 820 ("[T]he MAC clause allows the acquirer to costlessly avoid closing the deal if the target's business suffers a sufficiently adverse change during the executory period."); Miller, *Deal Risk*, *supra*, at 2012 ("Merger agreements typically address [the risk of a substantial decline in valuation] through complex and highly-negotiated 'material adverse change' or 'MAC' clauses, which provide that, if a party has suffered a MAC within the meaning of the agreement, the counterparty can costlessly cancel the deal." (footnote omitted)).

protection to the buyer,[255] but "[f]or a variety of reasons, reliance on the target's representations . . . will not provide the buyer adequate assurance as to the target's maintenance of its business."[256] An ordinary course covenant provides an additional and greater level of protection to ensure that "the business of the target will be substantially the same at closing as it was on the date the purchase agreement was signed."[257] The ordinary course covenant thus is primarily concerned with a change in how the business operates, irrespective of any change in valuation. It assumes stability in valuation and tests for variation in operations.

The two provisions that Seller seeks to link are separate and distinct. An unexpected event might well affect the valuation of a business and lead to changes in its operations, which would implicate both provisions. But that does not mean that the outcome of the analysis under both provisions would be the same. To the contrary, because the provisions guard against different risks, the contractual results could be different. If contracting parties want the analysis to be the same, then they have many options available. To pick just two, they could omit one of the provisions as superfluous, or they could build MAE language into the ordinary course covenant.

---

[255] Kling & Nugent, *supra*, § 14.02[1], at 14-9; *accord id.* §§ 1.05[2]–[4].

[256] *Model Merger Agreement*, *supra*, at 120.

[257] *Model Stock Purchase Agreement*, *supra*, at 202; *accord* Kling & Nugent, *supra*, § 13.03, at 13-19.

Because the Ordinary Course Covenant does not incorporate MAE language, the fact that Strategic did not suffer a Material Adverse Effect does not dictate the outcome under the Ordinary Course Covenant. Contrary to Seller's assertions, treating the provisions as separate does not alter the parties' bargain. Treating the provisions as co-extensive would alter it.

### 2. Seller's Breach Of The Ordinary Course Covenant

Seller breached the Ordinary Course Covenant when Strategic made extraordinary changes to its business in response to the COVID-19 pandemic. The circumstances created by the pandemic warranted those changes, and the changes were reasonable responses to the pandemic. Consequently, if acting in the ordinary course of business meant doing what was ordinary during the pandemic, then Seller would not have breached the Ordinary Course Covenant. But under extant Delaware law, the Ordinary Course Covenant required Seller to maintain the normal and ordinary routine of the business.

Overwhelming evidence demonstrates that Strategic departed from the normal and customary routine of its business as established by past practice. In response to the COVID-19 pandemic, Strategic closed two of the Hotels entirely and limited operations at the other thirteen severely. Seller closed the Four Seasons Jackson Hole and the Four Seasons Palo Alto. By closing the Four Seasons Jackson Hole, Seller departed from past practice by lengthening its normal seasonal closure by approximately two months.[258] The Four Seasons

---

[258] *See* Lesser Dep. 86 (the Four Seasons Jackson Hole is normally closed for one month, but in 2020 it was closed for three months); *compare* Hogin Tr. 822 (the Four

171

Hotel Palo Alto did not close seasonally; its closure was unprecedented. When announcing the closures, Strategic cited "very low demand as well as governmental orders."[259]

Strategic's other thirteen hotels were placed in a state that Strategic described as "closed but open." *See* JX 3159. The hotels stopped all food and beverage operations except for room service, which was limited to "breakfast, lunch and dinner with no overnight operations."[260] The hotels shut down or limited all other amenities, including gyms, pools, spa and health club operations, recreational activities, club lounge operations, valet parking, retail shops, and concierge and bellhop services.[261]

Strategic slashed employee headcount, with over 5,200 full-time-equivalent employees laid-off or furloughed.[262] The remaining employees saw their work weeks

---

Seasons Jackson Hole ordinarily is closed "twice a year for about a month" and was scheduled to close in the first week of April), *with* JX 3207 at 1 (the Four Seasons Jackson Hole was closed by late March), and Hogin Tr. 823 ("we ended up reopening [the Four Seasons Jackson Hole] in the middle of June").

[259] JX 3105 at 1; *see* JX 3207 at 1 (the Four Seasons Palo Alto "was running at zero occupancy, so [it] made sense to shut it down"); JX 3282 at 1 (the hotel was closed because "we can reasonably expect no demand as local employees shelter-in-place"); JX 3107 at 3 (the hotel is "small and closure is an effective way to reduce the operating [costs]"); JX 4537 at 6 (the hotel was closed based on "analyses of the costs and benefits of closing versus remaining open").

[260] JX 3282 at 3; *see* Lesser Report at 78, 83, 88, 93, 103, 114, 119, 124, 129, 134, 139, 144, 149 (describing changes at individual hotels).

[261] *See* JX 2771; JX 3282 at 3; Lesser Report at 10; JX 4547 at 23–24 [hereinafter Tantleff Report].

[262] Tantleff Report at 29; *see* Lesser Report at 78, 83, 88, 93, 103, 114, 119, 124, 129, 134, 139, 144, 149 (reporting furloughs and layoffs at individual hotels).

shortened, were encouraged to take vacation or paid time off, and had any pay increases deferred until further notice. *See* JX 3282 at 3. Across many areas, Seller reduced hotel operations to skeleton staffing. Seller limited engineering coverage to safety and OSHA issues, and the Hotels' front desks assumed responsibility from call centers for all calls.[263]

Strategic minimized spending on marketing and capital expenditures. Seller's expert on the hospitality industry calculated that marketing expenses decreased year-over-year by 33.1%, 76.4%, and 69% in March, April, and May of 2020. Lesser Report at 15–17. Strategic placed all non-essential capital spending on hold and directed all of the Hotels to "[h]old all FF&E spending until further notice." JX 3282 at 2–3.

These changes departed radically from the normal and routine operation of the Hotels and were wholly inconsistent with past practice. A reasonable buyer would have viewed them as having significantly altered the operation of the business.

- Hogin, Strategic's top executive, admitted that by April 23, 2020, "Strategic had made major material changes to its business when compared to its past practice as a result of COVID-19." Hogin Tr. 855–56.

- Buyer's expert on the hospitality industry opined that the changes in the Hotels were "the opposite of normal or ordinary." Tantleff Report at 27. During his thirty-year career in the hospitality industry, he had "never seen or heard of such monumental or extensive changes in the operations of a hotel or portfolio, much less a luxury one." *Id.* at 27–28.

- Seller's expert on the hospitality industry testified that the Hotels' "operations, once COVID hit, were dramatically negatively impacted by the pandemic compared to prior to the pandemic." Lesser Dep. 33. He could not identify any other period of

---

[263] JX 2771; JX 3207 at 1; JX 3282 at 1; *see* Tantleff Dep. 24.

time in history during which the Hotels had laid off or furloughed employees in remotely comparable numbers. *Id.* at 80.

- The experts agreed that the Hotels took unprecedented actions regarding employees.[264] Buyer's expert explained that the layoffs were material because they meant that to reopen, the Hotels would face the challenges of "rehiring and retraining employees, addressing collective bargaining agreements, re-stocking supplies, re-opening spas and restaurants with employees who may no longer be available to work . . . . The list is monumental." Tantleff Report at 28.

- Eliminating all food and beverage service except for room service for breakfast, lunch, and dinner was unprecedented and material. Between 2015 and 2018, revenue for food and beverage services constituted approximately thirty-five percent of hotel revenue. The dramatic reduction in these services caused this component of the Hotels' revenue to drop precipitously.[265]

- The changes that Strategic made to its sales and marketing efforts were unprecedented and material. The marketing budget dropped almost sixty percent year-over-year in March, April, and May 2020. The Hotels also shut down their call center operations, routing calls instead to the front desk.[266]

- Strategic's reduction in capital expenditures represented an extreme deviation from past practice. Delaying renovations and repairs will impair the Hotels' competitiveness and increase costs in the future. *See* Tantleff Report at 31, 33.

- Reducing staffing and amenities was "inconsistent with the very nature of the luxury hotel business." Tantleff Report at 25. The reductions could imperil the Hotels' status as "Four Diamond" and "Five Diamond" hotels. *Id.* at 24–25.

In his testimony, Hogin tried to blunt these dramatic changes by drawing high-level general comparisons to previous crises, such as the global financial crisis in 2008, and asserting

---

[264] *See id.*; Tantleff Report at 23–24.

[265] *See* JX 508; JX 5011; Lesser Report at 77.

[266] *See* JX 3282 at 1; Tantleff Report at 27.

that during those crises, Strategic cut operations that ceased being profitable.[267] He admitted that Strategic had not previously shut down amenities such as spas or gyms. *See* Hogin Dep. 292–93. And although Hogin maintained that Strategic deployed "the same playbook[]" in the 2008 financial crisis, he conceded that "the depth of the recession or the change in demand dictates" the magnitude of changes that Strategic makes in response to economic downturns. Hogin Tr. 873. He acknowledged that the decline in revenues expected as a result of COVID-19 was much more severe than during the 2008 crisis.[268] Seller's expert described the industry-wide decline in hotel revenues during 2008 as a "blip[] on the screen" compared to the impact of COVID-19. Lesser Tr. 1292–93.

In an effort to evade the implications of the dramatic changes to the Hotels' operations, Seller argues that the hotel operators—the hotel brands like Four Seasons, Fairmont, InterContinental, and JW Marriott—implemented those changes. *See* Dkt. 467 at 31–32. Legally, that is irrelevant. The Ordinary Course Covenant uses passive voice. It requires that "the business of the Company and its Subsidiaries *shall be conducted* only in the ordinary course of business consistent with past practice in all material respects." For purposes of the covenant, it does not matter whether the decision to depart from the

---

[267] *See* Hogin Tr. 815–16; Hogin Dep. 292–94.

[268] Hogin Tr. 847, 852; *compare* JX 19 at 25 (reporting 72.2% average occupancy rate in 2008), *and* JX 3518 at 8 (displaying positive $155 million in EBITDA in 2008), *with* JX 4966 (projecting negative $25.7 million in EBITDA and 28% occupancy rate for 2020).

ordinary course of business was made by Seller, Strategic, a manager at a subsidiary of Strategic, or a third-party management firm.

Factually, Seller's argument is incorrect. The hotel management agreements between Strategic's subsidiaries and the hotel management firms generally delegate some decision-making authority to the hotel manager as an agent (defined as the "Operator"), but the relevant subsidiary (defined as the "Owner") retains ultimate control.[269] Strategic also controlled the purse strings, giving it final decision-making authority over whether to fund the Hotels.[270] And the record makes clear that Strategic made a wide range of

_____

[269] For example, under eleven of the fifteen agreements, Strategic retained ultimate control over hiring and firing employees, with the hotel management firm acting only as an agent for the Owner. *See* JX 5099 § 3.3 ("In the performance of its duties as operator and managing agent of the Hotel pursuant to this Agreement, the Operator shall act solely on behalf of and as agent for the Owner and not on its own behalf."); *accord* JX 5100 § 3.3; JX 5105 § 5.02; JX 5109 §§ 6.6, 7.1; *see also* JX 5101 §§ 3.02(c), 4.01 (delegating hiring and firing to the hotel operator but only in accordance with an "Annual Plan" approved by the Owner); JX 5102 §§ 2.03(c), 2.04 (delegating hiring and firing power to the hotel operator but prohibiting the operator from "adopt[ing] any major change in the policy of operating the Hotel"); JX 5103 § 5.02(c) (authorizing the hotel operator to hire and fire hotel employees but making the Owner responsible for "the expenses relating to the employment or discharge of such personnel"); JX 5104 § 5.02(c) (same); JX 5106 §§ 5.03(a), 23.01(lllll) (same); JX 5107 §§ 5.03(a), 23.01(lllll) (same); JX 5113 § 2.5(c) ("All Hotel Personnel shall be employed at Owner's cost and expense . . . ."). Four hotel management agreements delegated broader hiring-and-firing authority to the Operator, but the Owner retained authority to hire and fire certain senior hotel personnel. *See* JX 5108 §§ 1.04, 1.06; JX 5110 §§ 2.1, 2.6, 4.1; JX 5111 § 2.3; JX 5112 § 4.2.

[270] *See* Hogin Tr. 826–27 (explaining that Strategic "fund[s] the bank accounts that are in the brands' names," so although "[e]ach [brand] manager put forward a plan," Strategic retained final decision-making authority); Tantleff Report at 19–20 (describing Strategic's "industry-standard arrangement" with its hotel operators and Strategic's "hands on" management role (internal quotation marks omitted)).

176

decisions in response to the pandemic and directed the Hotels to take actions that radically changed the character of their operations.[271]

Seller's hospitality industry expert devoted much of his report to comparing Strategic's actions and financial performance with its competitors to support the argument that Strategic acted in the ordinary course of what managers do in response to a pandemic.[272] That is not the test. The parties agreed that to measure whether Seller deviated from ordinary course, the relevant question is whether "the business of the Company and its Subsidiaries" was conducted consistent with past practice. Quite obviously, it was not.

### 3. Seller's Claim That It Was Contractually Obligated To Deviate From The Ordinary Course Of Business

In a single sentence in its initial post-trial brief, Seller advanced two arguments. First, Seller argued that it was contractually obligated to depart from the ordinary course

---

[271] *See* JX 2990 at 1 (Strategic "holds the right to make the final decision" whether to close hotel operations); JX 3282 at 1 (memorandum from Strategic's management to its board of directors indicating that decisions to close two hotels, furlough and lay off employees, and employ "[s]keleton sales staff" were made by Strategic); *id.* at 3 (detailing Strategic's "Contingency Request to Hotels," which included closing or limiting amenities, pausing spending, laying off or furloughing employees, and reducing work week "for all managers and non-union hourly staff"); JX 3978 at 9 (describing similar changes as the result of decisions by Strategic management); Hogin Dep. 289–91 (confirming that Strategic directed the furloughs, layoffs, reduced work hours, and amenities closures).

[272] *See* Lesser Report at 4 ("[W]e have determined that throughout the pandemic Strategic has generally conducted its business in a manner that is consistent with typical owners of comparable hotels."); *id.* at 21–70 (comparing occupancy and revenue metrics between Strategic its competitors); *id.* at 71–153 (comparing financial performance between Strategic and its competitors); *see also* Dkt. 435 at 31–32 (Seller arguing that "[m]ost other luxury hotels in the United States—including Mirae-owned properties—took similar, if not identical, steps in response to COVID-19" (citing Lesser Report)).

177

of business because Seller had represented that its operations complied with applicable law. Seller suggested that this representation created an implied obligation that required Seller to continue complying with the law to ensure that the representation remained true. *See* Dkt. 467 at 85 (citing SA § 3.9). In the same sentence, Seller implied that the Inventory Maintenance Covenant and the Organizational Preservation Covenant obligated Seller to deviate from the ordinary course of business. The Seller described those covenants as imposing obligations to "use commercially reasonable efforts to maintain supply and inventory [and] preserve the business and its relationships." *Id.* (citing SA § 5.1). Seller seemed to suggest that if it had to deviate from the ordinary course of business to comply with the law or with those covenants, then it did not breach the Ordinary Course Covenant by doing so.[273]

---

[273] In its post-trial reply brief, Seller devoted two sentences to these arguments. *See* Dkt. 472 at 48–49. In the first sentence, Seller objected that Buyer "never explain[ed] how maintaining the Company's business and complying with the law could be outside the ordinary course 'in all material respects,'" without saying anything more. *See id.* at 48. In the second sentence, Seller asserted in conclusory fashion,

> Nor could there be a breach when Section 5.1 requires the Company to operate in the ordinary course "except as otherwise contemplated by the agreement," which requires "compl[ying] with all Laws" and using "commercially reasonable efforts" to maintain supply and inventory and "preserve" its organization and relationships, as Strategic did.

*Id.* at 48–49. Seller had an obligation to support its arguments and explain how they applied. It did not satisfy that obligation by making conclusory statements.

It is difficult to address these theories because Seller only mentioned them briefly, did not develop the arguments, and did not provide any supporting authority other than bare citations to provisions of the Sale Agreement. A court need not address arguments that are presented in such a cursory and elliptical manner.[274] These arguments are deemed waived and rejected on that basis.[275] Rejecting these arguments is particularly appropriate because Seller sought to create exceptions to the Ordinary Course Covenant, and Seller therefore bore the burden of proving that the exceptions were satisfied. *See* Part III.A, *supra*.

That said, it is relatively easy to reject Seller's argument about the Inventory Maintenance Covenant. That covenant appears as a non-restrictive adverbial phrase within the Ordinary Course Covenant. That structure demonstrates that the Inventory Maintenance Covenant is a subsidiary obligation within the Ordinary Course Covenant. It cannot override the Ordinary Course Covenant because it is included within it. It is also

---

[274] *In re Mobilactive Media, LLC*, 2013 WL 297950, at *12 n.152 (Del. Ch. Jan. 25, 2013) ("[I]ssues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived. . . . It is not enough merely to mention a possible argument in the most skeletal way, leaving the court to do counsel's work. . . . Judges are not expected to be mindreaders. Consequently, a litigant has an obligation to spell out its arguments squarely and distinctly, or else forever hold its peace." (omissions in original) (quoting *Roca v. E.I. duPont de Nemours & Co., Inc.*, 842 A.2d 1238, 1243 n.12 (Del. 2004))).

[275] *See Emerald P'rs v. Berlin*, 726 A.2d 1215, 1224 (Del. 1999) ("Issues not briefed are deemed waived."); *Murphy v. State*, 632 A.2d 1150, 1152 (Del. 1993) ("The failure to raise a legal issue in the text of the opening brief generally constitutes a waiver of that claim on appeal." (footnote omitted)).

overwhelmingly clear from the record that the Hotels' deviations from the ordinary course did not result from their efforts to comply with the Inventory Maintenance Covenant. The Hotels did not place their operations in a quasi-catatonic state because they faced a massive uptick in the use of soap, the consumption of alcohol, or thefts of towels that prevented them from maintaining inventory at levels consistent with past practice. Nothing suggests that the Inventory Maintenance Covenant was an issue.

The analysis of the Organizational Preservation Covenant is more difficult and less clear. The parties have not briefed the interaction between the Organizational Preservation Covenant and the Ordinary Course Covenant, which appear in separate sentences in Section 5.1. On a cold read, the introductory clause in the Ordinary Course Covenant provides that the business must be operated in the ordinary course "[e]xcept as otherwise contemplated by this Agreement or as set forth in Section 5.1 of the Disclosure Schedules." SA § 5.1. It is thus arguable that compliance with the Organizational Preservation Covenant might operate as an exception to the obligation to operate in the ordinary course. But that is not the only possible reading. It is also arguable that the efforts-based Organizational Preservation Covenant could be regarded as a subsidiary obligation, like the efforts-based Inventory Preservation Covenant.

The scope of the Organizational Preservation Covenant also is not clear. The covenant requires Seller to cause the Company and its Subsidiaries to use commercially reasonable efforts "to preserve in all material respects their business organization and to preserve in all material respects the present commercial relationships with key Persons with whom they do business." SA § 5.1. The Sale Agreement does not define "business

180

organization" or "commercial relationships," and the parties have not pointed to any authorities that address what this obligation entails.

Factually, Seller has asserted that Strategic "sought to *preserve* its operations during the pandemic." Dkt. 467 at 81. To support that assertion, however, Seller relied on high-level descriptions of the business functions in which Strategic engages as an asset manager. *See id.* at 81–82. Seller's bottom line position asserts that Strategic operated in the ordinary course, consistent with past practice, by "maximiz[ing] margins given existing demand." *Id.* at 82. The breadth of this statement shows that it is no standard at all.

As discussed, Seller's interpretation of the "business" in question disregards the plain language of the Sale Agreement. Interpreted correctly, the relevant business includes operating the Hotels. Consequently, to use commercially reasonable efforts to maintain the relevant "business organization," Strategic needed to use commercially reasonable efforts to retain the Hotels' employees. Strategic instead laid off or furloughed over 5,200 employees, reduced its operations to skeleton staffing, and operated the Hotels in a state that it described as "closed but open." The layoffs and furloughs mean that to reopen the Hotels, Buyer would face serious challenges related to staffing and labor relations. *See* Tantleff Report at 28. Rather than preserving the business organization, Seller gutted it.

It is thus not clear in the abstract, without assistance from the parties, what the Organizational Preservation Covenant requires, how it interacts with the Ordinary Course Covenant, or whether Seller either complied with or breached the Organizational Preservation Covenant. As a result, Seller failed to carry its burden of proving that the

181

Organizational Preservation Covenant forced Strategic to depart from the ordinary course of business such that the failure of the Covenant Compliance Condition would be excused.

The most difficult issue is Seller's argument regarding compliance with applicable law. Whether Seller could rely on its obligation to comply with the law to evade liability for taking actions outside of the ordinary course is freighted with competing policy considerations. That said, Seller's representation that it complied with the law seems unlikely to have any impact on the analysis. That representation is important in its own right and for purposes of the Bring-Down Condition, but it is not clear what it adds for purposes of the Ordinary Course Covenant. As a general matter, parties are obligated to comply with the law, and Delaware law does not permit a court to enforce a contract prohibited by law.[276] The *Restatement* likewise recognizes that if compliance with a contractual obligation "is made impracticable by having to comply with a domestic or foreign governmental regulation or order," then the obligation is discharged. *Restatement*, *supra*, § 264.

These principles suggest that if a governmental authority had issued an order that required a target business to close entirely due to the COVID-19 pandemic, and if a buyer sought an injunction forcing the business to remain open and to continue operating in

---

[276] *See Della Corp. v. Diamond*, 210 A.2d 847, 849 (Del. 1965) ("[I]t is against the public policy of this State to permit its courts to enforce an illegal contract prohibited by law."); *accord Restatement*, *supra*, § 178 ("A promise or other term of an agreement is unenforceable on grounds of public policy if legislation provides that it is unenforceable or the interest in its enforcement is clearly outweighed in the circumstances by a public policy against the enforcement of such terms.").

accordance with its normal and ordinary routine, then the seller's obligation to operate in the ordinary course would be discharged. The buyer would be unable to obtain injunctive relief and could not obtain damages for breach of the discharged obligation. But a contractual provision that makes operating in the ordinary course a condition to the buyer's obligation to close does not raise the same issues. The condition allocates the risk of action outside of the ordinary course of business to the seller and extinguishes the buyer's obligation to close under those circumstances. No one is required to comply with an illegal contract, and no one receives damages based on a breach of an unenforceable obligation. The scenario involves a risk whose materialization the parties anticipated, and a contractual consequence that follows as a result.

The situation in this case is more complicated than either of these hypotheticals because two provisions in the Sale Agreement operate together to create a hybrid fact pattern. The Covenant Compliance Condition is not framed plainly as a condition that looks to whether the business of Strategic and its subsidiaries was operated in the ordinary course. The Covenant Compliance Condition instead conditions Buyer's obligation to close on Seller having "complied in all material respects with all covenants and conditions required by this Agreement." SA § 7.3(a). If Strategic deviated from the ordinary course to comply with a government order, then it could argue legitimately that the underlying obligation was discharged and hence that it "complied in all material respects with" the covenant. But Buyer could argue legitimately that the Covenant Compliance Condition in this scenario would turn on *whether* the business failed to operate in the ordinary course, not *why* it failed to do so. To my mind, there are credible and contestable contractual, conceptual, and

183

policy-based arguments for both positions. It is not clear which position ultimately would prove more persuasive.

Assuming for the sake of argument that Seller could invoke illegality to exclude its deviation from ordinary course operations for purposes of the Covenant Compliance Condition, then Seller would bear the burden of proving that it indeed was legally obligated to deviate from the ordinary course. *See* Part III.A, *supra*. Seller did not make that showing. Seller does not seriously contend that the drastic changes that Strategic made in response to the outbreak of COVID-19 were required by law, nor does it cite any examples of legally-required deviations from the ordinary course. Seller cited testimony from Hogin, who described the impact of "orders precluding spas, pools, . . . food and beverage, restaurants, and gyms," Dkt. 467 at 31 n.19 (citing Hogin Dep. 290, 293, 297), but Hogin did not actually testify about any specific order. He described the decision to close spas, pools, and food and beverage amenities as resulting from "the anticipation or the actual materializing of an executive order that said, don't operate spas, pools, food and beverage outlets." Hogin Dep. 297. He then confirmed that the decision was commercial: "Some [jurisdictions] were takeout only. If it didn't make sense to provide takeout only in a jurisdiction where takeout only was being offered, we did not." Hogin Dep. 297; *accord* Hogin Tr. 826 ("The compliance required that we weren't serving anything inside early on. And then it went to not serving anything other than takeout. We can't make a living serving takeout. It doesn't work."). In his deposition testimony, Hogin did not describe any government orders that required Strategic to close restaurant obligations at all; he simply described closures and limitations of food and beverage services. *See* Hogin Dep. 290. As

184

to gym closures, Hogin's recollection was vague: "I believe the executive order across most or all of our portfolio was recommending or ordering gyms closed, but I'd have to go back and check the total accuracy of that." *Id.* at 293. None of this testimony suffices to establish that any government order required any particular class of amenities to shut down.

The record shows that state and local governments issued stay-at-home orders in response to COVID-19 in all of the jurisdictions in which the Hotels were located. *See* JX 4817. But Strategic implemented sweeping changes before the orders went into effect. On March 16, 2020, a Strategic executive disseminated a set of guidelines to several Four Seasons employees that included a litany of changes, including reduced staffing, closure of amenities, limiting security coverage, encouraging employees to take vacation or paid leave, halting categories of spending, and minimizing operating expenses.[277] At that point, no state had issued a stay-at-home order. Three days later, on March 19, California issued a stay-at-home order; other states followed suit, but not until over a week later.[278] It is thus unclear whether the ordinary course deviations were legally required.

---

[277] JX 2778 at 1; *see also* JX 2773 (email dated March 16, 2016, describing sweeping changes at the JW Marriott Essex House hotel including closure of all food and beverage operations, "[l]ayoffs and reduced work weeks in all departments," and "[c]urtailment of all discretionary spending"); *see also* JX 2775 (memorandum attached to email dated March 16, 2020, directing work-from-home for Strategic employees).

[278] JX 4817; *see also* Hogin Dep. 205–07 (acknowledging that Strategic implemented its work-from-home policy in Chicago before Illinois issued its stay-at-home order).

The record evidence also does not indicate whether state and local shutdown orders required the Hotels to close. Seller admitted that there was "no binding law, order, government regulation, or other legal directive that specifically required that . . . the Four Seasons [Palo Alto] suspend all operations." JX 4537 at 6. Rather, Strategic shut down the hotel because there was no demand.[279] The public health order governing Teton County, Wyoming, where the Four Seasons Jackson Hole is located, limited gatherings but permitted "[t]ravel to and work at a place of employment, if the work cannot be remotely from home." JX 3287 at 3. A stay-at-home recommendation promulgated the day before the public health order identified hotels as essential businesses exempt from its recommendations. JX 3276 at 1–3. Strategic closed the Four Seasons Jackson Hole anyway. The stay-at-home order in Illinois exempted hotels and motels "to the extent used for lodging and delivery or carry-out food services."[280] Even if Strategic had been legally required to close two of its hotels and cease or limit amenities at the other hotels, that would not obligate Strategic to make other changes, such as layoffs and staff reductions, cuts to sales and marketing efforts, or decreased capital expenditures.

---

[279] *See* JX 3107 at 3; JX 3207 at 1; JX 3282 at 1; JX 4537 at 6.

[280] Ill. Exec. Order No. 2020-10 (Mar. 20, 2020), https://www2.illinois.gov/Pages/Executive-Orders/ExecutiveOrder2020-10.aspx. The parties did not introduce the order into evidence, although they included exhibits that reference it. *See, e.g.*, JX 3027 (press release announcing the executive order). The court can take judicial notice of the order. *See* D.R.E. 201(b); *Windsor I, LLC v. CWCapital Asset Mgmt. LLC*, 238 A.3d 863, 873 (Del. 2020) ("The trial court may also take judicial notice of matters that are not subject to reasonable dispute." (internal quotation marks omitted) (quoting *In re Gen. Motors (Hughes) S'holder Litig.*, 897 A.2d 162, 169 (Del. 2006))).

There are thus substantial questions about whether Strategic was legally obligated to make changes to its business. Neither this argument nor the other arguments that Seller raised in passing enabled Seller to carry its burden of demonstrating that Strategic's deviations from the ordinary course of business were excused.

### 4. Seller's Argument About Buyer Consent

Finally, Seller suggested in a footnote in its reply brief that any deviation from the ordinary course of business could not constitute a breach of the Ordinary Course Covenant because that provision permitted deviations if Buyer consented and further provided that Buyer's consent "shall not be unreasonably withheld." Dkt. 472 at 51 n.34 (citing SA § 5.1(a)). During post-trial argument, Seller's counsel returned to this argument at somewhat greater length. *See* Dkt. 481 at 116. Seller admitted that it never sought Buyer's consent, but argued that if it had, then Buyer could not reasonably have withheld its consent. According to Seller, consent therefore should be deemed given, meaning that Seller did not breach the Ordinary Course Covenant.

Compliance with a notice requirement is not an empty formality. Notice to the buyer is a prerequisite because it permits the buyer to engage in discussions with the seller and if warranted, seek information about the situation under its access and information rights. The buyer then can protect its interests. For example, it can propose reasonable conditions to its consent, and it can anticipate and account for the implications of the non-ordinary-course actions when planning for post-closing operations.

Seller did not cite any authority to support its Buyer-would-have-been-obligated-to-consent theory, much less any case involving an ordinary course covenant. Vast bodies of

case law, commentary, and scholarship address the giving of notice in other contexts. The parties did not cite or discuss any of these authorities.

Absent authority suggesting a different outcome, the most logical reading of the Ordinary Course Covenant is that Seller was required to seek Buyer's consent before taking action outside of the ordinary course. If Seller asked, and if Buyer refused, then Seller could litigate the reasonableness of Buyer's refusal. Seller admitted that it did not seek Buyer's consent under Section 5.1 until April 2, 2020, after it had already made major operational changes.[281]

Seller waived this argument by not presenting it in a meaningful fashion. The notion that Buyer might have been obligated to consent if asked does not provide grounds to excuse the breach of the Ordinary Course Covenant.

### 5. The Finding Regarding The Covenant Compliance Condition

Buyer proved that the business of Strategic and its subsidiaries was not conducted only in the ordinary course, consistent with past practice, in all material respects. The resulting breach of the Ordinary Course Covenant was never cured, and the Covenant Compliance Condition thus failed.

---

[281] *Compare* JX 4335 at 61 ("[Seller] first requested [Buyer's] consent under Section 5.1 of the [Sale Agreement] on April 2, 2020."), *with* JX 3282 (memorandum dated March 30, 2020, summarizing major operational changes "taken to mitigate" the impact of COVID-19).

**D.    The Title Insurance Condition**

The Buyer's obligation to close was subject to a specific condition that the parties negotiated to address the Fraudulent Deeds. Appearing in Section 7.3(c), the condition consists of a single, dense, compound-complex sentence containing 366 words. Diagramming the sentence would likely be achievable only using software designed for computer-assisted drafting. The condition contains multiple points of potential failure, one of which is the Title Insurance Condition. Buyer proved that the Title Insurance Condition failed, relieving Buyer of its obligation to close.

**1.    The Plain Meaning Of The Title Insurance Condition**

Section 7.3(c) conditioned Buyer's obligation to close on Strategic having done two things: (i) obtaining a specified type of documentation and (ii) providing that documentation to the Title Insurer. To satisfy the condition, the documentation had to be sufficient to accomplish two things: (i) satisfy the Expungement Condition by removing the Fraudulent Deeds from the public record and (ii) satisfy the Title Insurance Condition by enabling the Title Insurers to issue a specified level of title insurance. To satisfy the Title Insurance Condition, the documentation had to be sufficient for the Title Insurers to issue a policy of title insurance to Buyer in its capacity as the owner of the Hotels that either (i) did not contain an exception for the Fraudulent Deeds or (ii) contained an

exception the Fraudulent Deeds and expressly provided coverage for the exception through an endorsement.[282]

Parsing the actual language of Section 7.3(c) requires a difficult slog through a contractual thicket. Initially, Section 7.3(c) conditioned closing on Strategic having obtained a specified type of documentation. In the language of the provision,

> [t]he Company shall have obtained (X) a judgment, order, decree, ruling or other action from a Governmental Authority of competent jurisdiction (each a "Wild Deed Judgment") or (Y) such other documentation which is reasonably satisfactory to Buyer . . . .

*Id.* (the "Required Documentation").

Section 7.3(c) next required that the Required Documentation be sufficient to satisfy both the Expungement Condition and the Title Insurance Condition. To satisfy the Expungement Condition, the Required Documentation had to have resulted in the expungement of the Fraudulent Deeds. Using the language of the provision, the Required Documentation had to be sufficient so that

> when filed in the recording office for the applicable county in which each Company Property affected by each Fraudulent Deeds is located, [the Required Documentation] shall result in the expungement, removal or clearing of the Fraudulent Deed from the public record, with respect to any Company Property which is encumbered by a Fraudulent Deed.

*Id.*

---

[282] This summary simplifies the title insurance requirement in Section 7.3(c). As discussed below, in addition to being sufficient for the Title Insurer to issue a policy to Buyer as owner of the Hotels, the documentation also had to be sufficient for the Title Insurer to issue a policy of title insurance to the lenders financing the Transaction.

To satisfy the Title Insurance Condition, the Required Documentation had to be sufficient for the Title Insurers to provide clean title insurance both to Buyer in its capacity as owner of the Hotels and to the lenders who were financing the Transaction. Using the language of the condition, Strategic must have

> submitted same [viz. the Required Documentation] to the [Title Insurers] for recording in a manner sufficient for the [Title Insurers] to issue as of the Closing Date
>
> (I) an owner's title insurance policy either (A) without taking exception therefrom for the Fraudulent Deeds or (B) issuing affirmative insurance (which may be in the form of an endorsement) providing coverage over the Fraudulent Deeds in form and substance reasonably acceptable to Buyer, and
>
> (II) a lender's title insurance policy for such Fraudulent Deed Encumbered Property that does not take exception therefrom for the Fraudulent Deeds,
>
> dated as of the Closing Date (subject to Seller's right to satisfy the foregoing pursuant to Section 5.10), in each case subject only to the payment by Buyer of the premium therefor on the Closing Date and satisfaction by Buyer, Seller and/or the Company of the other conditions to issuance of the owner and lender title insurance policies . . . .

Id. (formatting added) The parties have focused on subpart (I) of this aspect of Section 7.3(c), which refers the owner's title insurance policy; they largely have ignored subpart (II), which refers to the lender's title insurance policy. This decision follows their lead, which means that when this decision uses the term "Title Insurance Condition," it refers to the condition relating to the owner's title insurance policy.[283]

---

[283] There is an odd divergence between the two subparts. Unlike the owner's policy, the aspect of the condition relating to the lender's policy does not permit the policy to take an exception for the Fraudulent Deeds and then provide express coverage through an endorsement. It is not clear why the parties framed the requirements differently.

Section 7.3(c) finishes with a proviso that describes one way in which the Title Insurance Condition could fail:

> provided, that it shall be deemed a failure of condition hereof with respect to any Company Property affected by a Fraudulent Deed in the event that the [Title Insurers] confirm[] in writing that any Wild Deed Judgment or other document or instrument presented by Seller (or the Company) is insufficient to permit the [Title Insurers] to issue all or any portion of the title insurance with respect to such Company Property in the manner as described above following Buyer's request for a written explanation therefor from the [Title Insurers] (and Buyer hereby agrees to timely make such request of the [Title Insurers] promptly following receipt and review of any Wild Deed Judgment or other document or instrument delivered by Seller to Buyer for such purpose).

*Id.* (the "Written Confirmation Proviso").

By its terms, Section 7.3(c) does not impose any mandatory obligations on Strategic. It rather conditions Buyer's obligation to close on Strategic having accomplished the tasks identified in Section 7.3(c). Most notably, for present purposes, Strategic had to satisfy the Title Insurance Condition.

### 2. The Failure Of The Title Insurance Condition

The title commitments for each of the Hotels contain the DRAA Exception. The Title Insurers added this exception to the commitments on April 13, 2020, after Seller obtained the default judgments that ostensibly quieted title, thereby satisfying the Expungement Condition.[284]

---

[284] *See* JX 3675 at 17; JX 3676 at 11; JX 3679 at 18; JX 3698 at 13.

The DRAA Exception encompasses "[a]ny defect, lien, encumbrance, adverse claim, or other matter resulting from, arising out of, or disclosed by, any of the following." JX 3698 at 13. The DRAA Exception then identifies four items, including,

- "(i) that certain '[DRAA Agreement],' dated on or about May 15, 2017, to which AnBang Insurance Group Co., Ltd., Beijing Dahuabang Investment Group Co., Ltd., Amer Group LLC, World Award Foundation Inc., An Bang Group LLC, and AB Stable Group LLC are purportedly parties and/or also interested, and the rights, facts, and circumstances disclosed therein,"

- "(ii) that certain action styled World Award Foundation, et al. v. AnBang Insurance Group Co, Ltd, et al., in the Court of Chancery of the State of Delaware, as DRAA C.A. No. 2019-0605-JTL and the rights, facts, and circumstances alleged therein,"

- "(iii) those certain actions, each styled World Award Foundation, et al. v. AnBang Insurance Group Co Ltd, et al., in the Superior Court of the State of Delaware, as Nos. C.A. N193-05055, C.A. N19J-05253, C.A. N193-05458, C.A. N19J-05868, C.A. N193-06026, and C.A. N19J-06027 and the rights, facts, and circumstances alleged therein," and

- "(iv) that certain action styled World Award Foundation, et al., v. AnBang Insurance Group Co., Ltd., in the Superior Court of State of California for the County of Alameda, as Case No. RG19046027 and the rights, facts, and circumstances alleged therein."

JX 3698 at 13 (formatting added). In other words, the DRAA Exception creates an exception from coverage for anything resulting from, arising out of, or disclosed by the DRAA Agreement, the DRAA Chancery Action, the Delaware enforcement actions, and the California Action.

The DRAA Exception encompasses the Fraudulent Deeds. First, the DRAA Exception excludes from coverage any matter "resulting from, arising out of, or disclosed by" the DRAA Agreement "and the rights, facts, and circumstances disclosed therein." Even though fraudulent, the DRAA Agreement purports to provide the authority on which

193

Hai Bin Zhou and Belitskiy relied when recording the Fraudulent Deeds. After supposedly making Anbang contractually liable for significant sums, the DRAA Agreement states,

> In the event that the deposit and assets under the preceding Paragraph 79 have not been delivered by then, after June 15, 2018, all other parties may, without going through arbitration or court, directly transfer and, following the Durable Power of Attorney conveyed in this Paragraph, persons appointed by the other five parties can directly transfer the ownership of the assets by signing a Grant Deed in front of any Notary Public. [Anbang] guarantees that the aforementioned assets are free from any joint liability; if there is any such liability, [Anbang] shall compensate the other parties ten times their worth, the other parties may file directly in the county recording office of the place where such asset is located.

JX 4837 at 13, 30. When preparing and filing the Fraudulent Deeds, Hai Bin Zhou and Belitskiy claimed to use the durable power of attorney granted by this paragraph, with each of the Fraudulent Deeds containing a reference to a "DPOA" or "POA" bearing the ostensible date of signing of the DRAA Agreement. *See* Part I.E, *supra*.

The plain language of the DRAA Exception therefore covers the Fraudulent Deeds. For purposes of the exception, it does not matter that the DRAA Agreement is fraudulent or that Hai Bin Zhou could not use it to create any rights against the Hotels that a legitimate legal system ultimately would respect. The Title Insurers were the masters of their offers of coverage, and they could limit that coverage in any way they wished.

Next, the DRAA Exception excludes from coverage any matter "resulting from, arising out of, or disclosed by" the Alameda Action "and the rights, facts, and circumstances disclosed therein." Seller's title expert agreed that the DRAA Exception exempts from coverage "anything referenced in or disclosed by the Alameda action," including any "fact, right, or circumstance," and that "what that means" is that "any

194

encumbrance, claim, or other matter arising from the grant deed . . . is excepted from coverage under the [DRAA Exception]."[285] An affidavit filed in the Alameda Action identifies all of the Fraudulent Deeds and describes the facts and circumstances surrounding the deeds.[286] As a result, the plain language of the DRAA Exception eliminates coverage for the Fraudulent Deeds.[287]

Finally, the DRAA Exception excludes from coverage any matter "resulting from, arising out of, or disclosed by" the DRAA Chancery Action "and the rights, facts, and circumstances disclosed therein." When seeking a temporary restraining order against the petitioners in the DRAA Chancery Action, Anbang provided the court with copies of the Fraudulent Deeds for the Ritz Carlton Laguna Niguel, the Ritz Carlton Half Moon Bay, the Westin St. Francis, the Loews Santa Monica, and the Four Seasons Palo Alto.[288] When seeking to compel production of the DRAA Agreement, Anbang referred to the Fraudulent Deeds, citing the existence of "a multi-state conspiracy to derail a multi-billion deal that [Anbang] had entered into for the sale of a number of luxury for the sale of a number of luxury properties across the United States." JX 5181 at 845. Asserting that the DRAA Petitioners were "directly involved in that fraud," Anbang alleged the following:

---

[285] Chernin Tr. 1261–63; *accord id.* at 1257–58.

[286] *See* JX 1757 at 2–6, 24–25, 73, 79, 143, 152, 157, 166, 226, 235, 240, 249, 284.

[287] *See* Nielsen Tr. 1441–43 (explaining that because "there are references in the [Alameda Litigation] pleadings to the deeds," the DRAA Exception "fully encompasses the former exception for just the California deeds"); *see* JX 4541 ¶¶ 153, 169–171, 261.

[288] *See* JX 5181 at 379–80, 392–92, 417, 426, 431, 440, 464, 470.

> Petitioner AB Stable Group LLC was a grantee on the false deeds involving the Ritz-Carlton, Half Moon Bay and the Four Seasons Hotel [Palo Alto], two of the six hotels that are the object of Petitioners' real estate fraud scheme, and Andy Bang, who verified the petition commencing this action, is the secretary of AB Stable Group LLC according to corporate documents filed with the Delaware Secretary of State. In addition, Bang's eponymous Andy Bang LLC was the grantee of the false deed for the Montage Laguna Beach, another of the six California properties. Finally, as set forth in more detail in [Anbang's] opening brief in support of its TRO Motion, the individual who attempted to fraudulently transfer these deeds in the first instance was Daniil Belitskiy, who purports to be the VP of AB Stable Group LLC.

*Id.* at 845–46 (citations omitted). The opposition to the motion also referenced the deeds. *See id.* at 1078–79. And when providing the court with a status update about the DRAA Chancery Action and the Transaction, Anbang's counsel discussed the Fraudulent Deeds. *See id.* at 1112–13, 1118, 1130. The DLA Piper letter that was docketed in the DRAA Chancery Action also discussed the Fraudulent Deeds. *See id.* at 1186–91. In light of these disclosures in the DRAA Chancery Action, the DRAA Exception again eliminates coverage for the Fraudulent Deeds.

In response to the plain language of Title Insurance Condition and the DRAA Exception, Seller argues that the Title Insurance Condition was satisfied because it only requires that the title insurance policies "not take exception therefrom for the Fraudulent Deeds." SA § 7.3(c); *see* Dkt. 467 at 86–87. Seller maintains that this language is satisfied if the title insurance policies do not explicitly reference the Fraudulent Deeds, even if the title insurance policies contain a broader exception that encompasses the Fraudulent Deeds.

Seller's interpretation is contrary to the plain language of the Title Insurance Condition. The parties agreed that Buyer would not be obligated to close without insurance

196

policies that do "not take exception therefrom for the Fraudulent Deeds." SA § 7.3(c). The plain language of the condition does not treat the term "Fraudulent Deeds" as magic words that must appear in the exception. The condition turns on whether the title commitments take exception for the Fraudulent Deeds, regardless of the specific words used. The DRAA Exception plainly encompasses the Fraudulent Deeds, causing the Title Insurance Condition to fail. Both sides' title experts agreed.[289] Ivanhoe, who served both as Buyer's lead deal lawyer and as Buyer's lead real estate lawyer, expressed the same understanding. Ivanhoe Tr. 633. Seller's lead deal lawyer did not offer testimony on the issue, and its lead real estate lawyer did not testify at trial.[290]

Attempting to reinforce its argument about magic words, Seller correctly points out that (i) the title insurance commitments do not contain an exception that refers explicitly to the "Fraudulent Deeds," (ii) the DRAA Exception does not expressly use the term "Fraudulent Deeds," and (iii) earlier drafts of the title commitment contained a specific exception for the Fraudulent Deeds, but the Title Insurers removed that narrower exception

---

[289] Chernin Tr. 1263; Nielsen Tr. 1442–43.

[290] At a conceptual level, the relationship between the broader DRAA Exception and a narrower exception for the Fraudulent Deeds tracks the relationship between a broad exception to the MAE Definition for a "calamity" and a narrower exception for a pandemic. *See* Part III.B.2, *supra.* The only difference is that the parties' positions are reversed. For the DRAA Exception, Buyer argues that the broader provision encompasses the narrower concept, while Seller argues that it cannot. For the calamity exception, Seller argues that the broader provision encompasses the narrower concept, while Buyer argues that it cannot. In both cases, the answer is the same: the broader exception encompasses the narrower concept.

when they added the broader DRAA Exception.[291] These observations are factually accurate but legally irrelevant.

As Seller's title insurance expert explained, the deletion of an exception from a prior title commitment carries no independent significance because the scope of a title commitment is limited to the four corners of that commitment.[292] The plain language of the title commitments makes clear that the removal of an earlier exception does not affect the interpretation of existing exceptions. The title commitments stated,

> **LIABILITY OF THE COMPANY MUST BE BASED ON THIS COMMITMENT.**
>
> . . .
>
> (c)    Until the Policy is issued, this Commitment, as last revised, is the exclusive and entire agreement between the parties with respect to the subject matter of this Commitment and supersedes all prior commitment negotiations, representations, and proposals of any kind, whether written or oral, express or implied, relating to the subject matter of the Commitment.

JX 3698 at 3. This language functions like a powerful integration clause. Both parties' title experts agreed that in light of this language, the scope of the exceptions in the commitments

---

[291] *See* Dkt. 467 at 87–88. *Compare* JX 2532 at 16–17, *with* JX 3700 at 11–12. In making this argument, Seller relies heavily on testimony from Kravet, who agreed that the specific exception for the Fraudulent Deeds was removed when the DRAA Exception was added. *See* Dkt. 467 at 89–90 (citing Kravet Dep. 161, 216). Kravet's testimony accurately reflects the historical changes in the title insurance commitments, in which the Title Insurers initially included a specific exception for the Fraudulent Deeds, and then replaced it with the broader DRAA Exception. Kravet's testimony did not address the legal implications of the change, and he testified that the DRAA Exception was a "separate exception" that "stands on its own." Kravet Dep. 216.

[292] *See* Chernin Tr. 1253–54; Chernin Dep. 86–87; *accord* Ivanhoe Tr. 766.

198

depends entirely on the words in those exceptions, without giving any effect to any prior commitments. Chernin Dep. 87–88; Nielsen Dep. 1442.

The operative question for purposes of the Title Insurance Condition is whether the DRAA Exception covers the Fraudulent Deeds, not whether the Title Insurers previously included a narrower exception that focused specifically on the Fraudulent Deeds. The plain language of the DRAA Exception encompasses the Fraudulent Deeds, which caused the Title Insurance Condition to fail.

Seller further argues that the DRAA Exception did not cause the Title Insurance Condition to fail because the Written Confirmation Proviso required that the Title Insurers "confirm that the judgment obtained is insufficient to issue insurance." Dkt. 467 at 87 n.63. In making this argument, Seller misreads the Written Confirmation Proviso, which contemplates that Section 7.3(c) "shall be deemed" to have failed in the event the title insurer issues such a notice "following Buyer's request for a written explanation therefor." SA § 7.3(c). The Written Confirmation Proviso does not require written confirmation from the Title Insurers for the Title Insurance Condition to fail; it instead provided one means by which the Title Insurance Condition would be deemed to have failed. The Written Confirmation Proviso enables the parties to determine whether the Title Insurance Condition failed without awaiting formal title commitments. But the Title Insurance Condition also would fail if the Title Insurers did not issue a policy that satisfied the Title Insurance Condition.

199

### 3. The Parenthetical Reference And The Possibility Of Satisfying The Title Insurance Condition By Complying With Section 5.10

To avoid the implications of the Title Insurance Condition, Seller tries to redraft Section 7.3(c) to eliminate it. That attempt fails.

Initially, Seller claims that Section 7.3(c) only requires that Seller obtain a "Wild Deed Judgment" that, once recorded, "shall result in the expungement . . . of [each] Fraudulent Deed from the public record."[293] That assertion describes the Expungement Condition; it ignores the Title Insurance Condition.

In a slightly better argument, Seller claims that it satisfied Section 7.3(c) by complying with Section 5.10(a) and causing the Company to clear the Fraudulent Deeds in accordance with the Litigation Plan. *See* Dkt. 467 at 61. Seller did not satisfy Section 7.3(c) under this route either.

In August 2019, Anbang proposed to address the Fraudulent Deeds through the Quiet Title Actions. Anbang made this proposal after representing to Mirae that the Fraudulent Deeds represented the solitary work of a twenty-something Uber driver with a criminal record, while withholding its broader knowledge about Hai Bin Zhou and his years of disputes with Anbang. Anbang's proposed solution thus only addressed the misleadingly narrow version of the problem that Anbang had identified, but it achieved the desired effect of making Mirae think that Anbang was being forthright and responsible.

---

[293] Dkt. 467 at 86 (alterations and omissions in original) (quoting JX 1226 § 7.3(c)).

The result was Section 5.10 of the Sale Agreement, in which Seller covenanted to cause Strategic "to take actions . . . and use best efforts as are necessary to satisfy the condition to closing set forth in Section 7.3(c) prior to the Termination Date." SA § 5.10(a). In another example of the convoluted drafting that is typical of the Sale Agreement, Section 5.10 required Seller to cause Strategic "to take such actions . . . as are necessary to satisfy the condition," thereby imposing an unconditional obligation, while following that requirement with an efforts-based obligation under which Seller committed to cause Strategic to "use best efforts as are necessary to satisfy the condition." The flat and unconditional obligation necessarily dominates the efforts-based obligation.

In Section 5.10(a), the parties agreed that actions required to satisfy Section 7.3(c) "includ[ed], without limitation," causing Strategic and any applicable subsidiary

> to hire counsel . . . and cause such counsel to promptly commence and diligently prosecute such actions as necessary to accomplish the same [viz. satisfaction of the condition in Section 7.3(c)]. Buyer and Seller agree that those certain actions identified in Section 5.10(a)(ii) of the Disclosure Schedules (the "<u>Litigation Plan</u>") are approved for such purpose; provided, however, the actions set forth in the Litigation Plan shall not be deemed a limitation of Seller's obligation hereunder.

SA § 5.10(a). The parties approved Gibson Dunn as counsel to carry out the Litigation Plan. *Id.*

Seller now argues that as long as Strategic followed the Litigation Plan, then it necessarily satisfied all aspects of Section 7.3(c), including the Title Insurance Condition. Under Seller's logic, the Litigation Plan was "approved for such purpose," with the "purpose" being prosecuting the actions "necessary to accomplish the same," with the "same" being "to satisfy the condition to closing set forth in Section 7.3(c)."

201

This argument ignores the structure of Section 7.3, which requires fulfilling *both* the Expungement Condition *and* the Title Insurance Condition. At most, compliance with the Litigation Plan could satisfy the Expungement Condition; it could not inherently result in satisfaction of the Title Insurance Condition.

Equally important, the plain language of Section 5.10(a) does not support Seller's reading. Section 5.10(a) imposed on Seller an obligation "to take such actions . . . as are necessary to satisfy the condition to closing set forth in Section 7.3(c)." Section 5.10(a) did not modify the parameters of Section 7.3(c); it left them intact and obligated Seller to satisfy them. The bottom-line obligation thus required Seller to satisfy Section 7.3(c). Whether Seller fulfilled the covenant and satisfied Section 7.3(c) depended on the terms of Section 7.3(c), not Section 5.10(a).

Other language in Section 5.10(a) confirms that the provision does not equate carrying out the Litigation Plan with satisfying all of the conditions in Section 7.3(c). Seller's obligations under Section 5.10(a) "includ[ed], without limitation" pursuing the Litigation Plan, which by definition meant that Seller's obligations under Section 5.10(a) were not limited to pursuing the Litigation Plan and that Seller might need to take further action to satisfy Section 7.3(c). Eliminating any doubt, a proviso in Section 5.10(a) stated that "the actions set forth in the Litigation Plan shall not be deemed a limitation of Seller's obligation hereunder." And after making this statement, an additional proviso added

> nor shall [the actions set forth in the Litigation Plan] constitute the exclusive means for Seller to satisfy the condition to closing set forth in Section 7.3(c) and Seller shall have the right to take such action as it deems reasonably necessary to satisfy the condition to closing set forth in Section 7.3(c) (as the same may be satisfied under this Section 5.10). Seller shall make all material

202

decisions pertaining to the action it takes to satisfy the condition to closing set forth in Section 7.3(c) (as the same may be satisfied under this Section 5.10); provided, that, following Closing, Seller shall not enter into or agree to any settlement, compromise or discharge relating to the Fraudulent Deeds unless in accordance with clause (iv) of this Section 5.10(a) below; provided, further, that, in the event that, following the Closing if such actions are still ongoing and Seller fails to diligently pursue such actions, Buyer shall have the right, by written notice to Seller, to assume control of such actions in accordance with the Litigation Plan.

*Id.* Carrying out the Litigation Plan and satisfying Section 7.3(c) were not coextensive.

And still more language, this time appearing in Section 5.10(c), illustrates that fulfilling the Litigation Plan was not equivalent to satisfying Section 7.3(c). In Section 5.10(c), the parties expressly agreed upon a means by which Seller could satisfy Section 7.3(c):

> Notwithstanding the foregoing, if prior to the Termination Date Seller shall have satisfied the condition to closing set forth in Section 7.3(c) with respect to at least three (3) but less than all of the Company Properties affected by the Fraudulent Deeds, then, so long as all other conditions to the parties' respective obligations set forth in Article VII are then satisfied or waived (other than those conditions which may only be satisfied at Closing), Seller may, in its sole discretion, and by delivery of written notice to Buyer, elect to satisfy the condition precedent to Buyer's obligation to close as set forth in Section 7.3(c) by delivering at Closing the Section 5.10(c) Closing Deliverables (as hereafter defined).

*Id.* § 7.3(c). The deliverables consisted of

- either cash or a letter of credit in an amount equal to the amount of the purchase price allocated to the properties that were still subject to Fraudulent Deeds,

- additional funds in an amount sufficient to satisfy the condition to closing set forth in Section 7.3(c) on a post-closing basis,

- additional funds sufficient to cover any release price premium, yield maintenance premium, spread maintenance premium or other prepayment charges or premiums payable to the Lenders by Buyer,

- a prorated portion of any acquisition costs incurred by Buyer under the Sale Agreement allocated to the properties that were still subject to Fraudulent Deeds, and

- for the three or more properties where the Fraudulent Deeds had been removed, an affidavit from an officer of Seller attesting to the expungement of the Fraudulent Deeds and such other documents or instruments as the Title Insurers reasonably required to satisfy the condition to closing set forth in Section 7.3(c).

*Id.* § 5.10(c). As shown by Section 5.10(c), when the parties agreed on requirements that would cause Section 7.3(c) to be satisfied, they said so explicitly. Just as important, even when they did so, expunging a certain number of the Fraudulent Deeds and providing economic assurances equivalent to the expungement of the remaining Fraudulent Deeds did not suffice. To satisfy the condition to closing set forth in Section 7.3(c), Seller still had to provide such other documents or instruments as the Title Insurers reasonably required.[294]

---

[294] The existence of Section 5.10(c) and the specific path it contemplates for satisfying Section 7.3(c) helps to explain parenthetical language that otherwise could be confusing. In Section 7.3(c), after describing the title insurance policies and specifying that they are to be "dated as of the Closing Date," and before stating that the policies are to be "subject only to the payment by Buyer of the premium therefor on the Closing Date and satisfaction by Buyer," the provision states, "(subject to Seller's right to satisfy the foregoing pursuant to Section 5.10)." Although this language cites Section 5.10, the parenthetical necessarily refers to the specific means of satisfying Section 7.3(c) that appears in Section 5.10(c).

Two similar parenthetical references appear in Section 5.10(a) in the form of language stating that Seller has the right to take action and make decisions to satisfy the condition to closing set forth in Section 7.3(c) "(as the same may be satisfied under this Section 5.10)." Once again, although the citation is to "Section 5.10," the parenthetical necessarily refers to the specific means of satisfying Section 7.3(c) that appears in Section 5.10(c).

### 4. Buyer's Actions Did Not Cause The Failure Of The Title Insurance Condition

Up to this point in the analysis, the evidence establishes that Seller failed to satisfy the Title Insurance Condition, relieving Buyer of its obligation to close. Seller argues that Buyer cannot rely on the failure of the Title Insurance Condition because Buyer's actions caused the condition to fail. Seller failed to prove that Buyer caused the failure of the Title Insurance Condition by breaching a performance obligation.

#### a. No Breach

Seller relies on Sections 5.5(a) and (i) of the Sale Agreement to establish that Buyer breached a performance obligation sufficient to excuse the failure of the Title Insurance Condition. *See* Dkt. 467 at 90. According to Seller, both provisions impose broad obligations on the parties to use commercially reasonable efforts to complete the Transaction. Although the provisions look similar, they create different obligations. Only Section 5.5(a) is relevant.

Section 5.5(a) imposes the type of broad reasonable efforts obligation that Seller seeks to invoke. It states:

> Each of the parties shall use all commercially reasonable efforts to take, or cause to be taken, all appropriate action to do, or cause to be done, all things necessary, proper or advisable under applicable Law or otherwise to

---

Regardless, the plain language of Section 5.10, including Section 5.10(c), demonstrates that compliance with Section 5.10 provides a means of satisfying only the Expungement Condition in Section 7.3(c). It does not also provide a means of satisfying the Title Insurance Condition.

205

consummate and make effective the transactions contemplated by this Agreement as promptly as practicable, including to

(i) obtain from Governmental Authorities all consents, approvals, authorizations, qualifications and orders as are necessary for the consummation of the transactions contemplated by this Agreement and

(ii) promptly (and in no event later than five (5) Business Days after the date hereof) make all necessary filings, and thereafter make any other required submissions, with respect to this Agreement required under the HSR Act or any other applicable Law.

SA § 5.5(a) (formatting added) (the "Reasonable Efforts Covenant"). The Reasonable Efforts Covenant thus imposes a general obligation on each party to use commercially reasonable efforts "to do, or cause to be done, all things necessary, proper or advisable under applicable Law or otherwise to consummate and make effective the transactions contemplated by this Agreement." The "including" clause confirms that general obligation "includ[es]" an obligation to use commercially reasonable efforts to accomplish the two enumerated items, both of which involve obtaining government approvals and making regulatory filings.

Section 5.5(i) imposes a different type of obligation: It requires each party to use commercially reasonable efforts to take actions that the *other party identifies* as reasonably required to complete the Transaction. It states:

Seller and Buyer will use commercially reasonable efforts to do, execute, acknowledge and deliver all and every such further acts, deeds, conveyances, consents, estoppels, waivers, assignments, notices, transfers and assurances *as may be reasonably required by the other party* for carrying out the intentions or facilitating the consummation of this Agreement, including, without limitation, such further acts, deeds, conveyances, consents, estoppels, waivers, assignments, notices, transfers and assurances as may be reasonably required in order to satisfy the contingencies and conditions

established by any Lender in connection with the Buyer's financing of the transactions contemplated hereby.

SA § 5.5(i) (emphasis added) (the "Reasonable Assistance Covenant"). The provision thus imposes on each party a general obligation that is identical to the Reasonable Efforts Covenant—to use commercially reasonable efforts—but with an important difference. The Reasonable Assistance Covenant mandates that each party must use commercially reasonable efforts that are "reasonably required by the other party." Section 5.5(i) is thus a covenant to provide reasonable assurances.

As noted, Seller relies on both the Reasonable Efforts Covenant and the Reasonable Assistance Covenant in arguing that Buyer caused the failure of the Title Insurance Condition. To succeed on its claim that Buyer breached the Reasonable Assistance Covenant, Seller must point to an action that it identified to Buyer as "reasonably required . . . for carrying out the intentions or facilitating the consummation of this Agreement," which Buyer then failed to take. Seller has not identified any actions falling into this category. The analysis therefore focuses on the Reasonable Efforts Covenant.

The Reasonable Efforts Covenant requires "commercially reasonable efforts," which is one gradation in what many deal practitioners believe to be a hierarchy of efforts standards.[295] The ABA Mergers and Acquisitions Committee has ascribed the following meanings to commonly used terms:

---

[295] *See* Kling & Nugent, *supra*, § 13.06, at 13-46 to -47; *Model Stock Purchase Agreement*, *supra*, at 212.

- *Best efforts:* the highest standard, requiring a party to do essentially everything in its power to fulfill its obligation (for example, by expending significant amounts [of] management time to obtain consents).

- *Reasonable best efforts:* somewhat lesser standard, but still may require substantial efforts from a party.

- *Reasonable efforts:* still weaker standard, not requiring any action beyond what is typical under the circumstances.

- *Commercially reasonable efforts:* not requiring a party to take any action that would be commercially detrimental, including the expenditure of material unanticipated amounts [of] management time.

- *Good faith efforts:* the lowest standard, which requires honesty in fact and the observance of reasonable commercial standards of fair dealing. Good faith efforts are implied as a matter of law.[296]

Kling and Nugent "believe that most practitioners treat 'reasonable efforts,' 'commercially reasonable efforts' and 'reasonable best efforts' as all different from and as imposing less of an obligation than, 'best efforts.'"[297] They also observe that "'reasonable best efforts' *sounds* as if it imposes more of an obligation than 'commercially reasonable efforts.'"[298]

---

[296] *Model Stock Purchase Agreement*, *supra*, at 212 (citation omitted); *see* Ryan A. Salem, Comment, *An Effort to Untangle Efforts Standards Under Delaware Law*, 122 Penn St. L. Rev. 793, 800–04 (2018) (identifying five commonly used standards: good faith efforts, reasonable efforts, best efforts, commercially reasonable efforts, and diligent efforts).

[297] Kling & Nugent, *supra*, § 13.06, at 13-46 to -47 (footnote omitted); *see* Adams, *Contract Drafting*, *supra*, at 195 ("Anecdotal evidence suggests that many who work with contracts believe that *best efforts* obligations are more onerous than *reasonable efforts* obligations. The distinction is often expressed like this: *reasonable efforts* requires only what is reasonable in the context, whereas *best efforts* requires that you do everything you can to comply with the obligation, even if you bankrupt yourself.").

[298] Kling & Nugent, *supra*, § 13.06, at 13-47.

Commentators who have surveyed the case law find little support for the distinctions that transactional lawyers draw.[299] Consistent with this view, in *Energy Transfer*, the Delaware Supreme Court interpreted a transaction agreement that used both "commercially reasonable efforts" and "reasonable best efforts." 159 A.3d at 271–73. Referring to both provisions, the high court stated that "covenants like the ones involved here impose obligations to take all reasonable steps to solve problems and consummate the transaction." *Id.* at 272. The high court did not distinguish between the two. While serving as a member of this court, former Chief Justice Strine similarly observed that even a "best efforts" obligation "is implicitly qualified by a reasonableness test—it cannot mean everything possible under the sun." *Alliance Data Sys. Corp. v. Blackstone Cap. P'rs V L.P.*, 963 A.2d 746, 763 n.60 (Del. Ch. 2009) (quoting *Coady Corp. v. Toyota Motor Distribs., Inc.*, 361 F.3d 50, 59 (1st Cir. 2004)). Another Court of Chancery decision—*Hexion*—framed a buyer's obligation to use its "reasonable best efforts" to obtain financing in terms of commercial reasonableness: "[T]o the extent that an act was both commercially reasonable

---

[299] The most thorough analytical treatment of efforts clauses rejects the existence of a hierarchy. *See* Kenneth A. Adams, *Interpreting and Drafting Efforts Provisions: From Unreason to Reason*, 74 Bus. Law. 677, 693–703 (2019) (surveying field). Other commentators agree. *See* Kling & Nugent, *supra*, § 13.06, at 13-44 to -49 & nn.2–9, 11 (collecting cases); Adams, *Contract Drafting*, *supra*, at 193 (observing that "[t]here's widespread confusion over phrases using the word *efforts*" and recommending that drafters use a single standard of "reasonable efforts"); Salem, *supra*, at 800–21 (surveying case law; recommending that Delaware resolve the ambiguity created by different efforts standards by adopting a single standard of "reasonable efforts"); Zachary Miller, Note, *Best Efforts?: Differing Judicial Interpretations of a Familiar Term*, 48 Ariz. L. Rev. 615, 615 (2006) ("The judicial landscape is littered with conflicting interpretations of efforts clauses.").

and advisable to enhance the likelihood of consummation of the financing, the onus was on [the buyer] to take that act." *Hexion*, 965 A.2d at 749.

The language from *Hexion* also suggests that in a commercial agreement, including the word "commercially" in an efforts obligation is redundant. The leading commentator on efforts clauses agrees:

> Determining whether someone has tried hard involves considering the circumstances, and in the case of a business transaction, that necessarily involves acknowledging that the parties are engaged in the world of commerce. That would be the case whether or not the word *commercially* is used in the *efforts* standard.

Adams, *Interpreting and Drafting Efforts Provisions: From Unreason to Reason*, *supra*, at 702 (footnote omitted). Buyer's obligation under the Reasonable Efforts Covenant thus was an obligation to use reasonable efforts.

Seller contends that Buyer breached the Reasonable Efforts Covenant by seeking to convince the Title Insurers to adopt the DRAA Exception. *See* Dkt. 467 at 90–91. There are grounds for concern about Buyer's conduct, but Seller ultimately failed to prove a breach. The dispositive evidence on this point came from Seller's own title expert, who concluded that Ivanhoe acted appropriately when communicating with the Title Insurers.

The record indicates that during March and April 2020, Ivanhoe made statements to the Title Insurers that supported the inclusion of the DRAA Exception, rather than arguing that the Title Insurers should provide clean commitments without any exceptions. As someone who is not personally familiar with the dynamics of seeking title insurance, this behavior looks to me like conduct that was designed to undermine the deal. Viewed from that standpoint, that behavior would breach the Reasonable Efforts Covenant.

Not surprisingly, Seller argues that Ivanhoe sought to cause the Title Insurance Condition to fail and give his client a basis for refusing to close. Seller's account stresses that on February 19, 2020, after the Lenders discovered the DRAA Chancery Action and the related proceedings in Delaware Superior Court, the Lenders sent various filings from those actions to Greenberg Traurig.[300] Anbang and Gibson Dunn had never mentioned these lawsuits, so Greenberg Traurig immediately began investigating them. As part of that process, a litigator in Greenberg Traurig's Delaware office circulated a summary of the filings, including a copy of the transaction from the status conference held on January 8, 2020.[301]

While these events were unfolding, Ivanhoe was vacationing in the Middle East. He returned on February 21, 2020, and participated in a call with Gibson Dunn.[302] The Gibson Dunn lawyers downplayed the Delaware filings, arguing that they were part and parcel of the same fraud involving the Fraudulent Deeds and that they had been addressed by the January Chancery Judgment. The Gibson Dunn lawyers did not tell Ivanhoe about Anbang's long history of trademark disputes with Hai Bin Zhou, nor did they share the information they had about Hai Bin Zhou.

---

[300] Dkt. 467 at 21; *see* JX 2246.

[301] *See* Ivanhoe Tr. 673–76; JX 2280.

[302] *See* JX 2292; Ivanhoe Tr. 588–89.

Although Ivanhoe was taken aback that Gibson Dunn and Anbang had not mentioned the filings previously, he again relied on what Gibson Dunn told him. His litigation colleague's review of the filings in the DRAA Chancery Action also suggested that the threat from that proceeding had been beaten back. On Sunday, February 23, 2020, Ivanhoe told the Lenders' counsel that he had consulted with Mirae and that they did not view the DRAA Chancery Action as an impediment:

> Their view is that since the Delaware litigation does not involve Strategic or the hotel properties (and has been successfully beaten back by Anbang with the latest Delaware judgment and Alameda County ruling), there is little to no risk on our transaction from these cases.[303]

According to Seller, because Ivanhoe determined that the DRAA Chancery Action did not pose any risk, he could not later advocate to the Title Insurers that the DRAA Chancery Action and the DRAA Agreement posed a risk. *See* Dkt. 467 at 91–92. Doing so, Seller claims, constituted bad faith and a clear breach of the Reasonable Efforts Covenant.

The problem for Seller's argument is that events did not stop after Ivanhoe communicated with the Lenders on February 23, 2020. On February 25, Stamoulis filed the DLA Letter in the DRAA Chancery Action. Over the weekend of February 29, 2020, Ivanhoe reviewed the DLA Letter, which raised alarm bells. As he explained at trial, "you have the partner at a major law firm, major international law firm, I think a peer of ours and Gibson and Dunn, who is now describing the basis of all of these claims . . . ." Ivanhoe

---

[303] JX 2304; *accord* JX 2311 at 2 (Jones Lang telling Goldman on February 23, 2020, "Mirae is prepared to proceed based on its understanding of the [Delaware] litigation.").

Tr. 600. He called the head of Greenberg Traurig's litigation practice and asked him to assemble a team to address "a very serious problem on a very large transaction." *Id.* Ivanhoe viewed the situation as an "emergency." *Id.*

Ivanhoe's testimony was credible and supported by corroborating evidence. In addition, as the judge presiding over the DRAA Chancery Action, I recall reviewing the DLA Letter when it was filed on the docket. It depicted a different and more serious situation than Anbang and its counsel had presented, and it caused me to question whether counsel had provided me with the full story. In fact, they had not. Anbang and its counsel knew much more about Hai Bin Zhou and his fraud than they had shared.

I am therefore persuaded that Ivanhoe viewed the DLA Letter as materially changing the landscape and elevating the risk to the Transaction. I am likewise persuaded that the letter caused Ivanhoe to lose whatever remaining faith he might have had in Anbang and Gibson Dunn. They had delayed disclosing the Fraudulent Deeds. They had failed to disclose the DRAA Chancery Action, the Delaware Judgments, and the Alameda Action. And they did not share any information about Hai Bin Zhou or the history of the trademark litigation. Instead, they claimed that the whole mess was the work of a twenty-something-year-old Uber driver with a criminal record. Anbang and Gibson Dunn's behavior destroyed their credibility.

By March 10, 2020, Ivanhoe concluded that he needed to disclose to the Title Insurers the information that the Greenberg Traurig team had assembled. *See* Ivanhoe Tr. 601–02, 604–06. Ivanhoe forwarded to Kravet, the agent for the title companies, all of the filings from the DRAA Chancery Action, the proceedings in Delaware Superior Court, and

213

the Alameda Action. *See id.* at 604–05. After doing so, Ivanhoe and his litigation partners continued to provide the Title Insurers with information and analysis as they evaluated the risk. *See id.* at 615, 629–30. At the time, Buyer and Greenberg Traurig sought to understand the risk posed by the DRAA Agreement so that they could work out a solution that would enable the Transaction to close. In an internal email, dated March 12, 2020, a senior member of Buyer's deal team told his colleagues that "the key at the moment is to have a clarification on the Delaware litigation issue first." JX 2737 at 1.

As Ivanhoe commendably admitted at trial, he did not want Seller to be able to force Buyer to close until Ivanhoe understood the risk posed by the DRAA Chancery Action and the DRAA Agreement. He believed that if the Title Insurers raised an exception based on the DRAA Chancery Action, then that exception would operate as a "failsafe" that would eliminate any risk that Buyer could be forced to close before the risk was fully understood and addressed. Ivanhoe Tr. 724–25. Seller portrays Ivanhoe's forthright testimony as an admission that he was trying to torpedo the deal, but I do not view it that way. Ivanhoe acted reasonably. He tried to protect his client's rights within the scope of the Sale Agreement by ensuring that if the Transaction closed, then his client would have title insurance.

During the same period, by contrast, Anbang refused to acknowledge the apparent seriousness of the DLA Letter or the risk posed by the as-yet-unseen DRAA Agreement. With the benefit of hindsight, it seems likely that Anbang's different perspective stemmed from the fact that Anbang had been dealing with Hai Bin Zhou since 2008. Anbang properly regarded him as a hold-up artist. During the intervening years, Anbang had

214

investigated Hai Bin Zhou, and since the discovery of the Fraudulent Deeds, both Anbang and Gibson Dunn had done so extensively. They had assembled a trove of information, so their dismissive views were well-founded. But Anbang and Gibson Dunn did not share this information with Buyer (or with the court), and they failed to understand that parties who did not possess similar information could have concerns about the DLA Letter. Anbang and Gibson Dunn also appear not to have understood how they destroyed their own credibility by initially withholding information about the Fraudulent Deeds, then providing misleading half-truths about their origins, and later failing to disclose the DRAA Chancery Action, the Delaware Judgments, and the Alameda Action.

Seemingly blind to the problems that they had created, Anbang and Gibson Dunn became more aggressive in attempting to force a closing. Glover, the lead deal lawyer from Gibson Dunn, "made very clear" to Ivanhoe that "Anbang was not going to take an adjournment to address these things." Ivanhoe Tr. 616. "[H]e said something like, 'Well, if you're not ready on the date you have to close, we will litigate.'" *Id.* Those bullying tactics only caused Buyer and Greenberg Traurig to become more concerned, which understandably led Ivanhoe to want to ensure that his client was protected.

On April 10, 2020, the senior representatives of the Title Insurers met to make a decision on the DRAA Exception. They spoke with Gibson Dunn, then spoke among themselves. At the end of the call, they reached out to Ivanhoe and asked him to join. Ivanhoe Tr. 619–20, 623. Ivanhoe had no agenda and no script, and he did not know what questions the Title Insurers would ask. *Id.* at 619–20. To ensure that all of the Title Insurers had the same information, he provided an overview of the facts. *Id.* at 626–28. The Title

215

Insurers then asked directly for his candid view of potential title risks and what he thought they should do. *Id.* at 626, 631. Unlike the Gibson Dunn lawyers, who had eschewed candor throughout the deal process, Ivanhoe provided the complete, unvarnished truth. He explained that he thought that

> there was a very clear link between the Delaware litigation, the Fraudulent Deeds and the 15 Properties that seem to have been pledged to the Delaware Petitioner, something that they and we have notice of, and asked how they could possibly insure and omit both the Fraudulent Deeds and not raise an exception to title for the Delaware case.

JX 3645 at 1. Ivanhoe testified credibly that if he had provided any other assessment, then his client would have faced an unacceptable risk: If a claim emerged post-closing, and if discovery in litigation revealed his contemporaneous concerns about the DRAA Agreement and the DRAA Chancery Action, then Buyer could have lost coverage. Ivanhoe Tr. 763. If Anbang and Gibson Dunn had been equally candid with Mirae by disclosing the Fraudulent Deeds in May 2019 and explaining the context of the longstanding dispute with Hai Bin Zhou, then the Transaction likely would have closed, and this litigation would never have happened.

If I were considering Ivanhoe's actions without the benefit of expert testimony, I still would be concerned that Ivanhoe could have caused Buyer to breach its obligations under the Reasonable Efforts Covenant by arguing for an exception to coverage for the DRAA Chancery Action. Whether that evidence rose to a preponderance would be a difficult call. But in this case, both sides retained experts who evaluated the interactions with the Title Insurers. Seller's own title insurance expert opined that "they all seem to be working in a normal fashion . . . toward accomplishing a closing." Chernin Tr. 1250. He

216

reached this opinion after reviewing "the corpus of communications between buyer or seller's counsel, on the one hand, and Mr. Kravet or the title insurers, on the other hand."[304] The testimony of Seller's own expert is dispositive on the question of whether Ivanhoe's interactions with the Title Insurers breached Buyer's obligations under the Reasonable Efforts Covenant.

Two unique aspects of title insurance practice explain how Seller's expert could conclude that everyone interacted in a normal fashion, even though Ivanhoe seemed to be working against the Transaction by suggesting that the Title Insurers include the DRAA Exception. The first is the knowledge-of-the-insured doctrine. The second is drafting practice for title insurance policies.

Under the knowledge-of-the-insured doctrine, a title insurer can deny coverage for a claim if the insured withheld knowledge relating to the claim from the title company before the title company issued the policy. Even if an insured disclosed all the factual information that it possessed, a title insurer can avoid coverage if the insured had an internal negative assessment of the risk that it failed to disclose under the principle that "a prospective insured cannot select and present only favorable information on a subject and delete less favorable information on the same point, even if no follow up questions are asked." *Commonwealth Land Title Ins. Co. v. IDC Prop., Inc.*, 547 F.3d 15, 20–23 (1st Cir. 2008) (upholding denial of coverage where insured failed to disclose its unfavorable

---

[304] *Id.* at 1249–50; *accord* JX 4543 ¶ 21(d).

internal assessment). If a party applying for insurance "withholds information from the insurer about a title risk out of concern that the insurer will not protect against the risk," then "that concealment of the material risk is emphatic proof that the applicant obtained insurance by the concealment." J. Bushnell Nielsen, *Title & Escrow Claims Guide* § 11.3.4, 2016 WL 6637232 (2020 ed.).

To avoid any risk under the knowledge-of-the-insured doctrine, Ivanhoe ensured that the Title Insurers knew everything that he did, including his assessment of the risks. Ivanhoe Tr. 600–01. Seller's title insurance expert admitted that Ivanhoe's communications with the Title Insurers "fulfilled [Buyer's] obligations to provide information to avoid application of a knowledge of the insured exclusion." Chernin Dep. 53–54. To someone who lacks expertise as to title insurance, Ivanhoe's communications might seem designed to cause the Title Insurers to include an exception for coverage that would cause the Title Insurance Condition to fail. But because of the knowledge-of-the-insured doctrine, Ivanhoe had to provide his negative assessments to avoid a situation in which the Title Insurers later might deny coverage.

The second reason why Ivanhoe's actions make sense is the nature of drafting practice in the title insurance industry. The standard structure of a title insurance policy consists of a base policy that provides coverage, followed by a list of exceptions removing coverage, followed by a series of endorsements restoring coverage for particular exceptions. The experts agreed that title insurance companies prefer to exclude known risks through exceptions, then provide coverage for specific exceptions through endorsements. Mertens Dep. 139–41; Chernin Dep. 106. Ivanhoe's communications with the Title

218

Insurers reflected the preferred approach. He advised them to identify an exception, and then to address the exception through an endorsement.

The consensus among the experts regarding the knowledge-of-the-insured doctrine and drafting practice in the title insurance industry negates Seller's otherwise intuitive argument that all Ivanhoe needed to do was provide the Delaware filings and DLA Letter to the Title Insurers. At that point, the argument goes, he had fulfilled his obligation to the Title Insurers and needed to exercise reasonable efforts to advocate in favor of the deal. That meant pushing the Title Insurers to omit any exception that would encompass the Fraudulent Deeds. *See Hexion*, 965 A.2d at 753 ("Hexion had been feeding the banks Huntsman's updated forecasts as it received them. Its obligations to update the banks ended there."). The testimony of Seller's title expert establishes that in the title industry, the practice is different. A party seeking title insurance is obligated to provide more information, including negative assessments. The title insurers then address the known risks through exceptions and endorsements. Ivanhoe acted properly by continuing to disclose his concerns about the DRAA Chancery Action and the DRAA Agreement and by suggesting that the Title Insurers include the DRAA Exception to make their coverage position clear.

The consensus among the experts regarding the knowledge-of-the-insured doctrine and drafting practice in the title insurance industry also negates Seller's second intuitive argument. By suggesting that the Title Insurers should include the DRAA Exception, the argument goes, Ivanhoe sought to obtain less coverage for his client than if he sought to exclude the exception. That is illogical, so Ivanhoe must have been trying to tank the deal.

219

To the contrary, Ivanhoe believed that if the title commitments did not include the DRAA Exception, then his client would be at risk under the knowledge-of-the-insured doctrine. Once the Title Insurers knew about the DRAA Agreement and the related litigation, the standard practice in the industry was to include the DRAA Exception and then address it with an endorsement.

Based on the factual record and the expert testimony in the case, Ivanhoe's conduct did not give rise to a breach of the Reasonable Efforts Covenant. Seller therefore cannot rely on a breach of the Reasonable Efforts Covenant to excuse the failure of the Title Insurance Condition.

### b. No Causation

Assuming for the sake of argument that Ivanhoe's conduct breached the Reasonable Efforts Covenant, Seller failed to prove that the breach caused the failure of the Title Insurance Condition, as required by Section 7.4 of the Sale Agreement. The Title Insurers made an independent decision to include the DRAA Exception. Ivanhoe's actions did not cause the Title Insurance Condition to fail.

For starters, the decision-makers for the Title Insurers were not ingénues. They were "a veritable who's who of the most senior title insurance professionals in America."[305] Seller's expert on title insurance opined that "title insurers are independent and make their own decisions independent of whatever advocacy seller's counsel or buyer's counsel

---

[305] Kravet Dep. 206; *see id.* at 204–08 (describing individuals).

presents," and he concluded after reviewing the record that the Title Insurers acted in that fashion in this case. Chernin Dep. 158–59. Kravet was a first-hand witness to the Title Insurers' deliberations, and he did not perceive any basis to think that the Title Insurers were influenced to add an exception. Kravet Dep. 203.

Moreover, the critical issue for the Title Insurers, particularly after the DLA Letter, was to review a copy of the DRAA Agreement. On April 7, 2020, three days before the meeting when Ivanhoe allegedly convinced the Title Insurers to add the DRAA Exception, the Title Insurers informed Lance that they needed a copy of the DRAA Agreement to evaluate the risk. JX 3525 at 5. The Title Insurers' position on the risk posed by the DRAA Agreement and the related litigation did not change.

The Title Insurers also did not provide Ivanhoe with disproportionate access or special treatment. Lance, the lead real estate lawyer from Gibson Dunn, and a group of litigators from Gibson Dunn advocated persistently for "clean" title commitments in multiple emails, calls, and letters with the Title Company.[306] On March 17 and 18, 2020, Lance and his Gibson Dunn colleges engaged in calls with the Title Insurers and provided them with documents in an effort to convince them that the DRAA Action and the DRAA Agreement were frauds that should not result in an exception to title. When the Title Insurers remained unconvinced, Gibson Dunn kicked its advocacy up a gear, sending the

---

[306] *See* Lance Dep. 367–69, 375–79; JX 2652 at 52.

Title Insurers a series of missives over the next two weeks.[307] On April 9, Gibson Dunn held a call with the Title Insurers' highest-ranking decision makers, and on April 13, Gibson Dunn sent the Title Insurers more documents. *See* JX 3662. Gibson Dunn later sent the Title Insurers a detailed letter which concerned the "allocation of risk in the Purchase Agreement," and "strongly urge[d] . . . that no exception is required or appropriate for these matters . . . arising from criminal activity by shadowy, unknown actors." JX 3674 at 4. Last, after obtaining a copy of the DRAA Agreement, Gibson Dunn sent it to the Title Insurers on April 22 with a detailed letter identifying purported "examples of why this document is fraudulent" in an effort to convince the Title Insurers to remove the DRAA Exception. JX 3950 at 1–3. The Title Insurers were unpersuaded.

The Title Insurers' rejection of Gibson Dunn's advocacy is noteworthy, because the Title Insurers had a financial interest in accepting Gibson Dunn's arguments and not asserting the DRAA Exception. The Transaction was a massive deal, and the Title Insurers and Kravet stood to gain "tens of millions" of dollars in fees by and providing clean title commitments. Ivanhoe Tr. 604. The Title Insurers also had the potential to receive additional fees by providing title commitments in connection with the refinancing of the debt on the properties. This court has seen situations in which advisors modified their positions or engaged in motivated reasoning to reach results that helped their clients or earned them contingent compensation. Here, the Title Insurers were not working for Mirae

---

[307] *See* JX 3119 at 1; JX 3638 at 9–13.

222

or Greenberg Traurig, and they did not have any financial incentive to cater to what Ivanhoe and Buyer allegedly wanted.

Finally, the record indicates that the senior representatives of the Title Insurers made a thorough decision. They reviewed the Gibson Dunn analyses and dozens of documents from the DRAA Chancery Action, the enforcement actions in Delaware Superior Court, and the Alameda Action. They deliberated in three internal calls. And they ultimately determined to include the DRAA Exception.

Under the circumstances, assuming for the sake of argument that Ivanhoe breached the Reasonable Efforts Covenant, that breach did not cause the failure of the Title Insurance Condition. The Title Insurers made a separate and independent decision.

### 5. The Finding Regarding The Title Insurance Condition

The Title Insurance Condition failed because the Title Insurers did not issue title commitments that provided coverage for the Fraudulent Deeds. The Title Insurers issued title commitments containing the DRAA Exception, which was broad enough to eliminate coverage for the Fraudulent Deeds. Buyer did not breach the Reasonable Efforts Covenant through its dealings with the Title Insurers, nor did Buyer cause the Title Insurance Condition to fail. Consequently, the non-satisfaction of the Title Insurance Condition is not excused. The failure of the Title Insurance Condition extinguished Buyer's obligation to close.

### IV. BUYER'S RIGHT TO TERMINATE

The next category of legal issues involves Buyer's right to terminate the Sale Agreement. The parties' rights to termination appear in Section 8.1 of the Sale Agreement,

which consists in its entirety of two (yes, two) sentences. The first is a linguistic train wreck containing 453 words, spanning four contractual subsections, and setting forth eleven distinct subparts or provisos. The second is twenty-eight words long and addresses notice of termination. It is not linked structurally to the other subparts. It appears to be an afterthought.

Buyer relies on two subsections in the first sentence to support its right to terminate. Section 8.1(b) of the Sale Agreement granted each party the right to terminate in the event that the other breached. Section 8.1(c) granted each party the right to terminate in the event that the contractually defined Termination Date passed. Buyer validly terminated the Sale Agreement under the first provision and has the right to terminate under the second.

**A.      The Termination Right For Breach**

Section 8.1(b)(ii) provides that Buyer may terminate the Sale Agreement at any time prior to closing

> if the Buyer is not in material breach of its obligations under this Agreement and
>
> the Seller breaches or fails to perform in any respect any of its representations, warranties or covenants contained in this Agreement and such breach or failure to perform
>
> (A)      would give rise to the failure of a condition set forth in <u>Section 7.3</u>,
>
> (B)      cannot be or has not been cured within 15 days following delivery of written notice of such breach or failure to perform and
>
> (C)      has not been waived by the Buyer.

SA § 8.1(b)(ii) (formatting added) (the "Termination Right for Breach"). Section 8.1(b) also contains a reciprocal termination right for Seller in the event of Buyer's breach, but it

is not relevant here. *See* SA § 8.1(b)(i).

On April 17, 2020, the scheduled closing date, Buyer issued a Notice of Default in which Buyer cited a series of breaches of the Sale Agreement, including Seller's failure to comply with the Ordinary Course Covenant. JX 3841 at 2–3. Buyer gave Seller the contractually required fifteen days to cure, while noting that cure did not seem possible. *Id.* at 4. On April 27, Seller filed this litigation. Seller failed to cure the identified breaches within fifteen days, and on May 3, Buyer terminated the Sale Agreement. JX 4100 at 2.

Buyer's termination notice validly terminated the Sale Agreement. This decision already has found that Seller failed to comply with the Ordinary Course Covenant, supplying the predicate breach for Buyer to exercise the Termination Right for Breach. This decision has held that Seller's failure to comply with the Ordinary Course Covenant caused the Covenant Compliance Condition to fail, which satisfying subpart (A) of the Termination Right for Breach. Seller failed to cure its breach of the Ordinary Course Covenant, satisfying subpart (B) of the Termination Right for Breach. And Buyer never waived compliance with the Ordinary Course Covenant, satisfying subpart (C) of the Termination Right for Breach.

The only remaining question is whether Seller proved that Buyer was in "material breach of its obligations under this Agreement." By using the term "material breach," the Termination Right for Breach invokes the common law standard, under which "[a] party is excused from performance under a contract if the other party is in material breach thereof." *BioLife Sols., Inc. v. Endocare, Inc.*, 838 A.2d 268, 278 (Del. Ch. 2003). As a matter of common law, "[a] breach is material if it goes to the root or essence of the

225

agreement between the parties, or touches the fundamental purpose of the contract and defeats the object of the parties in entering into the contract." *Mrs. Fields*, 2017 WL 2729860, at *28. Under this doctrine, whether a breach is material "is determined by weighing the consequences in the light of the actual custom of men in the performance of contracts similar to the one that is involved in the specific case."[308] The *Restatement* provides five guiding factors: (i) "the extent to which the injured party will be deprived of the benefit which he reasonably expected," (ii) "the extent to which the injured party can be adequately compensated for the part of that benefit of which he will be deprived," (iii) "the extent to which the party failing to perform or to offer to perform will suffer forfeiture," (iv) "the likelihood that the party failing to perform or to offer to perform will cure his failure, taking account of all the circumstances including any reasonable assurances," and (v) "the extent to which the behavior of the party failing to perform or to offer to perform comports with standards of good faith and fair dealing." *Restatement*, *supra*, § 241. "[N]onperformance will attain this level of materiality . . . when the covenant not performed is of such importance that the contract would not have been made without it." 14 *Williston on Contracts* § 43:6 (4th ed. 2003). The resulting standard is more onerous than a requirement of compliance "in all material respects." *See Akorn*, 2018 WL 4719347, at *86.

Seller has not shown that Buyer breached the Sale Agreement, much less that Buyer

---

[308] *BioLife Sols.*, 838 A.2d at 278 (internal quotation marks omitted); *accord* 23 *Williston on Contracts* § 63:3 (4th ed. 2003).

committed a material breach. Seller has not even argued the test for material breach. The closest that Seller came to arguing a material breach was to allege a breach of the Reasonable Efforts Covenant, and that ultimately unproven breach affected the Title Insurance Condition, not the Covenant Compliance Condition or the Ordinary Course Covenant. Buyer has proven that both the Title Insurance Condition and the Covenant Compliance Condition failed, which extinguished Buyer's obligation to close. Buyer therefore validly terminated the Sale Agreement as of May 4, 2020, by invoking the Termination Right for Breach.

**B.      The Temporal Termination Right**

Section 8.1(c) provides that the Sale Agreement may be terminated at any time prior to closing

> by either the Seller or the Buyer if the conditions to Closing as set forth in <u>Article VII</u> shall not have been satisfied by June 10, 2020;
>
> <u>provided</u>, that if all conditions to closing shall have been satisfied (other than those conditions that may only be satisfied as of the Closing) other than the condition to Closing set forth in <u>Section 7.3(c)</u> (subject to <u>Section 5.10</u>), then the Termination Date shall automatically be extended until September 10, 2020 (such date, as it may be so extended, the "<u>Termination Date</u>");
>
> notwithstanding the foregoing, the right to extend the Termination Date or to terminate this Agreement under this <u>Section 8.1(c)</u>, as applicable, shall not be available to such party whose failure to fulfill any obligation under this Agreement shall have been the cause of the failure of the Closing to occur on or prior to such date . . . .

SA § 8.1(c) (formatting added) (the "Temporal Termination Right").

Buyer is entitled to terminate the Sale Agreement under the Temporal Termination Right. This decision already has found that the Covenant Compliance Condition failed,

meaning that "the conditions to Closing as set forth in Article VII" were not "satisfied by June 10, 2020." Assuming the Covenant Compliance Condition was a condition that "may only be satisfied as of the Closing" (an issue the parties did not brief), then the Termination Date extended automatically to September 10, 2020. As of that date, the Covenant Compliance Condition remained unsatisfied, meaning that Buyer could exercise the Temporal Termination Right.

As of September 10, 2020, Buyer also could exercise the Temporal Termination Right because the Title Insurance Condition had failed. Buyer could not have exercised the Temporal Termination Right previously based on the Title Insurance Condition because that condition appears in Section 7.3(c), and its non-satisfaction (assuming the satisfaction of other pertinent conditions) resulted in the automatic extension of the Termination Date until September 10. Once that date came and went, Buyer could exercise the Temporal Termination Right because the Title Insurance Condition remained unsatisfied.

The only possible impediment to Buyer's ability to exercise the Temporal Termination Right is if Buyer's "failure to fulfill any obligation under this Agreement shall have been the cause of the failure of the Closing to occur." Seller has not proven that Buyer failed to fulfill an obligation under the Sale Agreement, much less that the failure caused the Closing not to occur.

## V.    THE CONSEQUENCES OF TERMINATION

The last category of issues involves the consequences of termination. Each side wants to keep the deposit. Each side claims that it is entitled to its attorneys' fees and expenses. Buyer seeks its transaction-related expenses, which are effectively a form of

228

reliance damages. Seller seeks damages so that it receives "complete and full relief." Dkt. 367 at 96 n.69.

## A. The Deposit

Sections 8.2(a) and (b) govern the fate of the deposit once the Sale Agreement is terminated. Section 8.2(a) identifies four scenarios in which Seller receives the deposit, but none of those scenarios came to pass. Under Section 8.2(b) of the Sale Agreement, if closing does not occur "for reasons other than as set forth in Section 8.2(a)," then Buyer receives the deposit, "together with all interest accrued thereon." In mandatory language, the provision states that "Buyer and Seller shall instruct the Escrow Agent to transfer to Buyer the full amount of the [d]eposit, together with all interest accrued thereon, by wire transfer of immediately available funds to an account designated by Buyer in writing."

Accordingly, under the plain language of Section 8.2(b), Buyer is entitled to the deposit and all accrued interest. Seller is not entitled to the deposit or any interest.

## B. Attorneys' Fees And Expenses

The Sale Agreement contains a standard fee-shifting provision that entitles the prevailing party to recover its attorneys' fees and expenses from the non-prevailing party. It states,

> If there shall occur any dispute or proceeding among the parties relating to this Agreement or the transactions contemplated hereby, the non-prevailing party shall pay all reasonable costs and expenses (including reasonable attorneys' fees and expenses) of the prevailing party.

SA § 9.22 (the "Prevailing Party Provision").

Under Delaware law, "[a]bsent any qualifying language [indicating] that fees are to

be awarded . . . [on a] partial basis," a fee-shifting provision like the Prevailing Party Provision "will usually be applied in an all-or-nothing manner." *W. Willow-Bay Ct., LLC v. Robino-Bay Ct. Plaza, LLC*, 2009 WL 458779, at *8 (Del. Ch. Feb. 23, 2009). For purposes of such a provision, the "prevailing party" is the party that prevails on "the main issue in the case." *World-Win Mktg., Inc. v. Ganley Mgmt. Co.*, 2009 WL 2534874, at *3 (Del. Ch. Aug. 18, 2009). The Prevailing Party Provision does not contain any language indicating that fees are to be awarded on a partial basis.

Buyer prevailed on the main issues in the case—whether Buyer was obligated to close and later validly terminated the Sale Agreement. Buyer is therefore entitled to its reasonable attorneys' fees and expenses. As the non-prevailing party, Seller is not entitled to recover any of its fees or expenses.

## C.    Transaction-Related Expenses

Both sides seek their transaction-related expenses, which are a form of reliance damages. Unlike many transaction agreements, the Sale Agreement preserves a non-breaching party's right to recover transaction-related expenses from a breaching party. It also preserves a non-breaching party's ability to recover damages, including expectation damages, in the event of a willful breach.

### 1.      Common Law Principles Governing Contract Damages

The common law has established a series of default rules governing the ability of a party to recover damages for a breach of contract. They form a backdrop to negotiated provisions.[309]

As a matter of common law, a party to a contract "has a right to damages for any breach by a party against whom the contract is enforceable unless the claim for damages has been suspended or discharged." *Restatement*, *supra*, § 346(1). "Contract damages are ordinarily based on the injured party's expectation interest and are intended to give him the benefit of his bargain by awarding him a sum of money that will . . . put him in as good a position as he would have been in had the contract been performed." *Id.* § 347 cmt. a. Delaware follows the *Restatement* and recognizes that "the standard remedy for breach of contract is based upon the reasonable expectations of the parties ex ante. This principle of expectation damages is measured by the amount of money that would put the promisee in the same position as if the promisor had performed the contract." *Duncan v. Theratx, Inc.*, 775 A.2d 1019, 1022 (Del. 2001) (citing *Restatement* § 347 cmt. a).

---

[309] *See Restatement*, *supra*, § 204 ("When the parties to a bargain sufficiently defined to be a contract have not agreed with respect to a term which is essential to a determination of their rights and duties, a term which is reasonable in the circumstances is supplied by the court."); *see also* Alan Schwartz & Robert E. Scott, *The Common Law of Contract and the Default Rule Project*, 102 Va. L. Rev. 1523, 1533 (2016); Robert E. Scott & George G. Triantis, *Anticipating Litigation in Contract Design*, 115 Yale L.J. 814, 817–18 (2006); Ian Ayres & Robert Gertner, *Filling Gaps in Incomplete Contracts: An Economic Theory of Default Rules*, 99 Yale L.J. 87, 87–88 (1989).

"As an alternative to [expectation damages], the injured party has a right to damages based on his reliance interest, including expenditures made in preparation for performance or in performance . . . ." *Restatement*, *supra*, § 349. Reliance damages recognize that

> [t]he promisee may have changed his position in reliance on the contract by, for example, incurring expenses in preparing to perform, in performing, or in foregoing opportunities to make other contracts. In that case, the court may recognize a claim based on his reliance rather than on his expectation. It does this by attempting to put him back in the position in which he would have been had the contract not been made . . . . Although it may be equal to the expectation interest, it is ordinarily smaller because it does not include the injured party's lost profit.

*Id.* § 344 cmt. a. Delaware follows the *Restatement* in this respect as well. *See, e.g.*, *NAACO Indus., Inc. v. Applica Inc.*, 997 A.2d 1, 19 (Del. Ch. 2009).

At common law, "every breach gives rise to a claim for damages," but "not every claim for damages is one for damages based on all of the injured party's remaining rights to performance under the contract." *Restatement*, *supra*, § 236 cmt. b. An injured party's claim for damages depends on whether the breaching party committed a partial breach or a total breach.

A partial breach is one that is "relatively minor and not of the essence." 23 *Williston on Contracts* § 63:3. When a partial breach has occurred, "the [injured party] is still bound by the contract and may not abandon performance . . . ." *Id.* Despite performing, the injured party "is entitled to damages caused even by the immaterial breach, albeit that these may be nominal in amount." *Id.*

A total breach is one that "touches the fundamental purpose of the contract and defeats the object of the parties in entering into the contract, or affect[s] the purpose of the

232

contract in an important or vital way." *Id.* (footnotes omitted). In the case of a total breach, "the [injured] party is discharged from further performance, and is entitled to substantial damages." *Id.*; *see* 3 *Farnsworth on Contracts* § 12.09, at 12-79 (4th ed. Supp. 2019) ("[I]f the breach is material, the owner can choose . . . to terminate, refuse to render any further performance, and claim damages for total breach."). Alternatively, an injured party may choose "to hold itself ready to perform the remainder of the contract and demand performance from the other party . . . ." 23 *Williston on Contracts* § 63:13. If the injured party chooses this path, then the injured party re-establishes its obligation to perform.[310] Nevertheless, this election by the injured party "does not waive the right to obtain damages for the breach." *Id.* This court summarized the rule as follows: "Continuing performance waives the argument that the waiving party's performance obligation was discharged, but it does not waive recovery for the material breach." *Williams Cos., Inc. v. Energy Transfer Equity, L.P.*, 2020 WL 3581095, at \*14 & n.141 (Del. Ch. July 2, 2020) (citing 23 *Williston on Contracts* § 43:15)).

---

[310] *See* 14 *Williston on Contracts* § 43:15 (4th ed. 2003) (explaining that if a party chooses to perform, "the general rule that one party's uncured, material failure of performance will suspend or discharge the other party's duty to perform does not apply" (footnote omitted)); 2 *Farnsworth on Contracts* § 8.20, at 8-166 to -67 ("Under this reasoning, the injured party cannot later reconsider, terminate, and recover damages for total breach unless the party in breach should commit a further breach, subsequent to the election, that would give the injured party a second chance to terminate.").

## 2. Standard Provisions In Transaction Agreements Governing Contract Damages

Parties to transaction agreements frequently agree to provisions that alter the default common law rules governing remedies. *See* Tina L. Stark et al., *Negotiating and Drafting Contract Boilerplate* 207, 373 (2003) [hereinafter *Boilerplate*]. Absent a provision limiting remedies, "all remedies, whether at common law, under statute, or under equitable principles, are cumulative." *Id.* at 211.

Parties can alter the common law rules by limiting the remedies available for breach (a "limited-remedies provision"). *See id.* at 219–20. A straightforward limited-remedies provision might identify a breakup fee as the exclusive remedy for breach. *See id.* at 230-31. A simple version of such a provision might state:

> **Breakup Fee.** If Seller breaches Section __, Seller shall pay to Buyer the sum of $_____. This fee is the exclusive remedy to Buyer under this letter of intent in the event of a breach by Seller of Section __.

*Id.* at 231. The author notes that if the provision did not refer to the fee as "the exclusive remedy," then the seller would remain exposed to a claim for "all of the buyer's actual out-of-pocket costs and any other claims for damages that the buyer may be able to prove." *Id.*

Parties may draft provisions that address the effect of terminating an agreement (an "effect-of-termination provision"). The following provisions give the buyer (i) a right to terminate in the event of a material breach or failure of performance by the seller and (ii) confirm that termination is not the buyer's only remedy for breach:

> **Termination by Buyer.** Buyer is entitled to terminate this Agreement upon written notice to Seller, with the effect set forth in Section __ of this Agreement, *if*

(a)     Seller has materially violated or breached any of the agreements, representations or warranties contained in this Agreement, and Buyer has not waived the violation or breach in writing at or before Closing; or

(b)     Seller has failed to satisfy a condition to the obligations of Buyer, and Buyer has not waived the condition in writing at or before closing.

**Effect of Termination.** Termination of this Agreement pursuant to Section __ does not terminate, limit or restrict the rights and remedies of Buyer. In addition to Buyer's right under common law to redress for any breach or violation, Seller shall indemnify and defend Buyer against all losses, damages (including, without limitation, consequential damages), cost and expenses (including, without limitation, interest (including prejudgment interest in any litigated matter), penalties, court costs, and attorney's fees and expenses) asserted against, imposed upon, or incurred by Buyer, directly or indirectly, arising out of or resulting from the breach or violation and the enforcement of this Section.

*Id.* at 220. The second clause "presents Buyer with the possibility of a common law claim for remedies from the breach of contract, as well as a contractual 'right' to indemnification for a broad spectrum of incidental and consequential damages." *Id.* at 221. Notably, this effect-of-termination provision confirms the common law rule under which termination is not an injured party's exclusive remedy. When a party has committed a breach that "touches the fundamental purpose of the contract and defeats the object of the parties in entering into the contract," the injured party may *both* terminate the contract *and* claim damages. 23 *Williston on Contracts* § 63:3; *see* 3 *Farnsworth on Contracts* § 12.09, at 12-79.

Another common provision requires each party to bear the fees and expenses it has incurred pursuing a transaction regardless of whether or not the transaction closes (a "pay-your-own-way provision"). Whether parties agree to such a provision or provide for

235

expense reimbursement is a transaction-specific issue: "There is certainly no general rule in the area of expense reimbursement. In each case the issue is negotiated and a resolution achieved depending upon the relative negotiating strength of the parties." Kling & Nugent, *supra*, § 13.05[2], at 13-42.

> The following provision is a simple example of a pay-your-own-way provision:

> Except as expressly provided in this Agreement, each party shall pay its own fees and expenses (including, without limitation, the fees and expenses of its agents, representatives, attorneys and accountants) incurred in connection with the negotiation, drafting, execution, delivery and performance of this Agreement and the transactions it contemplates.

Stark, *Boilerplate*, *supra*, at 379.

As suggested by the introductory language "[e]xcept as expressly provided in this Agreement," a transaction agreement may create exceptions to a pay-your-own-way provision. The *Boilerplate* treatise provides the following example of a provision that "might be used in tandem" with a pay-your-own-way provision to make clear "that, in the event of a breach, the breaching party will pay the other party's transaction costs." *Id.* at 381.

> (a) *Negligent or Unintentional Breaches.* If this Agreement terminates because of a breach based on a negligent or unintentional misrepresentation by one party (the "Breaching Party"), but not the other, then the Breaching Party shall pay to the other party an amount equal to the lesser of

> (i) all documented out-of-pocket expenses and fees incurred by the other party (including, without limitation, fees and expenses of all legal, accounting, financial, public relations and other professional advisors arising out of or relating to this Agreement and the transactions it contemplates); and

> (ii) $__ million.

236

(b)     *Breaches of Covenants and Intentional Breaches.* If this Agreement terminates because of a breach of a covenant or because of a breach based on an intentional misrepresentation or gross negligence by the Breaching Party, but not the other, then the Breaching Party shall pay to the other party an amount equal to

(i)     the amount payable pursuant to subsection (a), *plus*

(ii)     all other amounts that the other party is entitled to receive at law or in equity.

*Id.*

### 3.     The Provisions In The Sale Agreement

The Sale Agreement contains an effect-of-termination provision and a pay-your-own-way provision. Both provisions limit potential liability, but both contain exceptions that preserve specific types of liability.

The Sale Agreement contains the following effect-of-termination provision:

In the event of termination of this Agreement as provided in Section 8.1, this Agreement shall forthwith become void and there shall be no liability on the part of either party except (a) for the provisions of Sections 3.19 and 4.7 relating to broker's fees and finder's fees, Section 5.4 relating to confidentiality, Section 5.6 relating to public announcements, this Section 8.2 and Article IX and (b) that nothing herein shall relieve either party from liability for any willful breach of this agreement or any Agreement made as of the date hereof or subsequent thereto pursuant to this Agreement.

SA § 8.2(c) (the "Effect-Of-Termination Provision").

The Effect-Of-Termination Provision states that if terminated, the Sale Agreement "shall forthwith become void." Under the common law, termination results in an agreement becoming void, but that fact alone does not eliminate liability for a prior breach. *See 23 Williston on Contracts* § 63.3; 3 *Farnsworth on Contracts* § 12.09, at 12-79. The Effect-Of-Termination Provision alters the common law rule by stating that upon termination,

237

subject to two exceptions, "there shall be no liability on the part of either party." Setting aside the exceptions, the Effect-Of-Termination Provision broadly waives contractual liability and all contractual remedies.[311]

The two exceptions in the Effect-Of-Termination Provision modify its broad waiver of contractual liability. The first exception preserves liability under specified provisions in the Sale Agreement, which survive and can be enforced (the "Specified-Provision Exception"). The second exception preserves liability for bad conduct, here for a "willful breach" (the "Bad Conduct Exception"). Both exceptions are relatively standard.[312]

---

[311] *See* ABA Mergers & Acqs. Comm., *Model Tender Offer Agreement* 240 (2020) [hereinafter *Model Tender Offer Agreement*] (discussing exceptions to a provision contemplating no liability upon termination and stating that "[w]ithout this proviso, the language in Section 8.02 would provide that neither party would be liable for breach to the other after termination, regardless of pre-closing breaches"); Kling & Nugent, *supra*, § 15A.02 at 15A-4.3 (noting the effect of a broad elimination of liability upon termination and suggesting that "[it] is important . . . to continue and carve out a proviso to the effect that the foregoing will not relieve any party for liability for its breach of any provision prior to termination"). *Cf. Model Stock Purchase Agreement*, *supra*, at 275, 280–81 (discussing effect-of-termination provision that did not contain liability-extinguishing language but did contain an exception for specified provisions as well as confirmatory language stating that "termination of this Agreement will not relieve an party from any liability for any Breach of this Agreement occurring prior to termination"); ABA Mergers & Acqs. Comm., *Model Asset Purchase Agreement with Commentary* 199 (2001) [hereinafter *Model Asset Purchase Agreement*] (discussing effect-of-termination provision without liability-extinguishing language and with confirmatory language stating that "the terminating party's right to pursue all legal remedies will survive such termination unimpaired").

[312] *See, e.g.*, *Hexion*, 965 A.2d 715 (interpreting effect-of-termination provision in merger agreement that included both specified-provision exception and bad-conduct exception); *Frontier Oil*, 2005 WL 1039027, at *39 (same); *Model Tender Offer Agreement*, *supra*, at 240 (discussing effect-of-termination provision that broadly eliminated liability subject to specific-provision exception and bad-conduct exception); *see also Model Merger Agreement*, *supra*, at 273–74 (discussing effect-of-termination

By preserving liability under Article IX, the Specified-Provision Exception maintains the scheme for transaction-related expenses that appears in that article. The pertinent provision states,

> Except as otherwise provided herein, all fees and expenses incurred in connection with or related to this agreement and the transactions contemplated hereby shall be paid by the party incurring such fees or expenses, whether or not such transactions are consummated. In the event of termination of this Agreement, the obligation of each party to pay its own expenses will be subject to any rights of such party arising from a breach of this Agreement by the other.

SA § 9.1 (the "Pay-Your-Own-Way Provision").

The Pay-Your-Own-Way Provision begins by barring any recovery of fees or expenses "[e]xcept as otherwise provided herein." That introductory clause preserves the right to recover fees and expenses under the Prevailing Party Provision. It also ensures that the Pay-Your-Own-Way Provision does not limit any right of recovery under the Effect-Of-Termination Provision. But the Pay-Your-Own-Way Provision further states that the obligation of "each party to pay its own expenses will be subject to any rights of such party arising from a breach of this Agreement by the other" (the "Breach Exception"). This exception "avoid[s] a conflict between a judgment for damages due to a breach of the

---

provision without liability-extinguishing language but with specified-provision exception and bad-conduct exception).

239

acquisition agreement and any obligation to pay expenses by providing that a judgment for a breach will supersede [a provision like the Pay-Your-Own-Way Provision]."[313]

Notably, the reference to "breach" in the Breach Exception is not limited to a "willful breach." The Breach Exception contemplates the potential recovery of transaction expenses for any breach.

Reading these provisions together, the Effect-Of-Termination Provision broadly eliminates liability except as preserved through the Specified-Provision Exception or the Bad-Conduct Exception. The Specified-Provision Exception preserves the regime for expense allocation established in the Pay-Your-Own-Way Provision. Although that provision requires each party to pay its own expenses, the Breach Exception preserves the right of a non-breaching party to recover transaction expenses (effectively a form of reliance damages) regardless of the nature of the breach. The Bad-Conduct Exception preserves the full panoply of contract damages, including expectation damages, in the event of a willful breach.

This combination of provisions enables Buyer to recover its transaction expenses. Buyer proved that Seller breached the Ordinary Course Covenant. Buyer introduced

---

[313] *Model Asset Purchase Agreement*, *supra*, at 249 (discussing pay-your-own-way provision with breach exception, stating that the obligation of each party to pay its own way is "subject to any rights of such party arising from a Breach"); *see Model Stock Purchase Agreement*, *supra*, at 351 (discussing pay-your-own-way provision with breach exception, stating that "[t]he obligation of each party to bear its own fees and expenses will be subject to any rights of such party arising from a Breach of this Agreement by another party").

evidence that it incurred transaction expenses of $3.685 million, and Seller has not contested that amount. Buyer did not have to prove a willful breach to recover these transaction expenses, because that right was preserved under the Breach Exception. Buyer did not seek expectation damages, which would require a willful breach by Seller. Because the question of willful breach does not appear to be at issue, this decision does not reach it.

Buyer therefore is awarded transaction expenses in the amount of $3.685 million. Seller has not proven that Buyer breached the Sale Agreement. Seller is not entitled to recover any transaction expenses.

### 4. Additional Damages For Fraud

Buyer contends that it is entitled to additional amounts because it proved post-signing fraud. This decision has not reached Buyer's fraud claim, and Buyer did not articulate how its damages for post-signing fraud would differ from the amounts Buyer can recover under the Breach Exception. This decision therefore does not address the suggestion that Buyer might recover additional damages on a fraud theory.

## VI. CONCLUSION

The Covenant Compliance Condition and the Title Insurance Condition were not satisfied on the closing date, which relieved Buyer of its obligation to close. Seller failed to cure its breach of the Ordinary Course Covenant, and Buyer properly terminated the Sale Agreement. Buyer is entitled to the return of the deposit with all associated interest. Buyer is awarded transaction-related expenses of $3.685 million. Buyer also is entitled to its attorneys' fees and expenses under the Prevailing Party Provision. Separate and apart from

241

the Prevailing Party Provision, Buyer is entitled to court costs as the prevailing party. Seller is not entitled to any relief.

The court will enter judgment in the form of a final order. Within thirty days, the parties will submit a joint letter that either attaches an agreed-upon form of final order or identifies the issues that still need to be addressed at the trial level and proposes a schedule for resolving them.